Nos. 19-1582, 19-1583, 19-1625, 19-1626

## In the United States Court of Appeals for the First Circuit

Nos. 19-1582, 19-1625

United States of America,
Appellant

v.

Nia Moore-Bush, a/k/a Nia Dinzey,
Defendant-Appellee

Nos. 19-1583, 19-1626

United States of America,
Appellant

v.

Daphne Moore,
Defendant-Appellee

On Appeal from an Order,
Suppressing Evidence in a Criminal Case,
Entered in the United States District Court
For the District of Massachusetts

Opening Brief for the United States

Andrew E. Lelling
United States Attorney

Randall E. Kromm
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210
(617) 748-3381

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION......................................................1

STATEMENT OF THE ISSUE............................................................1

STATEMENT OF THE CASE..............................................................2

     A.     Statement of Facts ..................................................................2

           1.     The federal investigation...........................................2

           2.     Pole camera surveillance..........................................3

     B.     Procedural History..................................................................5

           1.     The motion to suppress and hearing ..........................6

           2.     The district court's ruling...........................................8

           3.     The district court's denial of reconsideration ...........13

SUMMARY OF ARGUMENT ...........................................................14

ARGUMENT ....................................................................................15

I.     THE DISTRICT COURT'S RULING THAT POLE CAMERA
     SURVEILLANCE OF THE FRONT OF THE DEFENDANTS'
     HOME CONSTITUTES A FOURTH AMENDMENT SEARCH IS
     CONTRARY TO BINDING PRECEDENT AND NO EXCEPTION
     TO THE LAW OF THE CIRCUIT DOCTRINE APPLIES........................15

     A.     This Court's decision in *Bucci* is dispositive as to whether
           a pole camera directed at the front of a house infringes a
           reasonable expectation of privacy .......................................15

B.    *Bucci* remains binding precedent under the law of the circuit doctrine and no exception to that doctrine applies .................19

      1.    *Bucci* has not been overruled by binding precedent .................20

      2.    The second exception to the law-of-the-circuit doctrine does not apply ............................................................21

II.    SHOULD THE COURT REACH THE MERITS OF THE DISTRICT COURT'S RULING, IT SHOULD BE REVERSED BECAUSE PRECEDENT DOES NOT SUPPORT THE CONCLUSION THAT USE OF A POLE CAMERA IS A FOURTH AMENDMENT SEARCH ....................................24

A.    Standard of Review ............................................................24

B.    Defendants did not demonstrate a subjective expectation of   privacy in the area surveilled .........................................25

C.    Any expectation of privacy was not objectively reasonable ...............26

D.    Suppression is not warranted because law enforcement relied in good faith on binding precedent .............................................33

CONCLUSION .......................................................................35

CERTIFICATE OF COMPLIANCE .....................................................36

CERTIFICATE OF SERVICE ..........................................................37

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Agostini v. Felton,*
    521 U.S. 203 (1997) ........................................................................29

*Boyd v. United States*,
    116 U.S. 616 (1886) ........................................................................29

*California v. Ciraolo*,
    476 U.S. 207 (1986) ................................................................. *passim*

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) ............................................................ *passim*

*Davis v. United States*,
    564 U.S. 229 (2011) ...................................................... 12, 13, 33-34

*Dow Chem. Co v. United States*,
    476 U.S. 227 (1986) ........................................................................27

*Florida v. Jardines*,
    569 U.S. 1 (2013) ........................................................................ 7, 20

*Katz v. United States*,
    389 U.S. 347 (1967) ................................................................. *passim*

*Kyllo v. United States*,
    533 U.S. 27 (2001) ........................................................................18

*Nevor v. Moneypenny Holdings, L.L.C.*,
    842 F.3d 113 (1st Cir. 2016) ..........................................................19

*San Juan Cable LLC v. P.R. Tel. Co.*,
    612 F.3d 25 (1st Cir. 2010) ............................................................19

*State v. Jones*,
    903 N.W.2d 101 (S.D. 2017) .................................................... 30-31

*United States v. Anderson-Bagshaw*,
    509 F. App'x 396 (6th Cir. 2012) (unpublished) .............................17

*United States v. Bain*,
　874 F.3d 1 (1st Cir. 2017) ..................................................................8

*United States v. Brooks*,
　911 F. Supp. 2d 836 (D. Ariz. 2012).................................................30

*United States v. Bucci*,
　582 F.3d 108 (1st Cir. 2009) .................................................. *passim*

*United States v. Cantu*,
　684 F. Appx. 703 (10th Cir. 2017) (unpublished) ...........................30

*United States v. Cuevas-Sanchez*,
　821 F.2d 248 (5th Cir. 1987).............................................................17

*United States v. Di Re*,
　332 U.S. 581 (1948) ..........................................................................29

*United States v. Fanning*,
　2019 LEXIS 137334 (N.D. Ga. May 28, 2019).................................31

*United States v. Flete-Garcia*,
　925 F.3d 17 (1st Cir. 2019) ...............................................................34

*United States v. Garcia-Gonzalez*,
　2015 WL 5145537 (D. Mass. 2015) ...................................................8

*United States v. Gbenedio*,
　2019 WL 2173994 (N.D. Ga. May, 17, 2019)...................................31

*United States v. Harris*,
　2019 WL 2996897 (E.D. Wis. Feb. 19, 2019)...................................32

*United States v. Houston*,
　813 F.3d 282 (6th Cir. 2016)..................................................... *passim*

*United States v. Jackson*,
　213 F.3d 12691 (10th Cir. 2000 ........................................ 17-18, 27, 30

*United States v. Jones*,
　565 U.S. 400 (2012) .................................................................. *passim*

iv

*United States v. Kay*,
 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018) ................................................32

*United States v. Kelly*,
 2019 WL 2137370 (E.D. Wis. May 16, 2019) ...............................................32

*United States v. Krawczyk*,
 2013 WL 2481275 (D. Ariz. June 10, 2013) .................................................30

*United States v. Kubasiak*,
 2018 WL 6164346 (E.D. Wis. Aug. 23, 2018) ...............................................32

*United States v. Mazzara*,
 2017 WL 4862793 (S.D.N.Y. Oct. 27, 2017) .................................................30

*United States v. Morel*,
 922 F.3d 1 (1st Cir. 2019) ...................................................... 24, 31

*United States v. Rheault*,
 561 F.3d 55 (1st Cir. 2009) ................................................................25

*United States v. Santiago-Colón*,
 917 F.3d 43 (1st Cir. 2019) .................................................... 19-20

*United States v. Tanco-Pizzaro*,
 892 F.3d 472 (1st Cir. 2018) ..............................................................34

*United States v. Tirado*,
 2018 WL 3995901 (E.D. Wis. Aug. 21, 2018) ...............................................32

*United States v. Tuggle*,
 2018 WL 3631881 (C.D. Ill. July 31, 2018) .................................................32

*United States v. Vankesteren*,
 553 F.3d 286 (4th Cir. 2009) .............................................................16

*Williams v. Ashland Eng'g Co.*,
 45 F.3d 588 (1st Cir. 1995) ..............................................................19

# STATUTES

18 U.S.C. §371 ...................................................................................................5

18 U.S.C. §922(a)(1)(A) ....................................................................................5

18 U.S.C. §922(g)(1)-(2) ...................................................................................5

18 U.S.C. §1001 .................................................................................................6

18 U.S.C. §1956(a)(1) .....................................................................................5-6

18 U.S.C. §1956(h) ..........................................................................................5-6

18 U.S.C. §3231 .................................................................................................1

18 U.S.C. §3731 .................................................................................................1

21 U.S.C. §841(a)(1) .......................................................................................5-6

21 U.S.C. §841(b)(1)(A)(iii) ..............................................................................5

21 U.S.C. §841(b)(1)(B)(iii) ..............................................................................5

21 U.S.C. §846 ................................................................................................5-6

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over the case because the indictment charged the defendants, Nia Moore-Bush and Daphne Moore, with an offense against the United States. 18 U.S.C. §3231.  The district court entered an order suppressing evidence on June 3, 2019, [D.416]; [1] amended the order on June 4, 2019 [Add.1-25]; and denied reconsideration on June 5, 2109.  [Add.26-27].  The filed timely notices of appeal from the amended order on June 6, 2019, and from the denial of reconsideration on June 19, 2019.   [G.App.233, 237]. This Court has jurisdiction over the government's appeal pursuant to 18 U.S.C. §3731.

## STATEMENT OF THE ISSUES

1.    The district court's ruling that pole camera surveillance of the front of the defendant's home constitutes a Fourth Amendment search is contrary to binding precedent and no exception to the law of the circuit doctrine applies.

2.    Should the Court reach the merits of the district court's ruling, it should be reversed because precedent does not support the conclusion that use of a pole camera is a Fourth Amendment search.

---

[1] Citations are as follows.  The citation "[D._]" refers to a docket entry.  The citations "[Add._]" and "[G.App._]" refer, respectively, to the government's addendum and appendix.

1

## STATEMENT OF THE CASE

### A.    Statement of Facts.

### 1.    The federal investigation.

In January 2017, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began investigating Nia Moore-Bush for the unlicensed sale of firearms in the Springfield, Massachusetts area. [D.369, p.2]. Consensually recorded calls, text messages, bank records, and car rental records revealed that Moore-Bush and her then-boyfriend (now husband) Dinelson Dinzey were trafficking narcotics from the Springfield area to Vermont, where they exchanged the narcotics for cash, firearms, and other valuables. [D.369, p.2; G.App.77]. The investigation ultimately revealed that Moore-Bush and Dinzey led a drug trafficking organization that, approximately every one or two weeks, transported approximately 50 grams of cocaine base and up to 36 grams of heroin from Springfield to the Barre, Vermont area. [G.App.38-44]. Moore-Bush, Dinzey, and their associates then distributed the narcotics in the Barre area and deposited the cash in Vermont into bank accounts held by Moore-Bush's mother, co-defendant Daphne Moore, in trust for Moore-Bush. [G.App.45-52; D.369, p.3]. Moore is a Hampden County (Mass.) Superior Court Assistant Clerk Magistrate. [G.App.68].

### 2.    Pole camera surveillance.

During the course of the investigation, a cooperating witness ("CW") purchased a total of six firearms from Moore-Bush and Dinzey. [D.369, p.2]. The second transaction occurred on May 5, 2017, when the CW arranged to purchase four firearms from Moore-Bush at 120 Hadley Street in Springfield, [G.App.55], where she was then living with Moore, Dinzey, and her two minor children, [G.App.109]. Moore owned the home, which was a single-family residence in a residential neighborhood. [Add.3].

On or about May 17, 2017, the ATF placed a pole camera on a public utility pole across the street from the 120 Hadley Street residence. [G.App.63, 77, 85]. The pole camera was directed at the driveway of the house, and primarily showed the right part of the front of the home, a side door, the attached garage, and the driveway. [G.App.154]. The pole camera's view of the front of the house and garage was partially obstructed by a tree during times of the year when the tree had leaves. [Add.3-4; G.App.168, 231]. The pole camera recorded video, without audio, and was live streamed to law enforcement via a password-protected website. [Add.3]. When agents were observing the live stream, they could pan, tilt, and zoom the pole camera in real time. [Add.3].[2]

---

[2] Because the suppression litigation in this case focused principally on legal issues and the district court did not hold an evidentiary hearing, the record contains limited factual information regarding the capabilities and use of the pole camera.

Using the pole camera, the government was able to obtain still images and video of cars and individuals arriving at and departing from 120 Hadley Street. [*See generally* G.App.149-231]. The zooming function allowed the government on some occasions to identify the license plates of the vehicles and the faces of the individuals. [*See* G.App.15-151, 153, 157-58, 161-62, 185, 187]. At other times, such as at night, the camera's images had a lower resolution and provided less detail. [*See, e.g.*, G.App.194-209].[3]

### B.    Procedural History.

On January 11, 2018, a grand jury issued an indictment charging Moore-Bush, Dinzey, and three Vermont residents with conspiracy to distribute and possess with intent to distribute heroin and 28 grams or more of cocaine base, in violation of 21 U.S.C. §§846 and 841(b)(1)(B)(iii). [D.3]. ATF removed the pole camera shortly

---

Review of the pictures the government submitted to the court with its motion for reconsideration, however, indicates that the camera generally was directed at the garage and driveway area and that the panning and zoom features were used to focus on the license plates of vehicles parked on the driveway or street and the faces of those driving or riding in them. [*See, e.g.*, G.App.150-57]. The photographs and video submitted by the government with the motion for reconsideration had previously been identified by the government as trial exhibits and represented the key evidence obtained from the pole camera.

[3] In November and December 2017, the government used pole camera data in its applications for Title III authority to intercept phones used by Moore-Bush and Dinzey to conduct their drug and firearms trafficking activity. The Title III applications cited the obstructed view (by the tree) and the picture quality as exhaustion factors necessitating Title III authority. [G.App.86].

4

thereafter; the pole camera thus was operable for approximately eight months. [Add.3].  Later, on December 20, 2018, a grand jury issued a superseding indictment [G.App.37] adding four defendants, including Moore, and twenty-three counts.  The indictment charged Moore-Bush with one count of conspiracy to distribute and possess with intent to distribute heroin, cocaine, and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§846 and 841(b)(1)(A)(iii) (Count One); five counts of distribution and/or possession with intent to distribute narcotics, in violation of 21 U.S.C. §841(a)(1) (Counts Two through Six); two counts of money laundering conspiracy, in violation of 18 U.S.C. §1956(h) (Counts Seven and Eight); seven counts of money laundering, in violation of 18 U.S.C. §1956(a)(1) (Counts Eleven and Fourteen through Nineteen); one count of conspiracy to deal firearms without a license, in violation of 18 U.S.C. §371 (Count Twenty); two counts of dealing firearms without a license, in violation of 18 U.S.C. §922(a)(1)(A) (Counts Twenty-One and Twenty-Two); and one count of aiding and abetting the possession of a firearm by a felon, in violation of 18 U.S.C. §§922(g)(1) and 2 (Count Twenty-Three).  The indictment charged Moore with one count of conspiracy to distribute and possess with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. §846 (Count One); one count of distribution and/or possession with intent to distribute narcotics, in violation of 21 U.S.C. §841(a)(1) (Count Three); one count of money laundering conspiracy, in violation of 18 U.S.C. §1956(h) (Count

5

Eight); multiple counts of money laundering, in violation of 18 U.S.C. §1956(a)(1) (Counts Fourteen through Nineteen); and one count of making false statements, in violation of 18 U.S.C. §1001 (Count Twenty-Four).[4]

### 1.    The motion to suppress and hearing.

On April 22 (Moore) and May 2, 2019 (Moore-Bush), the defendants moved to suppress the pole camera evidence, arguing that warrantless use of a pole camera violated their Fourth Amendment rights.  [G.App.63, 77].[5]  Moore and Moore-Bush argued, first, that their case was factually distinguishable from *United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009), in which the First Circuit held that the warrantless use of a pole camera for eight months did not infringe any reasonable expectation of privacy.  [G.App.69-70, 78-79].  The defendants argued the camera in their case had greater capabilities than the one in *Bucci*, including the ability to be operated remotely to change the view and magnification.  [G.App.69, 78].  The defendants also argued that the area surrounding the residence, including its location "on a quiet residential street where physical surveillance would be difficult to conduct without detection" and where a tree obstructed the view, provided greater

---

[4] One defendant charged in the original indictment pleaded guilty prior to the superseding indictment [D.168], and Dinzey and four others have since pleaded guilty to narcotics, firearms, and/or money laundering counts charged in the superseding indictment  [D.302, 303, 365, 374, 394].  One co-defendant remains a fugitive.

[5] Neither defendant objected to any specific image.  [G.App.142].

support for a subjective expectation of privacy than was the case in *Bucci*. [G.App.69-70, 78-79].

In addition, Moore and Moore-Bush claimed that recent Supreme Court cases had undermined and perhaps even overruled the rationale of *Bucci*. [G.App.70-71, 79]. Relying primarily on *Carpenter v. United States*, 138 S. Ct. 2206 (2018), and also citing *United States v. Jones*, 565 U.S. 400 (2012), and *Florida v. Jardines*, 569 U.S. 1 (2013), the defendants argued that they retained a reasonable expectation of privacy in the totality of their physical movements, even those exposed to the public. [G.App.72-73, 79-81].[6]

The government filed an opposition on May 6, 2019, arguing that *Bucci* controlled and prevented the defendants from establishing that the pole camera violated any reasonable expectation of privacy. [G.App.86-88]. The government also noted that the defendants offered no evidence supporting a subjective expectation of privacy: they had not filed any affidavits or argued that they had taken any steps to prevent observation of what the pole camera captured. [G.App.88-89].

On May 13, 2019, the district court held a motion hearing. The defendants argued that the duration and comprehensive nature of the pole camera recording

---

[6] In *Carpenter*, the Supreme Court ruled that cell site location information ("CSLI") implicated a reasonable expectation of privacy and, thus, obtaining it was a Fourth Amendment search. 138 S. C.t at 2219 The defendants argued that pole camera surveillance, like CSLI, was a search because it allowed the tracking of their movements and associations. [G.App.72-75, 80-83].

distinguished it from similar surveillance that might be conducted manually and that *Carpenter* required surveillance of this intensity to be considered a Fourth Amendment search. [G.App.107-22]. The government responded that *Carpenter* was a narrow decision addressing a very different technology and that nothing in it undermined the binding force of *Bucci* on the question of whether the defendants possessed a reasonable expectation of privacy. [G.App.122-26]. The government also noted that another district court judge in Massachusetts had rejected similar arguments for suppressing pole camera evidence on the ground that *Bucci* remained controlling. *See United States v. Garcia-Gonzalez*, 2015 WL 5145537 (D. Mass. 2015).

### 2.    The district court's ruling.

In an amended memorandum and order issued on June 4, 2019,[7] the district court granted the defendants' motion to suppress. [Add.25]. In doing so, the court applied the reasonable expectation of privacy test derived from *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), pursuant to which a government action constitutes a Fourth Amendment search if a defendant can show that she possessed a subjective expectation of privacy and that this expectation was objectively reasonable. [Add.5–6 (citing *United States v. Bain*, 874 F.3d 1, 11–12

---

[7] This order made minor, non-substantive changes to an earlier memorandum and order reaching the same result issued on June 3, 2019. [D.416].

(1st Cir. 2017) (quoting *Katz*, 389 U.S. at 360))].  The court found that the defendants satisfied both prongs of the test.  [Add.7].

In addressing the defendants' subjective expectation of privacy, the district court rejected the government's argument that the defendants had to provide affidavits or other affirmative evidence.  [Add.7].  The court also rejected the government's characterization of the relevant privacy interest as whether the defendants had an expectation of privacy in the front of their house.  [Add.7].  The court instead characterized the privacy interest as being free from "eight months [of] continuous video recording with magnification and logging features in the front of their house."  [Add.9].  Having framed the privacy interest this way, the court inferred that the defendants' "choice of neighborhood and home within it" ("a quiet, residential neighborhood obstructed by a large tree") provided sufficient basis to conclude that they had a subjective expectation that surveillance of this kind would not occur.  [Add.8-9].

Turning to whether the expectation was objectively reasonable, the district court rejected the defendants' argument that the case could be distinguished from *Bucci* on factual grounds, acknowledging that any difference in the capabilities of the camera used at the Moore residence was "too thin to distinguish *Bucci* from this case."  [Add.10-11].  The court held, however, that *Bucci* was no longer binding because it relied on the principle that an "individual does not have an expectation of

9

privacy in items or places he exposes to the public," [Add.11 (quoting *Bucci*, 582 F.3d at 116-17)], and that principle had been "cabin[ed] – if not repudiate[d]" by *Carpenter*. [Add.11]. The court noted that *Carpenter* cited *Katz* for the proposition that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere" and relied on the concurring opinions in *Jones*, which stated that long-term tracking of a defendant's activities could constitute a "search" because of its ability to reveal information about a person's "familial, political, professional, religious, and sexual associations." [Add.1 (quoting *Carpenter*, 138 S. Ct. at 2217)]. The court rejected the government's argument that *Carpenter* was limited to the particular technology at issue (CSLI), concluding that *Carpenter*'s "necessary reasoning" that "a person does have some objectively reasonable expectations of privacy when in spaces visible to the public" could not be reconciled "with *Bucci*'s blanket statement that no such expectations exist." [Add.12-13]. The court also declined to find that *Carpenter* itself provided a basis for not applying its reasoning, noting that, although *Carpenter* stated that it did not "call into question conventional surveillance techniques and tools, such as security cameras," the pole camera was not a "security camera." [Add.13-15].

On the merits, the court found that the defendants had a reasonable expectation of privacy "in their and their guests' activities around the front of the house for a continuous eight-month period" that the pole camera infringed.

10

[Add.15].  The court relied on three principles it derived from *Carpenter* and the concurring opinions in *Jones*: (1) "[a]wareness that the Government may be watching chills associational and expressive freedoms" and "unrestrained power to assemble data that reveal private aspects of identity is subject to abuse," [Add., pp.17-18 (quoting *Jones*, 565 U.S. at 416 (concurring opinion of Sotomayor, J.))]; (2) technologies that permit law enforcement to access and search vast amounts of passively collected data "gives police access to a category of information otherwise unknowable," [Add.18-19 (quoting *Carpenter*, 138 S. Ct. at 2218)]; and (3) while short-term monitoring of public movements "accords with expectation of privacy," "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy," [Add.19 (quoting *Jones*, 565 U.S. at 430 (concurring opinion of Alito, J.))].  The court found that each principle was implicated here.  The court reasoned that long-term monitoring of a home would chill associational freedoms by creating a detailed log of visitors, noting the historical use of homes as places where religious dissenters could meet.  [Add.19-20].  The court also asserted that collection of continuous, recorded information over a period of time exceeded what could be accomplished by human note-takers and enabled law enforcement to review events that might have passed without notice at the time.  [Add.21-22].[8]

---

[8] The court also found significant that the surveillance was trained at the front of the defendants' residence, noting "the different expectations people may

Finally, the court found unpersuasive the government's argument that pole cameras had long been used without objection, concluding that this camera had capabilities—including a "digitally searchable log" and the ability to be remotely panned and focused—that distinguished it from earlier pole cameras. [Add.23-24]. The court thus held that use of the pole camera constituted a search requiring a warrant, although the court noted that its ruling was narrow and rested on the facts of this case, namely the "(1) continuous video recording for approximately eight months; (2) focus on the driveway and front of house; (3) ability to zoom in so close that [the pole camera] can read license plate numbers; and (4) creation of a digitally searchable log." [Add.24–25]. In a footnote, the court stated that the government had not argued that the good faith exception of *Davis v. United States*, 564 U.S. 229 (2011), applied to this search and thus had waived that argument. [Add.4 n.2].

### 3.    The district court's denial of reconsideration.

The government filed a motion to reconsider on June 4, 2019. [G.App.139]. The government first argued that there was no novel or unique use of technology in the case that implicated *Carpenter*'s concern that new technologies could present unprecedented levels of invasiveness. [G.App.140]. The government noted that the "digitally searchable log" referred to by the court was simply a recording that could

reasonably have about activities on their driveway and near their front door." [Add.22-23].

go forward or backward, and challenged the court's conclusion that the pole camera had advanced capabilities, noting that the ability to pan, tilt, and zoom was present in many, if not all, of the pole cameras addressed in prior cases.  [G.App.140-42].  Second, the government argued that the record contained no information about how the defendants came to live at the house that could support the court's inference of a subjective expectation of privacy.  [G.App.144].  The government attached still images from videos intended for trial and noted that the images were similar to those captured from any traditional law enforcement pole camera.  [G.App.144; *see also* G.App.149-231].  Finally, the government argued, in the alternative, that the good faith exception to the exclusionary rule should apply because the government relied in good faith on *Bucci* as controlling First Circuit precedent.  [G.App.145-46 (citing *Davis v. United States*, 564 U.S. 229, 241 (2011))].

The district court denied the motion to reconsider in a brief order issued on June 5, 2019.  [Add.26-27].  The court did not address the merits of the government's first two arguments other than to say that, to the extent that the government sought to draw attention to the fact that the obstructing tree lacked leaves during parts of the year, this was inconsistent with its representations earlier that the tree's presence minimized the intrusion.  [Add.26].  As to good faith, the court held that the government had waived its argument by not raising it initially and had failed to offer on reconsideration a valid reason for the court to excuse that waiver.  [Add.27].

13

## <u>SUMMARY OF ARGUMENT</u>

The district court's decision to suppress pole camera evidence on the ground that it was a search under the Fourth Amendment is directly contrary to *Bucci*, and the court's reasons for declining to apply that precedent do not satisfy the limited exceptions to the law of the circuit doctrine. As a result, this Court should reverse the district court's ruling as contrary to circuit precedent without reaching its merits.

To the extent the Court finds that Supreme Court decisions post-dating *Bucci* permit it to revisit *Bucci*, the Court should reaffirm *Bucci*'s conclusion that pole camera surveillance of the front of a house and its driveway is not a Fourth Amendment search. The Supreme Court's holding in *Carpenter* that the continuous monitoring of a person's every movement is a search was narrowly focused on that particular form of comprehensive monitoring of a person's location and did not purport to more broadly undermine the principle that the observation or monitoring of activities exposed to the public is not a search. Applied here, that principle warrants reaffirmance that use of a pole camera is not a search, as every federal court to consider the issue post-*Carpenter* has held.

Alternatively, this Court may hold that suppression in this case is not warranted because the officers who installed the pole camera could have relied in good faith on *Bucci*'s holding that the Fourth Amendment was not infringed by its installation and use.

14

# ARGUMENT

## I.  THE DISTRICT COURT'S RULING THAT POLE CAMERA SURVEILLANCE OF THE FRONT OF THE DEFENDANTS' HOME CONSTITUTES A FOURTH AMENDMENT SEARCH IS CONTRARY TO BINDING PRECEDENT AND NO EXCEPTION TO THE LAW OF THE CIRCUIT DOCTRINE APPLIES.

This Court should reverse the district court's grant of the defendants' motion to suppress, because the court's holding that pole camera surveillance of the front of their house and driveway constituted a Fourth Amendment search contravenes binding precedent and no exception to the law of the circuit doctrine applies.

### A.   This Court's decision in *Bucci* is dispositive as to whether a pole camera directed at the front of a house infringes a reasonable expectation of privacy.

In *Bucci*, the First Circuit squarely rejected a Fourth Amendment challenge to use of a pole camera to surveil the front of a defendant's house, holding that there is no objectively reasonable expectation of privacy in the area, because it was exposed to public view.  582 F.3d at 116 (citing *Katz*, 389 U.S. at 351).  While investigating the defendant, Sean Bucci, law enforcement had installed a camera on a utility pole across from his home.  *Id.* at 116.  The pole camera captured the area at the front of the house, primarily the driveway, garage, and interior of the garage when open.  *Id.* at 116–17.  Although the operation of the camera was not discussed in detail, this Court's opinion noted that and it "had no remote capabilities," so "agents [could not]

. . . change the view or magnification of the camera without being physically at the scene." *Id.* at 116.  The pole camera operated for approximately eight months. *Id.*

Bucci sought to suppress evidence obtained from the pole camera on Fourth Amendment grounds, but the First Circuit easily dispensed with his challenge, "focus[ing] . . . only on the lack of a reasonable expectation of privacy because this failure is so clear." *Id.*  The Court noted that there were no "fences, gates, or shrubbery" obstructing the view of the driveway or garage from the street, rather "[b]oth [were] plainly visible." *Id.* at 116-17 (internal quotation marks omitted). The Court then held, citing the Supreme Court's decision in *Katz*, that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public," including the front of his home, and "[t]hat legal principle [was] dispositive." *Id.* at 117.  Although the Court had noted the limitations on the camera's capabilities, the Court did not address those capabilities because it found that the camera did not infringe a reasonable expectation of privacy. *See id.* at 116–17.

The First Circuit's holding in *Bucci* accords with decisions of other federal appellate courts rejecting Fourth Amendment challenges to pole cameras directed to areas exposed to public view[9] and is controlling here.  The pole camera in this case

---

[9] *See, e.g.*, *United States v. Houston*, 813 F.3d 282, 287-90 (6th Cir. 2016) (rejecting a motion to suppress pole camera video from ten weeks of surveillance on ground that the area was in public view); *United States v. Vankesteren*, 553 F.3d

was directed to precisely the same area considered in *Bucci*—the front of the garage and driveway area—and, as was true in *Bucci*, there were no fences, gates, or other areas blocking the view of that area from the street. [G.App.154]. Thus, on the key question of whether the defendant had a reasonable expectation of privacy in the area surveilled, this case is indistinguishable from *Bucci*. Although the First Circuit's reasoning did not suggest that the duration of the surveillance was a relevant consideration, the camera in this case also operated for the same amount of time—approximately eight months—as the camera in *Bucci*. And, while this Court's opinion in *Bucci* did not address the issue, district court documents in *Bucci* make clear that there, as here, the camera captured video that could be monitored live by law enforcement and was also recorded. *United States v. Bucci*, Crim. No. 3-10220, Docket No. 114, p.2.

---

286, 290-91 (4th Cir. 2009) (finding that a pole camera installed on a public road, directed at an adjacent, privately-owned open field, did not violate the Fourth Amendment because the defendant could not have had a reasonable expectation of privacy in that field); *United States v. Jackson*, 213 F.3d 1269, 1280-81 (10th Cir. 2000), *judgment vacated on different grounds* (holding that pole cameras that filmed only what was in the public view did not implicate Fourth Amendment concerns because there was no reasonable expectation of privacy). *Compare United States v. Cuevas-Sanchez*, 821 F.2d 248, 250-51 (5th Cir. 1987) (holding that Fourth Amendment was violated where a pole camera observed activities in defendant's back yard, which was surrounded by a 10-foot tall fence); *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 405 (6th Cir. 2012) (unpublished) (expressing "some misgivings" about use of pole camera to observe activities in a backyard that was largely enclosed—although it could be seen from a vacant lot next door—but not deciding the issue).

The sole factor differentiating the two cases—the ability of the camera in this case to be remotely panned and zoomed in—does not provide a basis for declining to apply *Bucci*, as the district court correctly recognized.  [Add.10-11].  *Bucci*'s reasoning focused solely on whether an expectation of privacy existed in the area to be searched; it did not suggest that anything turned on the details of how the surveillance was performed.  *See* 582 F.3d at 116.  Moreover, to the extent the nature of the surveillance is relevant at all, the modest technological improvement of allowing officers to remotely focus the camera on particular people or items within its field of view hardly represents a fundamental change in the nature or intensity of that surveillance, any more than would a surveilling officer's use of binoculars to get a better view.  Nor did it allow them to see anything that would not have been visible to anyone passing by on the street. *Compare Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding that government's use of thermal imaging device on a residence was a "search" because it was "a device that is not in general public use" and was employed "to explore details of the home that would previously have been unknowable without physical intrusion").  Thus, this difference does not undermine *Bucci*'s rationale.  *See Jackson*, 213 F.3d at 1276, 1281 (upholding use of pole camera that, like this one, "could be adjusted by officers at the police station, and could zoom in close enough to read a license plate," on the ground that the camera

18

was "capable of observing only what any passerby would easily have been able to observe"); *Houston*, 813 F.3d at 286, 288 (similar).   Thus, *Bucci* controls this case.

**B.   *Bucci* remains binding precedent under the law of the circuit doctrine and no exception to that doctrine applies.**

Under the law of the circuit doctrine, *Bucci* is binding on subsequent panels of the First Circuit.  *Nevor v. Moneypenny Holdings, L.L.C.*, 842 F.3d 113, 125 (1st Cir. 2016) ("The law of the circuit doctrine requires this [C]ourt (and, by extension, all lower courts within this circuit) to respect, in the absence of supervening authority, the decisions of prior panels on the same issue.").  Although this rule is "not 'immutable,'" the exceptions are "extremely narrow and their incidence is hen's-teeth-rare."  *San Juan Cable LLC v. P.R. Tel. Co.*, 612 F.3d 25, 33 (1st Cir. 2010) (internal citation omitted).  The first exception applies when "[a]n existing panel decision [is] undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court, an en banc opinion of the circuit court, or a statutory overruling."  *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 592 (1st Cir. 1995).  A second and "even less common exception has been recognized in those rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind."  *United States v. Santiago-Colón*, 917 F.3d 43, 57-58 (1st Cir. 2019) (internal quotation

19

omitted).  Neither exception applies here and, thus, contrary to the district court's belief, [Add.11], *Bucci* remains binding authority.

### 1. *Bucci* has not been overruled by binding precedent.

The inapplicability of the first exception requires little discussion.  The First Circuit has not overruled *Bucci*, nor has the Supreme Court.  *Jones*, *Jardines*, and *Carpenter* did not address the expectations of privacy associated with pole cameras and thus cannot plausibly be read as having directly overruled *Bucci*.[10]  And, contrary to the district court's view, these cases also did not repudiate any precedent essential to *Bucci*'s analysis.

As the district court's opinion reflects, the general principle that a person may have a constitutionally-protected privacy interest "even in an area accessible to the public" was not recognized by the Supreme Court for the first time in *Carpenter*, but was set forth in *Katz*.  [Add.11 (quoting *Carpenter* for this proposition and noting that *Carpenter* was quoting *Katz*)].  Thus, *Carpenter*'s embrace of this principle does not represent a departure from prior precedent.  Moreover, nothing in *Jones*, *Jardines*, or *Carpenter* purports to overrule as a general matter the principle set forth in *Katz* and repeated in *California v. Ciraolo*, 476 U.S. 207 (1986), that a person does *not* have a reasonable expectation of privacy in the activities he or she exposes

---

[10] Indeed, the majority opinions of *Jones* and *Jardines* did not address expectations of privacy at all, since they relied on a trespass theory in finding that a search occurred.

20

to public view.  *See Katz*, 389 U.S. at 351; *Ciraolo*, 476 U.S. at 213.  Rather, *Carpenter* recognized a limited exception to that principle where surveillance allows for the comprehensive monitoring of a person's movements over time.  *See* 138 S. Ct. at 2219 (holding that the use of CSLI "invaded Carpenter's reasonable expectation of privacy in *the whole of his physical movements*") (emphasis added).  Because *Carpenter* does not overrule *Bucci*'s holding or the holdings of cases on which *Bucci* necessarily depends, this is not an instance where controlling intervening authority has shown a prior panel opinion to be invalid.

>    **2.    The second exception to the law of the circuit doctrine does not apply.**

This case also does not fall within the scope of the rarely-applied second exception to the law of the circuit doctrine.  *Carpenter* and the *Jones* concurring opinions can be read as seen as suggesting an outer limit on the principle that a person does not have a reasonable expectation of privacy in activities exposed to the public, but that limit is narrowly defined—*Carpenter* holds only that a person has an expectation of privacy "in the whole of his physical movements" that is offended by an investigative technique that creates "an all-encompassing record of the holder's whereabouts" over a substantial period of time.  *See Carpenter*, 138 S. Ct. at 2217; *see also id.* (quoting *Jones*, 565 U.S. at 430 (concurring opinion of Alito, J.) for proposition that "society's expectation has been that law enforcement agents and others would not . . . secretly monitor and catalogue every single movement of

21

an individual's car for a very long period").  That *Carpenter*'s expectation of privacy holding was addressed only to this type of comprehensive surveillance is repeatedly emphasized in the opinion, *see, e.g.*, *id.* at 2218 (noting that tracking of a cell phone "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user"), and militates against any suggestion that *Carpenter* undermined the principles of *Katz* and *Ciraolo* more broadly.  Pole cameras, which capture only a small portion of a person's movements, do not create the same "all-encompassing record of the holder's whereabouts" and thus do not offend the expectation of privacy *Carpenter* establishes.  *See Houston*, 813 F.3d at 290 (rejecting a motion to suppress pole camera evidence post-*Jones* and finding that "unlike Justice Alito's concern in *Jones* [about] long-term GPS monitoring . . . the surveillance here was not so comprehensive as to monitor Houston's every move; instead the camera was stationary and only recorded his activities outdoors on the farm").

Nor do pole cameras present other concerns identified in *Carpenter*.  Because pole cameras address investigative needs in specific cases, they do not create a tracking capacity that "runs against everyone." *Id.* at 2218 (noting that CSLI information is "continually logged for all of the 400 million devices in the United States").  And, for the same reason, pole cameras also do not create the same likelihood that the government would engage in retrospective surveillance of something as to which no suspicion existed when the surveillance took place.  *See*

*id.* (noting that, because CSLI records are kept by telecom companies for up to five years, law enforcement's access to CSLI means that a suspect "has effectively been tailed every moment of every day for five years . . . without regard to the constraints of the Fourth Amendment" and without police knowing in advance).

The conclusion that *Carpenter* does not cast doubt on *Bucci* is underscored by *Carpenter*'s express statement that its holding is "a narrow one" that does not "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 2220. While the district court tried to make much of what it saw as the differences between pole cameras and security cameras, [Add.14-15], it did not purport to find that a pole camera was not a "conventional surveillance technique[]" or "tool[]."[11] Such a conclusion, moreover, would be untenable. Pole cameras are familiar investigative tools that have been in use for decades. As such, they would logically fall within the scope of the "conventional surveillance techniques" *Carpenter* was careful to preserve.

In sum, nothing in the holding of *Carpenter* or its rationale provides any basis for construing it to undercut *Katz* and *Ciraolo* under the circumstances presented

---

[11] The Supreme Court's decision to identify "security cameras" as not covered by the *Carpenter* opinion is not explained. The Court may have done because a "security camera" is typically a private recording system that law enforcement would access under the third-party doctrine, like CSLI. There is no reason to think that the Supreme Court meant by this to limit the generality of the phrase "conventional surveillance techniques or tools."

here.  As a result, *Carpenter* does not undermine *Bucci*'s reliance on those cases to find that a pole camera focused on the front of the defendants' house did not offend a reasonable expectations of privacy and the district court erred so holding.

## II.    SHOULD THE COURT REACH THE MERITS OF THE DISTRICT COURT'S RULING, IT SHOULD BE REVERSED BECAUSE PRECEDENT DOES NOT SUPPORT THE CONCLUSION THAT THE USE OF A POLE CAMERA IN THIS CASE WAS A SEARCH.

*Carpenter* does not provide a basis for revisiting *Bucci*.  Should this Court disagree, it should nonetheless reverse the district court's suppression order, because the defendants did not sufficiently establish a subjective expectation of privacy and because *Bucci*'s holding that no such expectation of privacy would be reasonable remains correct under current law.

### A.    <u>Standard of Review.</u>

On review of a motion to suppress, this Court "review[s] the district court's factual findings for clear error and its legal conclusions, including ultimate constitutional determinations, de novo."  *United States v. Morel*, 922 F.3d 1, 8 (1st Cir. 2019).

### B.    **Defendants did not demonstrate a subjective expectation of <u>privacy in the area surveilled.</u>**

Reversal is warranted in this case because the defendants did not satisfy their burden of establishing a subjective expectation of privacy.  When seeking to suppress evidence on Fourth Amendment grounds, a defendant has a "threshold

24

burden . . . to prove that he had a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009) (internal quotation marks omitted). While this Court has held that the question of whether a party was "'seek[ing] to preserve [the evidence at issue] as private'" may be inferred from the circumstances, *id.* (inferring subjective expectation of privacy where defendant placed guns and drugs in a washing machine on a landing in an apparent effort to hide them and citing cases drawing similar inferences) (quoting *Katz*, 389 U.S. at 351), the record in this case does not reflect that the defendants took any affirmative steps to shield their activities from view, such as by erecting fences or planting hedges to obscure the view from the street.

The district court's suggestion that the defendants' subjective desire to keep their actions private could be inferred from their "choice of neighborhood and home within it" is insufficient, especially where, as here, the activities in question remained visible from a public street. Nor is this conclusion altered by the presence of a tree that obstructed part of the camera's view—while the tree blocked some of what the camera could monitor (at certain times of year), it had no impact on what could be seen by passersby. Under these circumstances, the district court erred in finding that the defendants had met their burden of showing that they had a reasonable expectation of privacy in the activities that the pole camera captured.

### C.    Any expectation of privacy was not objectively reasonable.

The district court's suppression order must also be reversed because *Bucci*'s holding that a person in the position of these defendants has no expectation of privacy regarding pole camera surveillance remains correct under current law.   In *Bucci*, this Court held that a pole camera did not infringe the defendant's reasonable expectation of privacy because it only captured what could be observed from the street and "[a]n individual does not have an expectation of privacy in items or places he exposes to the public."  582 F.3d at 117.  In support of that conclusion, the Court relied on *Katz*'s statement that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Bucci*, 582 F.3d at 117 (quoting *Katz*, 389 U.S. at 351).  The Court also cited *Ciraolo*, in which the Court upheld warrantless aerial surveillance on the ground that the Fourth Amendment does not "preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."  476 U.S. at 213.

Other appellate courts rejecting challenges to pole cameras have relied on similar reasoning.  *See Houston*, 813 F.3d at 288 (holding based on *Ciraolo* and *Katz* that a pole camera capturing several residences on a farm did not violate a defendant's reasonable expectation of privacy "because the ATF agents had a right to access the public utility pole and the camera captured only views that were plainly

visible to any member of the public who drove down the roads bordering the farm"); *Jackson*, 213 F.3d at 1280-81 (relying on *Katz*, *Ciraolo*, and *Dow Chem. Co v. United States*, 476 U.S. 227 (1986), another aerial surveillance case, to hold that a defendant did not have a reasonable expectation of privacy in areas surrounding a residence that "any passerby would easily have been able to observe").[12]

For reasons addressed above, *Carpenter* does not by its reasoning or the reasoning it draws from the *Jones* concurrences call the rationale of these cases into question. Although *Carpenter* recognizes that a person may have a reasonable expectation of privacy that includes activities exposed to the public, that expectation of privacy is defined narrowly as being free from comprehensive, highly-accurate monitoring of the entirety of an individual's movements. 138 S. Ct. at 2217-18. *Carpenter* does not purport to hold that there is a comparable expectation to be free from less intensive monitoring of a person's movements, or to be free of surveillance that does not track movements but is comprehensive in a different way. To the contrary, *Carpenter*'s majority opinion emphasizes the narrowness of its holding, declining to express a view on technologies other than the one before it and explicitly stating that its holding does not call into question "conventional surveillance techniques and tools," including security cameras. 138 S. Ct. at 2220. Thus, as to

---

[12] As noted above, both of these cases involved cameras, like the one here, capable of panning and zooming in on a particular area. *See Houston*, 813 F.3d at 286; *Jackson*, 213 F.3d at 1276.

forms of surveillance other than CSLI, *Carpenter* leaves intact existing precedents, including the principles drawn from *Katz* and *Ciraolo* on which *Bucci* and the other appellate decisions upholding pole cameras have relied.

While the district court appears to have believed that *Carpenter*'s narrow exception, combined with the concurrences in *Jones*, presages a broader revision of Fourth Amendment precedents based on certain general principles, such as a concern with chilling the First Amendment right of association, [Add.19-21], such a prediction does not provide a sound basis for concluding that the warrantless use of pole cameras is unconstitutional. To begin with, the sole source the district court cites for its First Amendment concern is the concurring opinion of Justice Sotomayor in *Jones*. [Add.17-18 (quoting 565 U.S. at 416)]. This issue was not discussed in the other *Jones* concurring opinion or *Carpenter* and, thus, it is difficult to see how it could provide a basis for failing to follow existing precedent. *See United States v. Thompson*, 866 F.3d 114, 1158-59 (10th Cir. 2017) (declining to rely on statements regarding the third party in Justice Sotomayor's *Jones* concurrence, which "was not the opinion of the Court").

Nor would it be appropriate for that court or this Court to extrapolate a fundamental change in Fourth Amendment jurisprudence from the general principles *Carpenter* does discuss, such as its statements that the Fourth Amendment was intended to protect "'the privacies of life'" against "'arbitrary power,'" 138 S. Ct. at

28

2214 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)), and that a "central aim" of the Fourth Amendment was to "'place obstacles in the way of a too permeating police surveillance.'"  138 S. Ct. at 2214 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)).  These principles were firmly in place when *Katz* and *Ciraolo* were decided and the Supreme Court evidently did not see the holdings of those cases as incompatible with its earlier-stated principles.  To apply those principles to cases involving technologies very different from CSLI, such as pole cameras, would contravene not only *Carpenter*'s express statement that its holding is a narrow one, but also the Supreme Court's general reservation of the right to decide when and to what extent its prior precedents have been overruled.  In *Agostini v. Felton*, the Supreme Court reiterated that lower courts should generally continue to apply on-point precedent notwithstanding intervening precedent in tension with that precedent, "leaving to [the Supreme] Court the prerogative of overruling its own decisions."  521 U.S. 203, 237 (1997).  Here, the most closely on-point holdings are those in *Katz* and *Ciraolo*, and they provide the same support for the conclusion that use of a pole camera is not a "search" that they did when *Bucci* and cases like it were decided.

Federal decisions addressing pole cameras in the wake of *Jones* accord with this view.  The Sixth Circuit, which addressed a Fourth Amendment challenge to pole cameras for the first time post-*Jones*, had no trouble rejecting an argument

29

based on the *Jones* concurrences, finding that "unlike Justice Alito's concern in *Jones* that long-term GPS monitoring would 'secretly monitor and catalogue every single movement' that the defendant made," pole camera surveillance of the defendant's home "was not so comprehensive as to monitor . . . every move." *Houston*, 813 F.3d at 290. The Tenth Circuit, which had upheld the use of pole cameras in its pre-*Jones* opinion in *Jackson*, rejected a defendant's attempt to revisit the issue post-*Jones*, albeit without addressing the issue in any depth. *See United States v. Cantu*, 684 F. App'x 703, 705 (10th Cir. 2017) (unpublished).[13]

The sole appellate court to reach a contrary conclusion is the South Dakota Supreme Court, which relied on the *Jones* concurrences to hold that the warrantless use of a pole camera to conduct surveillance for two months violated the Fourth Amendment. *See State v. Jones*, 903 N.W.2d 101, 106–14 (S.D. 2017). In doing so, a narrow majority held that the defendant had a subjective expectation of privacy to

---

[13] A number of district court decisions in the wake of *Jones* also rejected the argument that *Jones* required courts to consider the scope or duration of surveillance undertaken through the use of pole cameras. *See, e.g.*, *United States v. Mazzara*, No. 16 Cr. 576 (KBF), 2017 WL 4862793 (S.D.N.Y. Oct. 27, 2017) (arguing that members of the public could aggregate data in the way that pole cameras do, and finding no controlling precedent that the amount of data collected could affect the assessment of whether an act constitutes a search); *United States v. Krawczyk*, No. CR12-01384-PHX-DGC, 2013 WL 2481275 (D. Ariz. June 10, 2013) (holding that *Jones* does not require courts to evaluate the duration of pole camera surveillance, and emphasizing that *Jones* turned on the trespassory nature of the GPS device); *United States v. Brooks*, 911 F. Supp. 2d 836 (D. Ariz. 2012) (stating that *Jones* does not require courts to evaluate the duration of surveillance in assessing whether pole camera use constituted a search).

be free from the long-term surveillance of his home, including "his comings and goings from his home, his guest's comings and goings, the types of cars coming and going from his home, etc.," and that this was objectively reasonable under the principles reflected in the *Jones* concurrences. *Id*. at 110-14. Notably, although the majority found a Fourth Amendment violation, it ultimately denied suppression on good faith grounds. *Id*. at 115.[14]

Although no appellate court appears to have considered the use of pole cameras since *Carpenter*, this Court declined to find that *Carpenter* "effected a sea change in the law of reasonable expectation of privacy" when considering its impact on the third-party doctrine. *Morel*, 922 F.3d at 8-9. District court decisions, moreover, other than the one under review here, have found that *Carpenter* did not undercut the settled view that the use of pole cameras does not infringe a reasonable expectation of privacy. *See United States v. Fanning*, No. 1:18-cr-362-AT-CMS, 2019 LEXIS 137334 (N.D. Ga. May 28, 2019) (finding that the "pole camera at issue in this case is akin to a security camera, which the Supreme Court expressly excluded from its holding in *Carpente*r"); *United States v. Gbenedio*, 1:17-CR-430-TWT, 2019 WL 2173994 (N.D. Ga. May 17, 2019) (finding no reasonable expectation of privacy as to defendant's ingress to and egress from unobscured front public entrance and distinguishing *Carpenter* because in this case, the camera captured a

---

[14] Two of the court's five justices concurred only in the result. *Id.* at 115-21.

single fixed location and did not track defendant's general movements); *United States v. Kelly*, No. 17-cr-175-pp, 2019 WL 2137370, at *4 (E.D. Wis. May 16, 2019) (arguing that *Carpenter* should be construed narrowly because "the text of the decision explicitly limit[ed] itself to CSLI, [and] its rationale relied on" the nature of cell phones); *United States v. Harris*, No. 17-CR-175, 2019 WL 2996897 (E.D. Wis. Feb. 19, 2019) (finding that *Carpenter* did not apply to pole cameras in part because the holding in *Carpenter* was narrow and pole cameras did not "capture[] any activities or movements that couldn't ordinarily be observed by neighbors, postal workers, or even law enforcement"); *United States v. Kubasiak,* No. 18 CR-120, 2018 WL 6164346 (E.D. Wis. Aug. 23, 2018) (holding that a video camera pointed at defendant's backyard does not implicate *Carpenter*); *United States v. Tirado*, No. 16-CR-168, 2018 WL 3995901 (E.D. Wis. Aug. 21, 2018) (ruling that *Carpenter* did not require the court to overturn its previous denial of a motion to suppress evidence from pole cameras that filmed a front yard for 59 days and a backyard for 83 days); *United States v. Kay*, No.17-CR-16, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018) (rejecting *Carpenter*-based challenge to use of a pole camera); *United States v. Tuggle*, No. 16-cr-20070-JES-JEH, 2018 WL 3631881, at *3 (C.D. Ill. July 31, 2018) (declining to extend *Jones* and *Carpenter* to pole cameras because "[p]ole cameras are limited to a fixed location and capture only activities in camera

view, as opposed to GPS, which can track an individual's movement anywhere in the world").

Consistent with this unbroken line of federal precedent, this Court should hold that, even if *Carpenter* permits it to revisit *Bucci*, settled precedent supports the conclusion that use of a pole camera to observe areas of the front of a house and driveway visible to passersby does not constitute a search for purposes of the Fourth Amendment because it does not infringe any reasonable expectation of privacy.

### D.    Suppression is not warranted because law enforcement relied in good faith on binding precedent.

This Court may also reverse the district court's suppression order on the ground that, even if *Bucci*'s holding was undermined by *Carpenter*, the installation and use of the pole camera in this case, prior to *Carpenter*'s issuance, is subject to the good faith exception of *Davis*, which precludes application of the exclusionary rule where law enforcement officers have acted "in objectively reasonable reliance on binding judicial precedent" that is later overturned.  *Davis*, 131 S. Ct. at 2428. The district court declined to reach this argument.  [Add.27].  This does not prevent this Court from considering the issue, however.

First, The logic of *Davis* suggests that its good faith analysis comes into play *after* a binding precedent has been overruled by a new binding precedent, creating a "potential ground for relief" under the Fourth Amendment that earlier precedent did not.  *See* 131 S. Ct. at 2430-31 (discussing relationship between retroactivity and

good faith) (emphasis omitted).   At that point, the question arises whether a defendant to whom the new rule applies is entitled to a remedy despite the fact that law enforcement officers complied with the precedent in place when the officers performed the challenged action.  *See id.*  Here, *Bucci* remains good law in the First Circuit notwithstanding the district court's view that its holding should be reconsidered.  Given this, it can be questioned whether an argument based on *Davis* is yet ripe.

Second, under this Court's precedent, the consequence of raising an argument for the first time in a motion for reconsideration is plain error review.  *See United States v. Tanco-Pizzaro*, 892 F.3d 472, 479 (1st Cir. 2018).  To prevail on plain error review, "an appellant must show (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Flete-Garcia*, 925 F.3d 17, 36 (1st Cir. 2019).

Each of these requirements is met here.   As has been discussed, *Bucci* involved the use of a pole camera under circumstances virtually identical to those identified here, and thus it cannot be doubted that law enforcement could reasonably have relied on the binding precedent established in *Bucci* in installing and operating the pole camera used in this case.  The district court's error in declining to find good faith therefore was "clear or obvious."  Moreover, as the government represented in

34

seeking this appeal, the loss of this significant evidence would no doubt harm this prosecution, thereby affecting the government's substantial rights.  Finally, the fairness, integrity, and public reputation of the proceeding will be enhanced by holding that officers may properly rely on binding precedent of this Court unless and until it is overruled.

## <u>CONCLUSION</u>

For these reasons, the government respectfully requests that the Court reverse the district court's order suppressing evidence.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   /s/ *Randall E. Kromm*
RANDALL E. KROMM
Assistant U.S. Attorney

**CERTIFICATE OF COMPLIANCE WITH**
**Rule 32(a)**

**Certificate of Compliance with Type-Volume Limit,**
**Typeface Requirements, and Type-Style Requirements**

1.   This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains **8,607** words (an opening or answering brief may not exceed 13,000 words, a reply brief may not exceed 6,500 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2016.

  /s/ *Randall E. Kromm*
  RANDALL E. KROMM
  Assistant U.S. Attorney

  Dated:  September 20, 2019

## <u>CERTIFICATE OF SERVICE</u>

I, AUSA Name, Assistant U.S. Attorney, hereby certify that on September 20, 2019, I electronically served a copy of the foregoing document, and served by first-class mail one copy of the government's appendix, on the following registered participant(s) of the CM/ECF system:

<u>*Counsel for Defendant Daphne Moore*</u>
Linda J. Thompson, Esq.
Thompson & Thompson, PC
1331 Main Street, Suite 320
Springfield, MA 01103

<u>*Counsel for Defendant Nia Moore-Bush*</u>
Joshua R. Hanye, Esq.
M.A. Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210

/s/ *Randall E. Kromm*
RANDALL E. KROMM
Assistant U.S. Attorney

Nos. 19-1582, 19-1583, 19-1625, 19-1626

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————

Nos. 19-1582, 19-1625

UNITED STATES OF AMERICA,
APPELLANT

v.

NIA MOORE-BUSH, A/K/A NIA DINZEY,
DEFENDANT-APPELLEE

————————

Nos. 19-1583, 19-1626

UNITED STATES OF AMERICA,
APPELLANT

v.

DAPHNE MOORE,
DEFENDANT-APPELLEE

————————

## Addendum Table of Contents

1.  District court's June 4, 2019 *Amended Memorandum and Order* (D.422) ..................................................................Add.01

2.  District court's June 5, 2019 *Order* (D.424) ........................................Add.26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
UNITED STATES OF AMERICA         )
                                 )
          v.                     )        CRIMINAL ACTION
                                 )        NO. 3:18-30001-WGY
NIA MOORE-BUSH and               )
DAPHNE MOORE,                    )
                                 )
               Defendants.       )
_____)
```

YOUNG, D.J.                                          June 4, 2019

## AMENDED MEMORANDUM AND ORDER[*]

### I.    INTRODUCTION

Casual observations of a person's forays in and out of her
home do not usually fall within the Fourth Amendment's
protections.  Here, the defendants ask the Court to consider
whether a precise video log of the whole of their travels in and
out of their home over the course of eight months, created by a
camera affixed to a utility pole that could also read the
license plates of their guests, raises Fourth Amendment
concerns.  After a thorough analysis of the parties' arguments
and recent Supreme Court authority, the Court rules that it
does.  Accordingly, the Court ALLOWS the defendants' motions to
suppress, ECF Nos. 326, 358.

[*] This amended memorandum and order deletes a superfluous
word in footnote 5 and corrects a citation in section IV.B.2.

Add.1

## II.  BACKGROUND

### A.  Procedural History

A federal grand jury indicted defendant Nia Moore-Bush ("Moore-Bush") on January 11, 2018.  ECF No. 3.  Almost a year later, on December 20, 2018, the grand jury returned a superseding indictment naming defendant Daphne Moore ("Moore"), Moore-Bush's mother, as well.  ECF No. 206.  Moore and Moore-Bush moved on April 22 and May 2, 2019, respectively, to suppress evidence that the Government collected using a video camera installed on a utility pole across the street from Moore's house (the "Pole Camera").[1]  See Def. Daphne Moore's Mot. Suppress ("Moore Mot."), ECF No. 326; Def. Nia Moore-Bush's Mot. & Mem. Suppress ("Moore-Bush Mot."), ECF No. 358.  Moore-Bush and Moore argue that the Government's use of the Pole Camera constituted a search under the Fourth Amendment to the United States Constitution.  See generally Moore Mot.; Moore-Bush Mot. The Government opposed the motions to suppress on May 6, 2019. Government's Opp'n Defs.' Mots. Suppress Pole Camera Evidence ("Gov't Opp'n"), ECF No. 367.

On March 13, the Court heard oral argument on the motion and took it under advisement.  Electronic Clerk's Notes, ECF No.

---

[1] Defendant Oscar Rosario also moved to suppress the Pole Camera's video, ECF Nos. 321 & 332, but he pled guilty on May 13, 2019, thereby obviating resolution of his motion, ECF No. 393.

396.  For the following reasons, the Court ALLOWS the motions to
suppress.

   **B.   Facts**

   The Court draws the facts from the parties' undisputed
statements at the motion hearing and in their briefing.

   The Government installed the Pole Camera on a utility pole
across the street from Moore's house, located at 120 Hadley
Street, Springfield, Massachusetts.  Gov't Opp'n 1.  The Pole
Camera captured video of, but not audio from, events occurring
near the exterior of Moore's house for approximately eight
months.  Gov't Opp'n 2; Tr. 15:4, ECF No. 414.  During this
time, Moore-Bush resided in Moore's house.  Gov't Opp'n 1.

   The Pole Camera surveilled the driveway and part of the
front of Moore's house.  Tr. 34:13-15; Gov't Opp'n 2, 4.  A tree
partially obscured its view.  Gov't Opp'n 2.  Although the Pole
Camera could zoom in so as to permit law enforcement officers to
read license plates, it could not peer inside windows.  Tr.
26:5-22.  Law enforcement officers also could pan and tilt the
camera.  Gov't Opp'n 3.  Additionally, law enforcement officers
could operate the Pole Camera's zoom feature remotely.  Tr.
13:19-14:14.  The Pole Camera produced a digitized recording
that the Government could search.  Tr. 16:2-16.

   Although the Government has not stated the exact nature of
the evidence that it seeks to admit from the Pole Camera, the

**Add.3**

parties assume that the Government will introduce video, much of it the Pole Camera recorded well into its eight-month existence. Tr. 20:5-23, 35:1-14.

## III. LEGAL FRAMEWORK

Moore-Bush and Moore argue that the Pole Camera's eight-month video log of Moore's house constitutes an unconstitutional search.  Moore-Bush Mot. 1; Moore Mot. 1.

The Fourth Amendment to the United States Constitution guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Government does not justify its use of the Pole Camera with a warrant or probable cause.  See generally Gov't Opp'n. Instead, it insists that its use of the Pole Camera does not amount to a search.  Id. at 2.  Consequently, as the parties have presented this case, the use of the Pole Camera violates the Fourth Amendment if its operation constitutes a search. Although there are some exceptions -- none of which the Government invokes here[2] -- courts exclude evidence that federal

---

[2] For instance, the Government might have argued that the good faith exception to the exclusionary rule applies to its use of the Pole Cameras.  See Davis v. United States, 564 U.S. 229, 239 (2011) (holding that the exclusionary rule does not apply

officers obtain using a search that violates the Fourth

Amendment.  See United States v. Dedrick, 840 F. Supp. 2d 482,

492 (D. Mass. 2012) (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

The Supreme Court has formulated two tests for analyzing

whether the Government has conducted a Fourth Amendment

"search."  See United States v. Bain, 874 F.3d 1, 11-12 (1st

Cir. 2017).  For one, "[u]nder the common law trespassory test,"

a Fourth Amendment search occurs "[w]hen the Government obtains

information by physically intruding on persons, houses, papers,

or effects."  Id. at 12 (quoting Florida v. Jardines, 569 U.S.

1, 5 (2013)).  In this case, neither Moore-Bush nor Moore assert

that a search occurred under the common law trespassory test.

See generally Moore-Bush Mot.; Moore Mot.

Instead, they rely on the "reasonable expectations test."

See id.; Bain, 874 F.3d at 12.  Under this test, "a search

occurs whenever the government intrudes upon any place in which

a person has a 'reasonable expectation of privacy.'"  Bain, 874

F.3d at 12 (quoting Katz v. United States, 389 U.S. 347, 360

---

"when the police conduct a search in objectively reasonable
reliance on binding judicial precedent").  It did not.
Accordingly, the Government did not carry its "'heavy burden' of
proving that the good-faith exception applies."  See United
States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013) (quoting United
States v. Syphers, 426 F.3d 461, 468 (1st Cir. 2005)), aff'd sub
nom. Riley v. California, 573 U.S. 373 (2014).  The Government
thereby waived that argument.  See United States v. Ramirez-
Rivera, 800 F.3d 1, 32 (1st Cir. 2015).

(1967) (Harlan, J., concurring)).  To show that a search
occurred under this test, then, each defendant has the burden of
showing that (1) she "exhibited an actual, subjective
expectation of privacy" and (2) her "subjective expectation is
one that society is prepared to recognize as objectively
reasonable."  See United States v. Morel, 922 F.3d 1, 8 (1st
Cir. 2019) (quoting United States v. Rheault, 561 F.3d 55, 59
(1st Cir. 2009); United States v. Stokes, 829 F.3d 47, 51 (1st
Cir. 2016)).

Although the reasonable expectations test represents a
relatively recent doctrinal innovation, the Supreme Court has
taught that the public's understanding of unreasonable searches
at the Fourth Amendment's framing informs the test's
application.  See Carpenter v. United States, 138 S. Ct. 2206,
2214 (2018) (quoting Carroll v. United States, 267 U.S. 132, 149
(1925)).  The Supreme Court thus has identified two "basic
guideposts" from history:  "First, that the [Fourth] Amendment
seeks to secure 'the privacies of life' against 'arbitrary
power.'  Second, and relatedly, that a central aim of the
Framers was 'to place obstacles in the way of a too permeating
police surveillance.'"  Id. (quoting Boyd v. United States, 116
U.S. 616, 630 (1886); United States v. Di Re, 332 U.S. 581, 595
(1948)).  These timeless guideposts point the Court on its way
towards resolving this motion.

**Add.6**

## IV.   ANALYSIS

The Court ALLOWS Moore-Bush and Moore's motion to suppress
because they have exhibited an actual, subjective expectation of
privacy that society recognizes as objectively reasonable.  See
Morel, 922 F.3d at 8.  First, the Court infers from their choice
of neighborhood that they subjectively expected that their and
their houseguests' comings and goings over the course of eight
months would not be surreptitiously surveilled.  See Moore Mot.
7.  Second, the Court rules that the Pole Cameras collected
information that permitted the Government to peer into Moore-
Bush and Moore's private lives and constitutionally protected
associations in an objectively unreasonable manner.  See United
States v. Jones, 565 U.S. 400, 415 (2012) (Sotomayor, J.,
concurring).

### A.   Subjective Expectation of Privacy

Moore-Bush and Moore have established that they had a
subjective expectation of privacy in their and their guests'
comings and goings from Moore's house.

As a preliminary matter, the Government suggests that, to
establish this prong of the test, Moore-Bush and Moore needed to
file affidavits or otherwise testify to their expectations.  See
Gov't Opp'n 4 (citing United States v. Ruth, 65 F.3d 599, 604-05
(7th Cir. 1995)).  The First Circuit requires nothing of the
sort:  In United States v. Rheault, the First Circuit rejected a

**Add.7**

similar suggestion and instead inferred a subjective expectation
of privacy from the defendant's actions. 561 F.3d at 59. The
Court thus analyzes whether Moore-Bush and Moore have manifested
a subjective expectation of privacy through the relevant actions
that they took.

Moore-Bush and Moore contend that they have established a
subjective expectation of privacy by choosing to live in a
quiet, residential neighborhood in a house obstructed by a large
tree. Moore Mot. 7.[3] The Government maintains that this amounts
to insufficient "conjecture" and "speculation." Gov't Opp'n 4-
5. Further, the Government tries to turn Moore-Bush and Moore's
tree argument around on them: It insists that the tree
"miminiz[ed] any potential intrusion." Id. at 5.

The Government sidesteps Moore-Bush and Moore's asserted
privacy interest: it focuses on whether Moore-Bush and Moore
had a broader privacy interest in the front of their house. See
Gov't Opp'n 4. Construed broadly, perhaps they did not. See

---

[3] The Court imputes Moore's expectations to Moore-Bush. See
Minnesota v. Olson, 495 U.S. 91, 99-100 (1990) (observing that
"an adult daughter temporarily living in the home of her
parents" has an expectation of privacy in her parents' home).
In opposing the motion, it seems that the Government does so,
too. See Gov't Opp'n 4 (stating "by pointing out just the tree,
Defendants effectively acknowledge that there are no fences,
shrubs, or other constructions that suggest that the inhabitants
meant to shield the front of the house or driveway from public
view" but then stating that "[t]he Defendant, however, uses the
reference . . . to the solitary tree") (emphasis added).

California v. Ciraolo, 476 U.S. 207, 213 (1986) (observing that law enforcement officers need not "shield their eyes when passing by a home on public thoroughfares").

Yet that is not the narrower privacy interest that Moore-Bush and Moore assert here.  Instead, Moore-Bush and Moore claim that they expected privacy in the whole of their movements over the course of eight months from continuous video recording with magnification and logging features in the front of their house. Moore Mot. 9-10; Moore-Bush Mot. 5.  The Court infers from Moore-Bush and Moore's choice of neighborhood and home within it that they did not subjectively expect to be surreptitiously surveilled with meticulous precision each and every time they or a visitor came or went from their home.

Therefore, the Court rules that Moore-Bush and Moore meet the first prong of the reasonable expectations test.  See United States v. Childs, Crim. A. No. 06-10339-DPW, 2008 WL 941779, at *7 (D. Mass. Apr. 4, 2008) (Woodlock, J.) (inferring from "circumstantial evidence" that the defendant "had a subjective expectation of privacy").

**B.    Objectively Reasonable Expectation of Privacy**

Moore-Bush and Moore's expectation of privacy "is one that society is prepared to recognize as objectively reasonable." See Morel, 922 F.3d at 8.

The First Circuit previously approved the use of a pole
camera in United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir.
2009).  Bucci, however, no longer binds this Court in light of
subsequent Supreme Court precedent undermining it.  See
Carpenter, 138 S. Ct. at 2217-18.  Consequently, this Court
considers the issue as matter of first impression and rules that
the surveillance conducted here exceeds the objectively
reasonable expectation of privacy of the public at the time of
the Fourth Amendment's framing.  See id. at 2214.

### 1.   Bucci Does Not Control

Moore-Bush and Moore offer two reasons why Bucci ought not
dictate the outcome here.  First, they claim that Bucci's
holding is limited to the camera that the Government used there,
which had fewer capabilities than this Pole Camera.  Moore-Bush
Mot. 2-3; Moore Mot. 7.  Second, they argue that Carpenter
changed the law and requires a different result.  Moore-Bush
Mot. 3-6; Moore Mot. 8-12.  The Court disagrees with Moore-Bush
and Moore's first contention and agrees with their second.

True, the First Circuit noted some factual distinctions
between the camera in Bucci and the Pole Camera here.  Although
the camera in Bucci pointed at the front of a house for eight
months, law enforcement officers lacked the capability to
control the camera remotely "without being physically at the

**Add.10**

scene."[4]  582 F.3d at 116.  That distinction is too thin to distinguish Bucci from this case, however, especially in light of the legal rules that the First Circuit applied.  In Bucci, the First Circuit reasoned that the "legal principle" that "[a]n individual does not have an expectation of privacy in items or places he exposes to the public" disposed of the matter.  Id. at 116-17 (citing Katz, 389 U.S. at 351).  If that principle remains an accurate depiction of the law, Moore and Moore-Bush lack an objectively reasonable expectation of privacy in the activities just outside their home, regardless of the camera's unique capabilities.

The Court reads Carpenter, however, to cabin -- if not repudiate -- that principle.  There, the Supreme Court stated that:  "A person does not surrender all Fourth Amendment protection by venturing into the public sphere.  To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'"  Carpenter, 138 S. Ct. at 2217 (quoting Katz, 389 U.S. at 351-52).  What's more, the Supreme Court recognized that long-term tracking of a person's movements "provides an intimate window into a person's life, revealing not only his particular

---

[4] It is unclear whether the law enforcement officers in Bucci could pan or zoom that camera when physically at the scene.  582 F.3d at 116.

movements, but through them his 'familial, political,
professional, religious, and sexual associations.'" <u>Id.</u>
(quoting <u>Jones</u>, 565 U.S. at 415 (Sotomayor, J., concurring));
<u>see also</u> <u>United States</u> v. <u>Garcia-Gonzalez</u>, Crim. A. No. 14-
10296-LTS, 2015 WL 5145537, at *9 (D. Mass. Sept. 1, 2015)
(Sorokin, J.) (observing that Justices Alito and Sotomayor's
concurrences in <u>Jones</u> "undermine <u>Bucci</u>'s legal [and] analytic
foundations"). Additionally, the Supreme Court distinguished
the tracking involved in <u>Carpenter</u> from historical surveillance
methods on the ground that the tracking produced a log that law
enforcement officers could use to "travel back in time to
retrace a person's whereabouts" whereas "a dearth of records and
the frailties of recollection" limited surveillance in the past.
138 S. Ct. at 2218.

   The Government protests that the Supreme Court
characterized its holding in <u>Carpenter</u> as "narrow" and thus
limited to the technology addressed in that case, cell-site
location information. Gov't Opp'n 6 (quoting <u>Carpenter</u>, 138 S.
Ct. at 2217, 2219). The Court, however, does not ground its
decision on <u>Carpenter</u>'s holding but instead on its necessary
reasoning; that is, a person does have some objectively
reasonable expectations of privacy when in spaces visible to the
public. <u>See</u> 138 S. Ct. at 2217. The Court cannot reconcile

that reasoning with Bucci's blanket statement that no such
expectations exist.  See 582 F.3d at 117.[5]

The Government also brings to this Court's attention two
out-of-circuit district courts' rejections of post-Carpenter
challenges to pole cameras.  Gov't Opp'n 6 (citing United States
v. Kay, No. 17-CR-16, 2018 WL 3995902 (E.D. Wis. Aug. 21, 2018);
United States v. Kubasiak, No. 18-CR-120, 2018 WL 6164346 (E.D.
Wis. Aug. 23, 2018), report and recommendation adopted 2018 WL
4846761 (Oct. 5, 2018)).  Nevertheless, in each of those
cases -- and the two others that this Court located -- the
district courts premised their approval of the pole cameras in
large part on the claim that those cameras were "security
cameras."  See Kubasiak, 2018 WL 6164346, at *4 (basing its
reasoning on the Supreme Court's emphasis in Carpenter that it
did not "call into question conventional surveillance techniques

_____

[5] One possible route to reconcile the First Circuit's
pronouncement in Bucci with the Supreme Court's reasoning in
Carpenter would be to distinguish between real-time observations
of the front of a house and a video log recording them.  See
Carpenter, 138 S. Ct. at 2217; Bucci, 582 F.3d at 116-17.  The
First Circuit, however, did not specify whether law enforcement
officers monitored the camera used in Bucci contemporaneously or
reviewed digitized recordings afterwards.  See Bucci, 582 F.3d
at 116-17.  The Court explains in section IV.B.2 why, at least,
the latter scenario sparks severe Fourth -- and First --
Amendment concerns.  The Court therefore reads Carpenter to
overrule Bucci to the extent that Bucci sanctioned constant law
enforcement video logging of activities outside a home for eight
months.  See Carpenter, 138 S. Ct. at 2217; Bucci, 582 F.3d at
116-17.

**Add.13**

and tools, such as security cameras" (quoting 138 S. Ct. at
2220)); Kay, 2018 WL 3995902, at *2 (same); United States v.
Tirado, No. 16-CR-168, 2018 WL 3995901, at *2 (E.D. Wis. Aug.
21, 2018) (same); United States v. Tuggle, No. 16-CR-20070-JES-
JEH, 2018 WL 3631881, at *3 (C.D. Ill. July 31, 2018) (same).

This Pole Camera is not a security camera by any stretch of
the imagination.  As relevant here, Merriam-Webster defines
security as "something that secures . . . measures taken to
guard against espionage or sabotage, crime, attack, or escape."
Security, Merriam-Webster, https://www.merriam-webster.com/dicti
onary/security (last accessed May 15, 2019); see also Security,
Black's Law Dictionary (10th ed. 2014) ("The quality, state, or
condition of being secure, esp. from danger or attack.").  Law
enforcement officers did not install the Pole Camera here "to
guard against . . . crime," but to investigate suspects.
Indeed, the prototypical security camera exists to monitor a
heavily trafficked area or commercial establishment.  Security
camera operators often install their cameras in plain view or
with warning signs to deter wrongdoers.  See, e.g., Commonwealth
v. Rivera, 445 Mass. 119, 133-34 (2005) (Cowin, J.) (observing,
in a different context, that the defendant should have expected
that a "standard security surveillance camera mounted by the
store owner in plain view" would record him).  The Government
hid the Pole Camera out of sight of its targets and does not

suggest that it did so to prevent criminal activity.  Instead,
the Government explained that it used the Pole Camera simply to
track suspects' travels, which, standing alone, were not crimes.
See Defs.' Exs. Pretrial Mots., Ex. 2 at 132 (describing the
installation of Pole Camera and explaining that it "proved to be
useful in identifying several vehicles visiting" Moore-Bush,
"confirm[ing] when MOORE-BUSH [was] in the Springfield area,"
and "identifying rental vehicles used by MOORE-BUSH").[6]
Accordingly, though Carpenter does not discuss pole cameras, its
logic contradicts Bucci's and requires this Court to examine
whether the Government's use of the Pole Camera constitutes a
search.

>        2.   **The Use of the Pole Camera Invaded Moore-Bush and
>             Moore's Objectively Reasonable Expectations of
>             Privacy**

     In light of the principles that the Supreme Court
elucidated in Carpenter, this Court holds that Moore-Bush and
Moore had an objectively reasonable expectation of privacy in
their and their guests' activities around the front of the house
for a continuous eight-month period.  See 138 S. Ct. at 2213-14,
2217-18.

     In Garcia-Gonzalez, Judge Sorokin came close to suppressing
video from a pole camera similar to the one here on the basis of

---

[6] Moore-Bush and Moore manually filed their exhibits, so the
exhibits do not appear on the electronic court filing system.

Jones but ultimately pulled back.  2015 WL 5145537, at *9.

Jones addressed whether the Government could surreptitiously

attach a location tracking device to a car.  565 U.S. at 402.

Although the opinion of the Court invalidated the tracking under

the common law trespassory test, Justices Alito and Sotomayor

filed concurrences that applied the reasonable expectations

test, which, combined, obtained the support of a majority of the

justices.  565 U.S. at 413-31.  Judge Sorokin noted this

apparent Supreme Court majority and observed that extended pole

camera surveillance raised more serious concerns than the

location tracking in Jones:

> [T]he two concurrences in Jones, emphasized that
> "longer term GPS monitoring in investigations of most
> offenses impinges on expectations of privacy."  Justice
> Sotomayor remarked that "GPS monitoring generates a
> precise, comprehensive record of a person's public
> movements that reflects a wealth of detail about her
> familial, political, professional, religious, and sexual
> associates." . . . GPS data provides only the "where"
> and "how long" of a person's public movements insofar as
> the person remains close to the monitored vehicle.  Long-
> term around-the-clock monitoring of a residence
> chronicles and informs the "who, what, when, why, where
> from, and how long" of a person's activities and
> associations unfolding at the threshold adjoining one's
> private and public lives.

Garcia-Gonzalez, 2015 WL 5145537, at *8 (quoting Jones, 565 U.S.

at 414 (Sotomayor, J., concurring)).  Nevertheless, Judge

Sorokin viewed himself bound to apply Bucci's reasoning because

neither Justice Alito nor Justice Sotomayor spoke for the

Supreme Court in Jones.  Garcia-Gonzalez, 2015 WL 5145537, at
*9.

       The Supreme Court's Carpenter decision, however,
incorporates the Jones concurrences.  See, e.g., Carpenter, 138
S. Ct. at 2215 (quoting with approval Justices Alito and
Sotomayor's conclusion that "'longer term GPS monitoring in
investigations of most offenses impinges on expectations of
privacy' -- regardless whether those movements were disclosed to
the public at large"); id. at 2217 (quoting Justice Alito's
concurrence stating that "[p]rior to the digital age, law
enforcement officers might have pursued a suspect for a brief
stretch, but doing so 'for any extended period of time was
difficult and costly and therefore rarely undertaken'"); id. at
2220 (citing Justices Alito and Sotomayor's Jones concurrences
that a search occurs when the Government subjects a vehicle to
"pervasive tracking" on public roads).  As a consequence, this
Court interprets Carpenter to apply the Jones concurrences.
This Court thus applies the principles from Carpenter and the
Jones concurrences to the Pole Camera here.

       In the Court's view, three principles from the Jones
concurrences and Carpenter dictate the resolution of this
motion.  First, as Justice Sotomayor points out in Jones,
"[a]wareness that the Government may be watching chills
associational and expressive freedoms.  And the Government's

**Add.17**

unrestrained power to assemble data that reveal private aspects

of identity is susceptible to abuse." 565 U.S. at 416.[7] Second,

as Chief Justice Roberts observes in Carpenter, technologies

that permit law enforcement officers to access and search vast

amounts of passively collected data may "give police access to a

---

[7] The Supreme Court has long instructed magistrates to consider First Amendment values in analyzing whether a warrant's proposed search is reasonable. See Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978) (in "determining the reasonableness of a search, state and federal magistrates should be aware that 'unrestricted power of search and seizure could also be an instrument for stifling liberty of expression.'" (quoting Marcus v. Search Warrant, 367 U.S. 717, 729 (1961))). The Fourth Amendment's framers recalled the use of general warrants that the King used to harass and persecute Catholic and Puritan publishers. Stanford v. Texas, 379 U.S. 476, 482 (1965). A line of cases establishes that when a magistrate analyzes a warrant application for expressive material, as opposed to physical contraband such as "weapons or drugs," the magistrate must review the application "with 'scrupulous exactitude.'" New York v. P.J. Video, Inc., 475 U.S. 868, 871 (1986) (quoting Stanford, 379 U.S. at 481-85).

As far as this Court can tell, Jones and Carpenter represent the first cases in which the Supreme Court instructed courts to consider First Amendment values in deciding whether a search occurred at all. See United States v. Sparks, 750 F. Supp. 2d 384, 387 n.5 (D. Mass. 2010) (pre-Jones, rejecting the defendant's arguments that "evidence must be excluded because the government violated his First Amendment right to free association"). Indeed, in Katz, Justice Stewart's opinion for the Supreme Court -- upon which courts seldom now rely in favor of Justice Harlan's concurrence -- takes pains to differentiate the spheres of protection provided by the First and Fourth Amendments. 389 U.S. at 350-51 & n.5. The Court views the addition of First Amendment principles to the Katz reasonable expectations test as a welcome development in Fourth Amendment law. See Rachel Levinson-Waldman, Hiding in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public, 66 Emory L.J. 527, 552, 557 (2017); Daniel J. Solove, The First Amendment As Criminal Procedure, 82 N.Y.U. L. Rev. 112, 127-28 (2007).

category of information otherwise unknowable." See 138 S. Ct.
at 2218. Third, as Justice Alito reasons in Jones, "relatively
short-term monitoring of a person's movements on public streets
accords with expectations of privacy that our society has
recognized as reasonable. But the use of longer-term GPS
monitoring in investigations of most offenses impinges on
expectations of privacy." 565 U.S. at 430 (citing United States
v. Knotts, 460 U.S. 276, 281–82 (1983)).

The surveillance here risks chilling core First Amendment
activities. Consider religious dissenters. Surely the public
at the time of the Fourth Amendment's framing would be familiar
with the dissenting religious groups that objected to the Church
of England's practices, such as the Methodists, Pilgrims,
Puritans, and Quakers. After Parliament enacted the Act of
Uniformity, which compelled all Englishmen to attend Church of
England services and criminalized "conduct[ing] or attend[ing}
religious gatherings of any other kind," religious dissenters
continued to hold their worship gatherings in secret. See Engel
v. Vitale, 370 U.S. 421, 432–33 (1962). Many of those
gatherings took place in private homes to avoid prosecution --
often unsuccessfully. See id.; John C. English, John Wesley and
the Rights of Conscience, 37 J. Church & St. 349, 350, 360
(1995) (noting that early Methodist ministers preached in
private houses notwithstanding the risk that magistrates would

fine them for violating the Conventicle Act); see also Church of
the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520,
530-31 (1993) (striking down city ordinance outlawing religious
practice that took place in secret); Congregation Jeshuat Israel
v. Congregation Shearith Israel, 186 F. Supp. 3d 158, 169
(D.R.I. 2016) (recounting that the first Jewish families to
emigrate to the colonies "met to worship at private dwelling
houses"), rev'd, 866 F.3d 53 (1st Cir. 2017) (not disturbing
this finding of fact).  It stands to reason that the public at
the time of the amendment's framing would have understood the
King's constables to violate their understanding of privacy if
they discovered that constables had managed to collect a
detailed log of when a home's occupants were inside and when
visitors arrived and whom they were.

What's more, people use their homes for all sorts of
liaisons.  For example, the Government has no business knowing
that someone other than the occupant's spouse visited the home
late at night when the spouse was away and left early in the
morning.  See Lawrence v. Texas, 539 U.S. 558, 574 (2003)
(reconfirming that "our laws and tradition afford constitutional
protection to personal decisions relating to marriage,
procreation, contraception, family relationships, child rearing,
and education" (citing Planned Parenthood of Southeastern Pa. v.
Casey, 505 U.S. 833, 851 (1992)).  Nor does the Government have

any business tracking a homeowners' hobbies or regular trips for
appointments.  Perhaps people would hesitate to have supporters
of opposition political parties visit if they knew that the
Government might be monitoring their driveway.  The continuous
video taken by the Pole Camera thus threatens to chill these
religious, political, and associational activities.  See U.S.
Const. amend. I; Jones, 565 U.S. at 416 (Sotomayor, J.,
concurring) ("Awareness that the Government may be watching
chills associational and expressive freedoms.").

      Moreover, the video from the Pole Camera was not only
continuous, but also recorded and digitized.  Thus, even if the
Government were to show no contemporaneous interest in these
intimate personal details, the Government can go back on a whim
and determine a home occupant's routines with to-the-second
specificity.  See Carpenter, 138 S. Ct. at 2218.  This
capability distinguishes this surveillance from human
surveillance.  Humans are imperfect note-takers and not all
blessed with photographic memory.  See id.  The Pole Camera,
however, captured every single second that passed over eight
months in a digitally searchable form.  Information that a law
enforcement officer might have ignored at the time as irrelevant
to the investigation or mis-recorded no longer prevents the
Government's prying eyes from wandering.  See id.  This power
also sets the Pole Camera apart from neighbors; even -- or

**Add.21**

perhaps especially -- on a residential street, neighbors notice
each other's peculiar habits.  Yet they would not notice all of
their neighbors' habits, especially those activities occurring
during traditional working hours or in the dark.

While <u>Jones</u> involved a car on a public road, Justice
Alito's conclusion that society reasonably expects to be free
from long-term surveillance in public applies with equal force
to society's reasonable expectations about the public space in
front of a person's home.  <u>See</u> 565 U.S. at 430.  Indeed, Fourth
Amendment doctrine treats the home with due reverence.  "'At the
very core' of the Fourth Amendment 'stands the right of a man to
retreat into his own home and there be free from unreasonable
governmental intrusion.'"  <u>Kyllo</u> v. <u>United States</u>, 533 U.S. 27,
31 (2001) (quoting <u>Silverman</u> v. <u>United States</u>, 365 U.S. 505, 511
(1961)).  Here, for eight months, the Government monitored every
single time that Moore-Bush and Moore retreated into their home,
thereby impairing their freedom to retreat as they pleased.

While the Government neither trespassed onto Moore's home's
curtilage nor peeked inside her home, the Court is sensitive to
the different expectations people reasonably may have about
activities on their driveway and near their front door.  <u>Cf.</u>
<u>Jardines</u>, 569 U.S. at 7-9 (applying the common law trespassory
test to a home's curtilage, limiting the "implicit license"
permitting visitors to approach a home's front door).  Although

**Add.22**

these activities, taken one by one, may not give rise to a
reasonable expectation of privacy, as on the public roads, the
Court aggregates their sum total for its analysis.  In Jones, a
majority of justices reasoned that law enforcement officers
conducted a search when they surveilled a car for four weeks.
565 U.S. at 413-14 (Sotomayor, J., concurring).  Here, law
enforcement officers surveilled the home for eight months.  A
home occupant would not reasonably expect that.  While the law
does not "require law enforcement officers to shield their eyes
when passing by a home on public thoroughfares," Ciraolo, 476
U.S. at 213 (emphasis added), it does forbid the intrusive,
constant surveillance here.

The Government counters that it has long used pole camera
technology to surveil suspects at home.  This Pole Camera,
however, is unique in this Court's experience.  As discussed
above, this Pole Camera did not require monitoring in real time
because the Pole Camera created a digitally searchable log.  The
Government provides no evidence that pole cameras have long had
this capability.  Moreover, the Court observes that in three of
the four post-Carpenter cases and in Bucci the Government could
not magnify images without traveling to the scene.  See Kay,
2018 WL 3995902, at *2; Tirado, 2018 WL 3995901, at *2; Tuggle,
2018 WL 3631881, at *3; Bucci, 582 F.3d at 116.  Law enforcement
officers could also pan and tilt this camera.  The ability to

take all these action from afar, potentially using a cellphone
or tablet computer, seems to be a new development.  Compare
Gov't Opp'n 3 & n.1 with Moore Mot. 6.

Therefore, the Court holds that the Pole Camera, as used
here, does not constitute a "conventional security technique[.]"
Carpenter, 138 S. Ct. at 2220.  Accordingly, Moore-Bush and
Moore meet the second prong of the reasonable expectations test.[8]

## V.    CONCLUSION

In sum, this Court does not rule that the use of a pole
camera necessarily constitutes a search.  Instead, the Court
rules narrowly that several aspects of the Government's use of
this Pole Camera does.  Those aspects are the Pole Camera's (1)

---

[8] While beyond the record here, it is worth noting that
"[p]olice surveillance equipment (including both dashboard
cameras and body cameras) has become both cheaper and more
effective . . . ."  United States v. Paxton, 848 F.3d 803, 812
(7th Cir. 2017); see also Farhad Manjoo, San Francisco Is Right:
Facial Recognition Must Be Put On Hold, N.Y. Times (May 16,
2019), https://www.nytimes.com/2019/05/16/opinion/columnists/fac
ial-recognition-ban-privacy.html (noting, among other things,
that cameras "keep getting cheaper and -- in ways both amazing
and alarming -- they are getting smarter"); Jones, 565 U.S. at
415-16 (Sotomayor, J., concurring) (observing that "because GPS
monitoring is cheap in comparison to conventional surveillance
techniques and, by design, proceeds surreptitiously, it evades
the ordinary checks that constrain abusive law enforcement
practices: "limited police resources and community hostility."
(quoting Illinois v. Lidster, 540 U.S. 419, 426 (2004)).
Although this Court's decision does not rely on this trend, it
appears beyond serious debate that the costs of pole camera
surveillance have shrunk significantly, thereby tilting any
cost-benefit calculation that the Government might perform in
favor of using that technique.

continuous video recording for approximately eight months; (2)

focus on the driveway and front of the house; (3) ability to

zoom in so close that it can read license plate numbers; and (4)

creation of a digitally searchable log.  Taken together, these

features permit the Government to piece together intimate

details of a suspect's life.  See Carpenter, 138 S. Ct. at 2217

(quoting Jones, 565 U.S. at 415 (Sotomayor, J., concurring)).

Therefore, the Court ALLOWS Moore-Bush and Moore's motions

to suppress evidence obtained directly from the Pole Camera, ECF

Nos. 326, 358.  Although Moore-Bush and Moore say that the Pole

Camera may have led to the discovery of other tainted evidence,

they do not identify that evidence for the Court.  The Court

thus takes no action with regard to evidence collected

indirectly from the Pole Camera.[9]

   **SO ORDERED.**

                                    /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE


   [9] A preliminary review of the record before this Court
indicates that the independent source exception may preclude
suppression of any other evidence.  See United States v. Flores,
888 F.3d 537, 546 (1st Cir. 2018) (providing that a court ought
not suppress evidence when the Government decided to obtain a
warrant "independent" of constitutional violations and if the
warrant, excised of knowledge obtained from those violations,
otherwise establishes probable cause) (citing United States v.
Murray, 487 U.S. 533, 542 (1988); United States v. Dessesaure,
429 F.3d 359, 367 (1st Cir. 2005)).

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                             )
UNITED STATES OF AMERICA     )
                             )
          v.                 )        CRIMINAL ACTION
                             )        NO. 3:18-30001-WGY
NIA MOORE-BUSH and           )
DAPHNE MOORE,                )
                             )
               Defendants.   )
_____)
```

YOUNG, D.J.                                          June 5, 2019

**ORDER**

After a careful review of the Government's motion for
reconsideration, ECF No. 423, the Court DENIES the Government's
motion.  Though the Government now seeks to suggest that
defendants Nia Moore-Bush and Daphne Moore lacked a subjective
expectation of privacy because the tree in front of their home
lacked leaves during much of the surveillance, this new argument
flatly contradicts the Government's earlier assertion that "it
is clear from the Affidavit that the tree partially obstructed
the view of the pole camera across the street, thus actually
minimizing any potential intrusion."  Compare Mot. Recons. Mem.
& Order & Continue Trial Date Allow Recons. ("Mot. Recons.") 6
with Government's Opp'n Defs.' Mot Suppress Pole Camera Evid. 5,
ECF No. 367.

**Add.26**

Further, the Government neglects to explain to the Court why the Court ought excuse the Government's waiver of its argument that the good faith exception to the exclusionary rule applies.  <u>Compare</u> Am. Mem. & Order 4-5 n.2, ECF No. 422 <u>with</u> Mot. Recons. 7-8.  The Court concludes that the Government's remaining arguments lack merit.

Accordingly, the Court DENIES the Court DENIES the Government's motion, ECF No. 423.  There shall be no continuance.

**SO ORDERED.**

William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

**Add.27**