Nos. 19-1583, 19-1626

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
Appellant

v.

DAPHNE MOORE,
Appellee.

ON APPEAL FROM AN ORDER SUPPRESSING
EVIDENCE UNLAWFULLY SEIZED
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[YOUNG, J.]

ANSWERING BRIEF FOR DAPHNE MOORE

Linda J. Thompson, Esq.
John M. Thompson, Esq.
THOMPSON & THOMPSON, P.C.
1331 Main Street, Suite 320
Springfield, MA 01103
[413] 739-2100

October 21, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................ v

STATEMENT OF THE ISSUES................................... 1

STATEMENT OF THE CASE.................................... 1

SUMMARY OF ARGUMENTS.................................... 8

ARGUMENTS........................................................ 12

    I. THE DISTRICT COURT'S RULING THAT THE
GOVERNMENT'S CREATION OF A COMPREHENSIVE,
SEARCHABLE DIGITAL VIDEO LOG OF ALL OF THE
COMINGS AND GOINGS TO AND FROM MS. MOORE'S
HOUSE FOR TWENTY FOUR HOURS A DAY OVER AN
EIGHT MONTH PERIOD CONSTITUTED A SEARCH
GOVERNED BY THE FOURTH AMENDMENT IS
CONSISTENT WITH THE SUPREME COURT'S
RULING IN CARPENTER AND SO REQUIRED A
WARRANT............................................................. 12

    A. Standard of Review.................................... 12

    B. The Government's Use Of The Pole
Camera And The Information That It Generated
Constituted A Search For Which A Warrant Was
Required...................................................... 12

    1. Ms. Moore Had A Subjective And Reasonable
Expectation Of Privacy In The Information The
Government Seized From Her And Compiled In
A Searchable Database................................... 14

2. *United States v. Jones*: GPS Monitoring And
Collection Of The Public Movements Of A Vehicle
Constitutes A Search........................................ 15

3. *Carpenter v. United States*: Seizure Of
Aggregated Cell Site Location Information
Compiling The Public Movements Of A Cell
Phone Is A Search........................................... 20

4. The Unavoidable Exposure Of The Individual
Events That The Government Has Compiled And
Archived Does Not Quash Ms. Moore's Reasonable
Expectation Of Privacy..................................... 26

5. Ms. Moore's Associational Interests Properly
Reinforce Her Reasonable Expectations Of
Privacy........................................................ 28

6. Because The Pole Camera Disclosed Who Was
In The House, And When They Entered And Left,
Its Use Was A Search....................................... 30

7. Pole Camera Surveillance Requires Judicial
Supervision Under The Fourth Amendment......... 33

II. AFTER *CARPENTER* AND *JONES, BUCCI*
IS NOT A CONTROLLING PRECEDENT APPLICABLE TO
MS. MOORE'S CLAIM THAT THE GOVERNMENT'S POLE
CAMERA OPERATION AGAINST HER AND HER HOME
CONSTITUTED A SEARCH UNDER THE FOURTH
AMENDMENT.......................................................... 34

A. The Holding In *Bucci* Did Not Address The
Government Activity That Is Contested In This
Case............................................................ 35

B. The Law Of The Case Applies Only To Prior
Circuit Holdings............................................. 38

C. Assuming, Arguendo, That *Bucci* Is A
Coterminous Circuit Precedent, Both Exceptions
To The Law Of The Case Rule  Make *Carpenter*
The Controlling Authority Here.......................... 39

III. THE GOOD FAITH EXCEPTION TO THE
WARRANT REQUIREMENT DOES NOT EXCUSE THE
GOVERNMENT'S FAILURE TO OBTAIN A WARRANT...... 49

A. The District Court Finding Of Waiver Is
Correct......................................................... 50

1. The Government's "Ripeness" Claim Is
Waived......................................................... 50

2. No Factual Basis Or Good Cause Is Asserted... 51

B. The Motion For Reconsideration Did Not
Obviate Or Cure The Waiver; Plain Error
Review Is Not Available................................... 53

1. The Good Faith Argument Was Inadequately
Developed..................................................... 54

2. The Motion For Reconsideration Did Not
Revive The waived Good Faith Claim................. 54

C. Because Bucci Did Not Hold That The Use
Of The Pole Camera In That Case Was Not
A Search, The Government Cannot Rely On
*Bucci* To Support A Good Faith Claim That
It Was Not A Search........................................ 56

D. The District Court's Refusal To Consider A
Good Faith Claim Not Asserted Was Not Error..... 57

CONCLUSION................................................ 60

REQUEST FOR ORAL ARGUMENT...................... 60

CERTIFICATE OF COMPLIANCE........................ 61

CERTIFICATE OF SERVICE............................. 62

ADDENDUM.................................... 63

## TABLE OF AUTHORITIES

<u>Cases</u>

*Berger v. New York*,
   388 US 41 (1967)*............................................. 33*
*Bond v. United States*,
   529 U.S. 334 (2000) ......................................  10,26
*Carpenter v. United States,*
   138 S.Ct.2206 (2018) ...................................... 9
*Carpenter's Local Union No. 26 v. United States*
*Fid. & Guar. Co.*,
   215 F3d 136 (1st Cir. 2000)............................... 41,42
*Crowe v. Bolduc*,
   365 F3d 86 (1st Cir. 2004)................................ 42,47
*Gall v. United States*,
   552 U.S. 38 (2007) ........................................ 57
*Greenlaw v. United States*,
   554 U.S. at 243-244........................................ 57
Griswold v. Connecticut,
   381 U.S. 489 (1965)........................................ 29
*Igartua v. Obama*,

-iv-

842 F3d 149 (1ˢᵗ Cir. 2016)................................ 39
*Iverson v. City of Boston*,
 452 F3d 94 (1ˢᵗ Cir. 2006)................................ 54,55
*Katz v. United States*,
 389 US 347 (1967).......................................... 26, passim
*Kimbrough v. United States*,
 552 U.S. 85 (2007).......................................... 44
*Kosereis v. Rhode Island*,
 331 F3d 207 (1ˢᵗ Cir. 2003)............................... 39
*Kyllo v. United States*,
 533 U.S. 27 (2001).......................................... 10, passim
*Massaro v. United States*,
 538 U.S. 500 (2003)........................................ 51
*Municipality of San Juan v. Rollan*,
 318 F3d 26 (1ˢᵗ Cir. 2003)................................ 39
*Osterneck v. Ernst & Whinney*,
 489 U.S. 169 (1989)........................................ 43
*Smith v. Maryland*,
 442 US 735 (1979).......................................... 37
*State v. Jones,*
 903 N.W.2d 101 (S.D.2017)............................. 15,24,25
*Thompson v. United States*,
 138 S.Ct. 2706 (2018)..................................... 22
*United States v. Allen*,
 573 F3d 42 (1ˢᵗ Cir. 2009). ............................... 55
*United States v. Almonte-Reyes,*
 *814 F3d 24 (1ˢᵗ Cir. 2016)*................................ 55
*United States v. Andujar-Arias*,
 507 F3d 734 (1ˢᵗ Cir. 2007).............................. 44,46
*United States v. Booker*,
 543 U.S. 220 (2005)........................................ 45
*United States v. Boyd*,
 138 S.Ct.  1518 (2018).................................... 56
*United States v. Boyd*,
 742 Fed. Appx. 587 (3ʳᵈ Cir. 2018)...................... 56

*United States v. Bucci*,
    582 F3d 108 (2008) ......................................... 10, passim
*United States v. Childs*,
    2008 U.S. Dist. LEXIS 27525,
    2008 WL 941779 (D. Mass. 2008)....................... 14
*United States v. Crooker*,
    688 F3d 1 (1st Cir. 2012) ................................... 53
*United States v. Curzi*,
    867 F2d 36 (1st Cir. 1989)................................. 31
*United States v. Flete-Garcia*,
    925 F3d 17 (1st Cir. 2019)................................. 59
*United States v. Garcia-Gonzalez*,
    2015 U.S. Dist. LEXIS 116312,
    2015 WL5145537 (D. Mass. 2015).......................48
*United States v. Gorsuch*,
    404 F3d 543 (1st Cir. 2005)............................... 49
*United States v. Holloway*,
    630 F3d 252 (1st Cir. 2011)............................... 40,47,48
*United States v. Jones*,
    565 U.S. 400 (2012)...................................... 9, passim
*United States v.*
    *Levasseur*, 699 F. Supp. 995(D. Mass. 1988)...... 31
*United States v.*
    *McNicol*, 829 F3d 77 (1st Cir. 2016) ................... 50
*United States v. Moss*,
    936 F3d 52 (1st Cir. 2019)............................... 12,34
*United States v. Olano*,
    507 U.S. 725, 733 (1993)................................ 49, passim
*United States v. Ramirez-Rivera*,
    800 F3d 1 (1st Cir. 2015)................................. 51
*United States v. Rodriguez*,
    527 F3d 221 (1st Cir. 2008)............................... 39, passim
*United States v. Samuels*,
    808 F2d 1298 (CA8 1987)................................ 58
*United States v. Tanco-Pizarro*,
    892 F3d 472 (1st Cir. 2018) .............................. 55

United *States v. Thompson*,
    866 F3d 1149 (10th Cir. 2017)............................ 22
*United States v. United States District Court*,
    407 US 297 (1972)......................................... 30
*United States v. Waller*,
    426 F3d 838 (6th Cir. 2005)............................... 14
*United States v. Wurie*,
    728 F3d 1 (1st Cir. 2013).................................. 51
*United States v.*
    *Zannino*, 895 F2d 1 (1st cir. 1990)...................... 54,59,60

Other Sources

Clark, Pole Cameras and Surreptitious Surveillance,
FBI Law Enforcement Bulletin, 23 (November 2009)...... 52

Farb, Pole Camera Surveillance Under the Fourth
Amendment,NorthCarolinaCriminalLaw,
https://nccriminallaw.sog.unc.edu
[July 2,2016]........................................... 52

LaPlante & Kaeser, The Continuing Evolution of
Pedestrian Walking Speed Assumptions, ITE
Journal 32 (September2003)..................................... 4

## STATEMENT OF THE ISSUES

I. The District Court correctly ruled that the government's use of a pole camera secretly positioned to capture the images of every person who entered and left Ms. Moore's house, and of every vehicle [license plate included] that entered or left Ms. Moore's driveway, simultaneously creating a precise, searchable video log of this intensive surveillance, conducted by the government uninterrupted for an eight month period, constituted a search within the meaning of the Fourth Amendment, and so required a warrant.

II. The District Court's ruling is not foreclosed by circuit precedent.

III. The government's claim that its agents **"could have"** conducted this warrantless search in good faith reliance on circuit precedent is waived.

## STATEMENT OF THE CASE

### *Pertinent Facts*

On May 17, 2017 agents of the Bureau of Alcohol, Tobacco and Firearms [BATF] placed a camera on a utility pole across the street from Defendant Daphne Moore's residence at 120 Hadley Street in Springfield, MA. Ms. Moore's home "is located on a quiet residential street where physical surveillance [is] difficult to conduct without detection." G.Add.8**.** The government operated this camera 24 hours a day, seven days a week, until mid-January 2018, approximately eight months. G.Add.3.

1

Nothing in the record indicates that BATF obtained permission from anyone to install this camera. BATF trained this camera on Defendant Moore's home for the entire period of operation.

From the images the government belatedly disclosed[1] with its Motion for Reconsideration, it appears that the camera lens was trained on the front yard, the right front corner of the house, the driveway and the garage when it made the images that the government has selected as most useful to its case. E.g., G.App.154-155. In some images, the right front corner of the house – from the perspective of one facing it from the street – is visible, including a double set of windows. Id. In others, only a corner of the eaves of the house is depicted. E.g., G.App.191. The camera

---

[1] In its Government's Appendix, the government has reproduced 82 pole camera images that it filed in the District Court in support of its June 4, 2019 Motion for Reconsideration [ECF Doc. 423-2]. The government submitted no such evidence with its opposition. In the May 13, 2019 hearing on Defendant Moore's motion to suppress, the Court asked which images the government intended to present, but was told that the government had not yet decided. G.App. 112-113,122. None of these images was before the Court when it heard the motion to suppress and issued its ruling. All except one that is undated [G.App. 231], these photos are taken from footage shot between November 17 and December 31, 2017, after six months of apparently unproductive surveillance. G.App.154-230.

lens may have had some wide-angle capabilities, as one of the images shows the yards to the right of 120 Hadley to a distance of 4 or 5 houses [G.App.186], while others show a much narrower view.  G.App.156,191.  Because no affidavit or testimony accompanied these images, the viewer cannot discern whether the variations reflect camera capabilities or manipulation of the images for publication.

The government's select photographs[2] demonstrate that the degree to which Defendant Moore's home is exposed to the camera's view varies by the season. When the trees are in full leaf, neither the house nor the garage is visible, and only the half of the driveway closest to the street is visible. G.App.231. In the fall and winter the view is more open. G.App. 154-155.

Between Ms. Moore's home and the house to the right stands a row of dense evergreen shrubbery and bushes, with larger trees interspersed. G.App.154-155. Stockade fencing connected to the garage extends to those bushes, which appear to be overgrown

---

[2] The same photographs are available on the Pacer website, 3:18-cr-30001-WGY, ECF Doc. 423, where the resolution and overall quality are superior to those reproduced in the government's appendix.

3

hedge. G.App.215, 218, 227. Because only the driveway and right side of the front yard can be seen clearly in them, these photographs do not disclose whether Ms. Moore's property exhibits other steps taken to privatize it. No street-level photographs depict what a casual pedestrian could observe. The width of the yard cannot be discerned but the adjacent yards that can be seen down the street appear to have a hundred feet or less of frontage. Moving at 4 feet/second  a typical pedestrian would pass by in less than a minute.[3]

The pole camera could be operated remotely in real time and produced a searchable, continuous digital recording of everything that came within its purview for those eight months. G.Add.3. It could be remotely panned, tilted, and zoomed in to enable law enforcement officers to read license plates, see into vehicles and observe what the occupants were doing, and focus on faces with

[3]

LaPlante & Kaeser, The Continuing Evolution of Pedestrian Walking Speed Assumptions, ITE Journal 32, 40 (September 2003)[Concluding that 4 feet/second is the average urban pedestrian foot speed. At this speed, a person would walk about 250 feet per minute].

enough precision to enable the operators to recognize facial features. G.App.230, 158-159, 182.

During the roughly eight months of this operation, the government collected an estimated 4 terabytes of data.[4] MooreAdd.1. No warrant authorized this activity. The government has not asserted that it was supported by probable cause. G.Add.4.

### *Procedural History*

On January 11, 2018 a federal grand jury charged Nia Moore-Bush and others with a single count of narcotics distribution conspiracy. ECF Doc. 3.  Ms. Moore-Bush has been detained since her arrest. ECF Doc. 30, 53. At the time of that arrest, her mother Daphne Moore was the adjudicated custodian of Ms. Moore-Bush's

---

[4]

A terabyte is a multiple of the unit byte for digital information. The byte is a unit of digital information that most commonly consists of 8 bits. Historically, the byte was the number of bits used to encode a single character of text in a computer and for this reason is the smallest addressable unit of memory in many computer architectures. The prefix "tera" represents the fourth power of 1000, and means 10 to 12th power in the International System of Units. Therefore one terabyte is one trillion bytes, or 1000 gigabytes.    https://en.wikipedia.org/wiki/Terabyte    and https://en.wikipedia.org/wiki/Byte, last visited October 9, 2019.

two minor children, who lived with her [and still do]. More than eleven months later, on December 20, 2018 a grand jury returned a superseder charging the original defendants with additional counts of committing narcotics, firearms and money laundering violations and conspiracies. Daphne Moore, Nia Moore-Bush's mother, was added as a defendant, charged with narcotics and money laundering crimes and conspiracies, and making false statements. ECF Doc. 206.

Ms. Moore is a lawyer and has served as an Assistant Clerk Magistrate of the Hampden Superior Court for more than 18 years. She was represented by counsel for the year leading up to her indictment, and her counsel offered to surrender her for arraignment. The government refused this accommodation. Instead, federal agents arrested Ms. Moore at her home at approximately 9:00 a.m. on December 21, 2018 and took her to the Springfield police station to be booked. Ms. Moore was then transported to the federal courthouse in Worcester and held in the United States Marshal's lockup in handcuffs and ankle shackles until her arraignment at the end of the court day. The government did not

6

seek detention; Ms. Moore was released on recognizance. ECF Docs. 228, 230, G.App.22; ECF Doc. 250, Ex.B; MooreApp. 18-20.

On January 14, 2019 trial was set for June 10, 2019. ECF Doc. 255, G.App.24.

Defendant Moore moved on April 22, 2019 to suppress the evidence collected by the government's pole camera. ECF Doc. 326, G.App. 27. The government filed an opposition on May 6, 2019. ECF Doc. 367, G.App. 30. Following a non-evidentiary hearing[5] on May 13, 2019 Judge Young took the matter under advisement. ECF Doc. 396, G.App.31.  On June 3, 2019 Judge Young granted the motion. ECF Docs. 416 (original memorandum and order),422 (amended memorandum and order), G. App.33.

On June 4, 2019 the government filed a motion for reconsideration, attaching the hearing transcript, together with 8 video clips and 82 pole camera images it designated as trial exhibits. ECF Doc. 423, G.App.33-34. Judge Young denied reconsideration on June 5, 2019. ECF Doc. 424, G.App.34.

---

[5]

Ms. Moore's counsel asked for an evidentiary hearing. G.App.104-105.

On June 6, 2019 Daphne Moore filed a Renewed Motion For Evidentiary Hearing On Derivative Evidence and Suppression of Evidence Derived From Fruits Of Pole Camera Surveillance, with exhibits demonstrating how other government evidence had been tainted by the fruits of the pole camera operation. ECF Doc. 426, G.App.34; Moore App.2-16. The same day, the government filed a notice of appeal from Judge Young's amended suppression order. ECF Doc. 427, G.App.34.

This prompted the District Court to continue the trial, scheduled to commence June 10, 2019, "without day." ECF Doc. 429, G.App.34. On June 19, 2019 the government filed its notice of appeal from the denial of its motion for reconsideration. ECF Doc.434, G.App.34.

The appeal was entered in this Court on June 11, 2019.

## SUMMARY OF ARGUMENTS

For eight months the government trained a pole camera on the front of Ms. Moore's home, her garage, front yard and her driveway. Indiscriminately and surreptitiously, it recorded the physical movements of all of the individuals and vehicles  who came to and

8

went from her house. In the process, the camera observed who was in Ms. Moore's house, when and for how long. The government did not claim probable cause or a warrant justified this activity; its only defense is that the activity did not constitute a search. Multiple Supreme Court precedents establish that the pole camera operation as a whole constituted a Fourth Amendment search.

*Carpenter v. United States,* 138 S.Ct.2206 (2018) held that individuals have a reasonable expectation of privacy in their "physical locations and movements." The historical cell site location information provided a detailed, time stamped  record of the phone's whereabouts at all times and gives police access to a trove of information "otherwise unknowable." Five justices in *United States v. Jones*, 565 U.S. 500 (2012)  agreed that GPS monitoring of a motor vehicle constituted a search for similar reasons. The *Carpenter* Court refused to extend the third party rule to this information.  In *Carpenter* and *Jones* the Court further indicated that the target individual's First Amendment interests in freedom of association and political advocacy were jeopardized by the unregulated collection and use of this information.  In *Kyllo v.*

9

*United States*, 533 U.S. 27 (2001) the Court held that all details of the interior of a home, including who was in the house, how warmly it was heated and whether there was a can of ether there, is protected from discovery through government surveillance. In *Bond v. United States*, 529 U.S. 334 (2000) the Court found that the passenger/owner of a "soft" luggage bag he had placed in the overhead bin of a bus, where he knew others could handle it, still retained a reasonable expectation that police would not search it by manipulating it.

These Supreme Court principles require the conclusion that the pole camera operation against Ms. Moore constituted a Fourth Amendment search. Since it was conducted without a warrant, the district court's order suppressing it must be affirmed. [12-33]

This Court's holding in *United States v. Bucci*, 582 F3d 108 (2008) that an individual does not have a reasonable expectation of privacy in the parts of her house and yard that are exposed to the public does not address the expectations of privacy found in *Carpenter, Jones, Bond* and *Kyllo* to be reasonable and thus protected from warrantless governmental searches. It does not

10

constitute a circuit precedent that controls the adjudication of Ms. Moore's claim.

Even if *Bucci* is the controlling circuit precedent, both exceptions to the law of the circuit direct this Court to find that the intervening Supreme Court precedents in *Kyllo, Jones* and *Carpenter* to follow their rationales and conclude that the pole camera operation against Ms. Moore constituted a warrantless search requiring suppression of its fruits. [33-48]

The government did not assert a claim of good faith reliance on *Bucci* in response to Ms. Moore's motion to suppress. It does not assert that the judge erred in finding this to be a waiver of the claim. The government made a good faith claim in a motion to reconsider that offered no factual basis for it, and made no effort to show good cause to excuse the waiver. The motion for reconsideration does not entitle the government to plain error review of its good faith claim. Its plain error argument is undeveloped and without merit in any event.   Accordingly, suppression is required. [48-59]

11

# ARGUMENTS

**I. THE DISTRICT COURT'S RULING THAT THE GOVERNMENT'S CREATION OF A COMPREHENSIVE, SEARCHABLE DIGITAL VIDEO LOG OF ALL OF THE COMINGS AND GOINGS TO AND FROM MS. MOORE'S HOUSE FOR TWENTY FOUR HOURS A DAY OVER AN EIGHT MONTH PERIOD CONSTITUTED A SEARCH GOVERNED BY THE FOURTH AMENDMENT IS CONSISTENT WITH THE SUPREME COURT'S RULING IN _CARPENTER_[6] AND SO REQUIRED A WARRANT.**

### *A. Standard of Review.*

This Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. It may affirm on any basis apparent in the record. *United States v. Moss*, 936 F3d 52, 58 (1st Cir. 2019). This standard applies to all arguments in this brief.

### *B. The Government's Use Of The Pole Camera And The Information That It Generated Constituted A Search For Which A Warrant Was Required.*

The pivotal issue in this case is whether the government is required to obtain a warrant before surreptitiously conducting surveillance of a person's comings and goings, and those of her family, friends and associates, to and from her home, twenty four

---

[6] 138 S.Ct. 2206 (2018).

hours a day, for eight months, using camera equipment that zooms and pans to permit identification of vehicle license plates and the faces and activities of individuals in and outside of vehicles in the driveway; and stores the aggregated images of this surveillance in a digitally searchable device indefinitely.

The District Court succinctly and correctly framed the government's position in these terms:

> The Government does not justify its use of the Pole Camera with a warrant or probable cause. See generally Gov't Opp'n. Instead, it insists that its use of the Pole Camera does not amount to a search. Id., at 2. Consequently, as the parties have presented this case, the use of the Pole Camera violates the Fourth Amendment if its operation constitutes a search.

G.Add.4. The government does not challenge this formulation in its brief.[7]

Judge Young correctly analyzed *Carpenter* and applied it to the

---

[7]

The District Court noted that the government had the opportunity to argue that the good faith exception salvaged its warrantless search, but it did not. G.Add.4-5, fn. 2. The court held that this omission constitutes a waiver of the issue. Id. The government asserted a good faith claim in its Motion for Reconsideration; the District Court declined to reconsider. G.Add.26-27, ECF Doc. 424. The Government's appellate claims on this issue are addressed below, Part III.

pole camera search in this case. G.Add.4-24.

### *1. Ms. Moore Had A Subjective And Reasonable Expectation Of Privacy In The Information The Government Seized From Her And Compiled In A Searchable Database*.

The district court found that Ms. Moore "exhibited" a subjective

expectation of privacy, inferred from her actions in choosing to live

in a secluded neighborhood and a home that featured significant

privacy precautions. G.Add. 8-9. She:

> expected privacy in the whole of [her] movements over the
> course of eight months from continuous video recording with
> magnification and logging features in the front of their home.
> [citations omitted] The Court infers from [Moore's] choice of
> neighborhood and home within it that [she] did not
> subjectively expect to be surreptitiously surveilled with
> meticulous precision each and every time [she] or a visitor
> came or went from [her] home.

G.Add.9. These findings of fact are not clearly erroneous. See,

*United States v. Waller*, 426 F3d 838, 844 (6th Cir. 2005)[subjective

expectation of privacy established by circumstantial evidence];

*United States v. Childs*, 2008 U.S. Dist. LEXIS 27525, 2008 WL

941779 (D. Mass. 2008).

As the owner of the house, Moore necessarily had a reasonable

expectation that she was not subject to the intense, personal

14

surveillance imposed on her here. *State v. Jones,* 903 N.W.2d 101 (S.D.2017)["These (pole camera) observations revealed the patterns of Jones's life and were gathered without a neutral judicial official deciding whether law enforcement had probable cause to justify the intrusion"].[8]

### 2. United States v. Jones: GPS Monitoring And Collection Of The Public Movements Of A Vehicle Constitutes A Search.

The basis for the expectation of privacy articulated in *Carpenter* is found in *United States v. Jones*, 565 U.S. 400 (2012). In *Jones*, the Court held that the installation of a GPS tracking device, and the use of that device to monitor the vehicle's movements, constituted a "search" under the Fourth Amendment. 565 U.S. at 404. It rejected the government's *Katz*-based argument that Jones had no reasonable expectation of privacy, either in the place where the device was attached or in the public movements of the vehicle. The Court responded that Jones's Fourth Amendment

---

[8] This astute, carefully reasoned pre-*Carpenter* ruling relied heavily on the *Jones* concurrences, quoting Justice Alito: "The best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of [the unregulated technology in a particular case involved a degree of intrusion that a reasonable person would not have anticipated." *Jones*, 565 U.S. at 430.

rights "do not rise or fall with the *Katz* formulation." Rather, "we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Id*., at 406. The *Katz* "reasonable expectation of privacy" formulation "has been added to, not substituted for, the common-law trespassory test." *Id.*, at 409. The common law trespass formulation covers the "persons, houses, papers, and effects" enumerated in the text of the Fourth Amendment; "[s]ituations involving merely the transmissions of electronic signals without trespass would remain subject to *Katz* analysis." *Id*., at 411 & n. 8.

Because the government trespassed on Jones's property interests in attaching the device to his car, its actions constituted a search.

Justice Alito, joined by Justices Kagan, Ginsberg and Breyer, concurred but advocated discarding the trespassory formulation in favor of a solely *Katz*-based analysis. 565 U.S. 419-431. The majority rejected that alternative because "[i]t would apply *exclusively Katz's* reasonable-expectation-of-privacy test, even when that eliminates rights that previously existed." *Id*., at 411.

16

Justice Sotomayor concurred separately, embracing and expanding on Justice Alito's observations that "physical intrusion is now unnecessary to many forms of surveillance," and "the same technological advances that have made possible *nontrespassory surveillance techniques* will also affect the *Katz* test by shaping the evolution of societal privacy expectations." *Id*., at 414-415 [emphasis added]. She agreed with Justice Alito that, "at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" She continued:

> In most cases involving even short-term monitoring, some unique attributes of GPS surveillance relevant to the *Katz* analysis will require particular attention. GPS monitoring generates a precise, comprehensive record of a person's *public movements that reflects a wealth of detail about her familial, political, professional, religious and sexual orientations*. * * * The government can store such records and efficiently mine them for information years into the future. *Pineda-Moreno*, 617 F3d, at 1124 (opinion of Kozinski, C.J.). And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility." *Illinois v. Lidster*, 540 U.S. 419, 426, 124 S.Ct. 885, 157 L. Ed. 2d 843 (2004).
> Awareness that the government may be watching chills associational and expressive freedoms. And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is

17

that GPS monitoring – by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the government, in its unfettered discretion, chooses to track – may "alter the relationship between citizen and government in a way that is inimical to democratic society." *United States v. Cuevas-Perez*, 640 F3d 272, 285 (CA7 2011)(Flaum, J., concurring).

*I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements*. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on. I do not regard as dispositive the fact that the government might obtain the fruits of GPS monitoring through lawful conventional surveillance techniques. See *Kyllo*, 533 U.S., at 35, n.2, 121 S.Ct. 2038, 150 L. Ed.2d. 94; *ante*, at ___, 181 L.ed. 2d at 923 (leaving open the possibility that duplicating traditional surveillance "through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy"). *I would also consider the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power and prevent "a too permeating police surveillance*," *United States v. Di Re*, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 2d 210 (1948).

*Jones*, 565 U.S. at 415-417 (Sotomayor, J., concurring)

[emphasis added].

Justice Sotomayor also foresaw the need to reexamine the

*Katz* dicta that was designed to curb the reasonable expectations of privacy doctrine – the third party and public "exposure" rules:

> But whatever the societal expectations, they can attain constitutionally protected status only if our *Fourth Amendment* jurisprudence *ceases to treat secrecy as a prerequisite for privacy.* I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to *Fourth Amendment* protection. * * * see also, *Katz*, 389 U.S., at 351-352, 88 S.Ct. 507, 19 L.ed. 2d 576 ("[W]hat [a person] seeks to preserve as private, *even in an area accessible to the public*, may be constitutionally protected").

Id., at 418 [emphasis added].

Most of the substance of these two concurrences was worked into the majority opinion in *Carpenter*: "**A majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements**." 138 S.Ct. At 2217 [emphasis added]. Like *Gall* and *Kimbrough*[9], *Jones* and *Carpenter* laid the groundwork for a wholesale revision of the Court's way of thinking about reasonable expectations of privacy concerning intensive, long-term surveillance

_____

[9]

See, *infra* pp. 44-46.

19

capabilities and practices that generate large aggregations of storable and searchable information about private citizens, whether or not that information is harvested from public activity.

### 3. *Carpenter v. United States: Seizure Of Aggregated Cell Site Location Information Compiling The Public Movements Of A Cell Phone Is A Search*.

In *Carpenter*, a court order permitted the government to obtain the defendant's cell site location information [CSLI] from his cell phone service provider without a warrant. CSLI is generated automatically by the electronic interaction between a cell phone and a set of radio antennae known as a cell site. Cell phones continuously scan their environment looking for the strongest signal, which typically comes from the closest cell site. Each time the phone connects with a cell site, the site generates a time-stamped record known as CSLI. Service providers collect and store "historical" CSLI for various business purposes. Federal law permitted federal prosecutors to apply for court orders that compel the service providers to disclose historical CSLI without a showing of probable cause. 138 S.Ct. at 2211-2213. This information can be digitally organized and searched precisely to pinpoint the location

20

of the cell phone at specified times. *Id*. At issue in *Carpenter* were two orders spanning 152 and 7 days of CSLI, which contained 12,898 location points cataloging Carpenter's movements over 127 days. Id., at 2212.

The Court held that Carpenter had a reasonable expectation of privacy in the CSLI generated by his cell phone, even though it was taken from the service provider.  138 S.Ct. at  2217. It reached this point by resolving tensions between a person's "expectations of privacy in his physical location and movements" and the third-party doctrine under which the voluntary transfer of information to another erases or delegitimizes that expectation. The Court concluded that the individual's expectation of privacy in CSLI depended on several "unique" attributes of historical CSLI:

• "Mapping a cell phone's location over 127 days provides an all-encompassing record of the holder's whereabouts."[10] 138 S.Ct. at 2217.

_____

[10]

In *Carpenter*, the Court observed that five Justices in *Jones* agreed that "privacy concerns would be raised by, for example, 'surreptitiously activating a stolen vehicle detection system'" or "conducting GPS tracking" of a suspect's cell phone. 138 S.Ct. at 2215.

- "The timestamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious and sexual associations.'"[11] *Id*.

- "[C]ell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just a click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Id*., at 2218.

- "[Individuals] compulsively carry cell phones with them all the time." *Id*.

- "[T]he retrospective quality of the data . . . gives police access to **a category of information otherwise unknowable**." *Id*., at 2218.

---

[11] The government argues that this attribute is found only in Justice Sotomayor's concurrence in *Jones*, 565 U.S. at 425. GOB at 28. This misses the fact that the *Carpenter* majority effectively incorporated this element of Justice Sotomayor's *Jones* concurrence. *Carpenter*, 138 S.Ct. at 2215, 2217, 2220. It also misses the fact that United *States v. Thompson*, 866 F3d 1149, 1158-1159 (10th Cir. 2017), cited for that proposition was GVR'd on the basis of *Carpenter*. *Thompson v. United States*, 138 S.Ct. 2706 (2018).

Aggregated, these five attributes of CSLI created an actual and reasonable expectation of privacy in that information.

The Court further held that the third party doctrine does not apply to CSLI because the underlying rationale of that doctrine is "voluntary exposure," which does not "hold up when it comes to CSLI." *Carpenter*, 138 S.Ct. at 2220. A cell phone "logs a cell-site record by dint of its operation, without any affirmative action on the part of the user beyond powering up." Further, "apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data." CSLI is "not truly shared as one normally understands the term." In other words, "in no meaningful sense does the user voluntarily 'assume[] the risk' of turning over a comprehensive dossier of his physical movements." *Id*. The Court did not except CSLI from the reach of the third party doctrine; it refused to *extend* the third party doctrine to that kind of information.[12] *Id*.

Therefore, the government's acquisition of Carpenter's CSLI

---

[12]

Viewed from this perspective, *Bucci* constitutes an unwarranted extension of the public exposure doctrine.

constituted a search. *Id*., at 2230.

The data generated by the Moore pole camera falls within these parameters.

•The pole camera monitored all comings and goings by any person into Ms. Moore's home and front yard for a period of 8 months. This data may be less comprehensive than CSLI but is more intimate because, being limited to her home, it is more likely to reveal her closest personal associations where her expectation of privacy is highest. *State v. Jones*, supra at 113.

•The pole camera's video cache is time stamped, revealing not only Ms. Moore's comings and goings, but identifying the people she interacts most closely with, and facilitating the investigation of them.

•The pole camera is easy, cheap and efficient compared to traditional surveillance tools. Without having to contend with third party custodians, the government can access its own repository of historical images of physical movements at practically no expense. It can also monitor these physical movements in real time and use the information generated to coordinate with other investigative

tools. In this aspect, it is more powerful than CSLI. See, MooreAdd.2-15.

●Ms. Moore was unaware of this surveillance and unwittingly compelled to participate in it for as long as the government chose to carry it out. Like a cell phone user, she had no choice in the matter.

●The ongoing nature of the surveillance and retrospective quality of the data gave the government access to a category of information otherwise unknowable – Ms. Moore's patterns of coming and going, and the identities and patterns of her visitors.[13] *State v. Jones*, supra.

Under *Carpenter* and *Jones*, the government's pole camera activity in this case clearly constituted a search. The public disclosure limitation has already been limited consistently with this proposition.

---

[13] This feature of pole camera surveillance is susceptible of profound abuse absent the judicial oversight that the warrant process imposes. Simple adjustments, such as the installation of facial recognition software, creates a "surveillance state" tool. See, MooreAdd.22-25.

25

### *4. The Unavoidable Exposure Of The Individual Events That The Government Has Compiled And Archived Does Not Quash Ms. Moore's Reasonable Expectation Of Privacy.*

As noted above, the information searched for and seized in *Jones* and *Carpenter* had been exposed publicly; that fact did not eliminate the individual's reasonable expectation of privacy in it. This is consistent with both *Katz*, 389 U.S. 347,  351-352 (1967), and *Bond v. United States*, 529 U.S. 334 (2000). Katz points out that public exposure is not determinative of whether it is protected by the Fourth Amendment.

Likewise in *Bond*, a person's reasonable expectation of privacy was not simply dependent on whether or not she she or her effects have been exposed to the public.  Rather, a reasonable expectation of privacy is informed by what that person may expect from the public, in general, in the circumstances of the particular "exposure".

For example, living in a residential neighborhood raises the reasonable prospect that one or more neighbors will observe you leaving your house at various times and for various purposes.  It would be unreasonable to expect such casual observations *not* to happen.  It is also within the realm of possibility that a neighbor or

passerby will take a photograph, incidentally or purposely capturing your image or the image of a guest.  However, being established in a quiet residential neighborhood, you would not reasonably expect neighbors or passers-by to record by searchable video every coming and going from your home for a period of even a day, much less for months on end.

Thus, Mr. Bond could expose his "soft" luggage to the public, on a bus, and reasonably expect that it would be handled by other passengers or bus employees, without losing his expectation of privacy in the contents of the luggage, even though manipulation of the exterior might reveal information about the contents.  Id at 338.  That expectation of privacy remained intact based on his life experience in carrying "soft" luggage on a public bus. And that expectation is one that society is prepared to accept as reasonable based on a shared community of experience.  *Id*.

The shared community experience of life in a quiet residential neighborhood creates a reasonable expectation of privacy in the entirety of your comings and goings, at least to the extent that you do not expect neighbors and passers-by to have you under constant

video surveillance.

The District Court's conclusion that Ms. Moore had exhibited a reasonable expectation of privacy based on her choice of residence is fully consistent with shared community experience and is clearly one that society is prepared to accept as reasonable.  Judge Young's finding that the government's pole camera operation against Ms. Moore constituted a search is fully supported by these precedents.

### 5. Ms. Moore's Associational Interests Properly Reinforce Her Reasonable Expectations Of Privacy.

The government has failed to advance any compelling interest in warrantless video/pole camera surveillance.  Its purpose in conducting such surveillance in this case was to obtain evidence for criminal prosecution, based particularly on identifying Ms. Moore's associates and visitors.  Unlike the self-imposed, voluntary limitations on warrantless search activities[14] in *Katz v. United States*, 389 US 347, 354 (1967), the government here was

---

[14]

". . . the surveillance was limited, both in scope and duration, to the specific purpose of establishing the contents of the petitioner's unlawful telephonic communications.  The agents confined their surveillance to the brief periods during which he used the telephone booth, and they took great care to overhear only the conversations of the petitioner himself." *Katz*, 389 US at 354.

profligate in its appetite for unfiltered and unlimited information about Ms. Moore and her associations[15].    The district court recognized the threat, to Ms. Moore's First Amendment right of privacy in her associations[16], posed by this completely unregulated government surveillance.    G.Add. 18.    Regulation of government surveillance was one of the basic principles that energized the Fourth Amendment's warrant requirement:

> The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. *Katz v. United States*, [389 US 347] supra, at 359-360 (DOUGLAS, J., concurring). But **those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize**

---

[15]

"It is difficult to imagine how any of these exceptions could ever apply to the sort of search and seizure involved in this case. Even electronic surveillance substantially contemporaneous with an individual's arrest could hardly be deemed an 'incident' to that arrest. Nor could the use of electronic surveillance without prior authorization be justified on the grounds of 'hot pursuit.' And, of course, the very nature of electronic surveillance precludes its use pursuant to the suspect's consent." *Katz*, 389 U.S. at 357-358.

[16]

"Various [constitutional] guarantees create zones of privacy. The right of association contained in the penumbra  of the First Amendment is one, as we have seen." *Griswold v. Connecticut*, 381 US 489, at 484 (1965).

29

**constitutionally sensitive means in pursuing their
tasks**. The historical judgment, which the Fourth
Amendment accepts, is that unreviewed executive
discretion may yield too readily to pressures to obtain
incriminating  evidence and overlook potential invasions
of privacy and protected speech. (emphasis added).

*United States v. United States District Court*, 407 US 297, at 317

(1972).

### *6. Because The Pole Camera Disclosed Who Was In The House, And When They Entered And Left, Its Use Was A Search*.

In *Kyllo v. United States*, 533 U.S. 27, 40 (2001) the Supreme

Court held that the use of a thermal imaging device to capture

infrared images of objects within a person's home constituted a

search. Kyllo's rationale applies directly to Ms. Moore's claim of a

reasonable expectation of privacy in the information obtained by the

pole camera system used against her.

The pole camera revealed not only who came to and left Ms.

Moore's home, but the dates and times at which each individual was

actually in the home at the same time as Ms. Moore.  The pole

camera recorded the identity of people who were inside Ms. Moore's

home at any given time.  This information constitutes "intimate

30

details" from within the walls of Ms. Moore's home.  See also,

*United States v. Levasseur*, 699 F. Supp. 995, 1000-1001 (D. Mass.

1988)[police order to exit home to learn who was inside constituted

a search], *aff'd sub nom on other grounds*, *United States v. Curzi*,

867 F2d 36 (1st Cir. 1989). This is a search within the protection of

the Fourth Amendment and this search requires a warrant:

> The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In *Silverman*, for example, we made clear that any physical invasion of the structure of the home, "by even a fraction of an inch," was too much, 365 U.S. at 512, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. **In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes**.

*Kyllo v. United States*, 533 US 27 at 37 (2001)(emphasis added).

In *Kyllo*, the Court dealt with a thermal imaging device that

purported to record only heat emanating from inside the home but

detectable as it exited the home. Id. at 35.  The Court did not limit

its holding to a particular surveillance device, nor to the type of

information it seized:

31

Limiting the prohibition of thermal imaging to "intimate details" would not only be wrong in principle; it would be impractical in application,   failing to provide "a workable accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment," *Oliver v. United States*, 466 U.S. 170, 181, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984). To begin with, **there is no necessary connection between the sophistication of the surveillance equipment and the "intimacy" of the details that it observes -- which means that one cannot say (and the police cannot be assured) that use of the relatively crude equipment at issue here will always be lawful**. The Agema Thermovision 210 might disclose, for example, at what hour each night the lady of the house takes her daily sauna and bath -- a detail that many would consider "intimate"; and a much more sophisticated system might detect nothing more intimate than the fact that someone left a closet light on. We could not, in other words, develop a rule approving only that through-the-wall surveillance which identifies objects no smaller than 36 by 36 inches, but would have to develop a jurisprudence specifying which  home activities are "intimate"  and which are not.   And even when (if ever) that jurisprudence were fully developed, no police officer would be able to know in advance whether his through-the-wall surveillance picks up "intimate" details -- and thus would be unable to know in advance whether it is constitutional.

*Kyllo*, 533 US at 38-39.

The information available to the government through the long

term use of the pole camera used in the instant case captures the

intimate details of the target's life much more effectively than does a thermal imaging device that does not even disclose who is in the house, if anyone.  Clearly, under the reasoning in *Kyllo*, the Fourth Amendment requires a warrant for the pole camera surveillance at issue in Ms. Moore's case.

### 7. Pole Camera Surveillance Requires Judicial Supervision Under The Fourth Amendment.

Pole camera surveillance that generates searchable video records of a person's public movements, especially as related to a person's private home, should be subject to the warrant requirement.  A warrant is particularly important where associational privacy is threatened because the goal of the surveillance is to gather intelligence on the home's occupants and their associations, to be sorted out at a later time.  See, *Berger v. New York*, 388 US 41, 59-60 (1967)(addressing the unconstitutionality of open-ended, long-term wiretaping/eavesdropping and the seizure of "conversations of any and all persons coming into the area covered by the device.").

Further, in determining whether a warrant should be required,

33

the Court should consider that the expectation of privacy inquiry applies not only to the area to be searched, but also to "the items seized." *United States v. Moss*, 936 F3d 52, 58 (1st Cir. 2019). The items seized from Ms. Moore – the images that reveal the intangible patterns of her physical movements – were hoovered up without any limitation. The particularity principle serves "to prevent wide-ranging general searches by the police." Id. The violence this search did to that principle is hard to overstate. See, *Jones*, 565 U.S. at 416-417 ["I would also consider the appropriateness of entrusting to the Executive, in the absence of any oversight from a coordinate branch, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power and prevent 'a too permeating surveillance,' *United States v. Di Re*, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948)."] (Sotomayor, J. concurring).

## II. AFTER *CARPENTER* AND *JONES, BUCCI* IS NOT A CONTROLLING PRECEDENT APPLICABLE TO MS. MOORE'S CLAIM THAT THE GOVERNMENT'S POLE CAMERA OPERATION AGAINST HER AND HER HOME CONSTITUTED A SEARCH UNDER THE FOURTH AMENDMENT.

The government's central argument in this appeal is that this

34

Court's holding in *United States v. Bucci*, 582 F3d 108 (1ˢᵗ Cir. 2008) controls the outcome in this case under the "law of the circuit" corollary to the principle of *stare decisis*, and that no exception to that rule applies here. Government's Opening Brief ["GOB"], 15. Specifically, it argues, *Bucci* held that the use of a pole camera to surveil the front of a person's home and driveway does not constitute a search because that area is exposed to public view. *Id*. For that reason, there can be no objectively reasonable expectation of privacy in those exposed areas.

Bucci did not address the government activity that is at issue here: the seizure of the intangible patterns of Ms. Moore's daily movements, and those of her family, friends and associates that were captured and aggregated in searchable format without limitation for eight months.

### A. The Holding In Bucci Did Not Address The Government Activity That Is Contested In This Case.

In *Bucci*, this Court was terse:

"There are no fences, gates or shrubbery located in front of [Bucci's residence] that obstruct the view of the driveway or the garage from the street. Both [are] plainly visible." An individual does not have an expectation of privacy in items or places he exposes to the public. See *Katz v. United States*,

35

389 U.S. 347, 351, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967)("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); see also, *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L. Ed. 2d 210 (1986). That legal principle is dispositive here. See *Kyllo v. United States*, 533 U.S. 27, 31-33, 121 S.Ct. 2038, 150 L.Ed. 2d 94 (2001)(noting lawfulness of unenhanced visual surveillance of a home).

582 F3d at 116-117. In essence, this Court said that Bucci had no expectation of privacy in the physical features of his front yard, house and driveway because he had taken no steps to conceal or obstruct the view of them from the street*.* 582 F3d at 116. The Court was focused on the "unenhanced visual surveillance of a home." 582 F3d at 117. The government argues that *Bucci* is indistinguishable from Moore's case and so controls the outcome here. GOB, 15-20.

The district court rejected this argument. Judge Young noted that Moore did not assert that a trespassory search had been made; she claimed that the government's intensive surveillance and aggregated storage of a huge volume of data about her physical movements and associations violated her reasonable expectations

of privacy.[17] G.Add.5. In other words, the government activity being challenged includes the seizure of images that, when aggregated, capture the patterns of Ms. Moore's life – her own activities and those of her friends and associates.

The first requirement of analysis of a Fourth Amendment claim is to "begin by specifying precisely the nature of the state activity that is challenged."  *Smith v. Maryland*, 442 US 735, 741 (1979). Once the nature of the government's challenged activity is specifically identified – here the creation of a "precise, comprehensive record of a person's public movements" by the use of long-term surreptitious video recording – the inapplicability of *Bucci* becomes clear.

---

[17]

In *United States v. Jones*, 565 U.S. 500 (2012) the Court clarified that the trespassory and reasonable expectation of privacy rubrics are not mutually exclusive but rather complementary: "the Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." Id., at 409. Justice Scalia elaborated:

> A trespass on "houses" or "effects," or a Katz invasion of privacy, is not alone a search unless it is done to obtain information, and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy.

Id., at 409 n. 5.

The district court put it this way:

> The Government sidesteps Moore-Bush and Moore's asserted privacy interest: it focuses on whether Moore-Bush and Moore had a broader privacy interest in the front of their house. See Gov't Opp'n 4. Construed broadly, perhaps they did not. See *California v. Ciraolo*, 476 U.S. 207, 213 (1986)(observing that law enforcement officers need not 'shield their eyes when *passing* by a home on public thoroughfares").
>
> Yet that is not the narrower privacy interest that Moore-Bush and Moore assert here. Instead, Moore-Bush and Moore claim that they expected privacy in the whole of their movements over the course of eight months from continuous video recording with magnification and logging features in the front of their house. Moore Mot. 9-10; Moore-Bush Mot. 5.

G.Add8-9 [emphasis added]. In its appellate brief, the government insists that the issue presented is merely whether Ms. Moore has a reasonable expectation of privacy in the features of the front of her home, driveway and yard, but that is not the issue adjudicated in the district court and presented for review by this Court.

Since *Bucci* does not address the government conduct at issue here, it is not binding on this Court under the law of the circuit doctrine.

## B. The Law Of The Case Applies Only To Prior Circuit Holdings.

Only a ruling that is essential to the disposition of the case is

38

Case: 19-1583    Document: 00117504973    Page: 47    Date Filed: 10/21/2019    Entry ID: 6291205


binding on later panels under the law of the circuit rule. *Igartua v. Obama*, 842 F3d 149, 151 n. 1 (1st Cir. 2016). Dicta – as opposed to a court's holdings – have no binding effect in subsequent proceedings in the same (or any other) case. *Municipality of San Juan v. Rollan*, 318 F3d 26, 28 n.3 (1st Cir. 2003); *Kosereis v. Rhode Island*, 331 F3d 207, 213 (1st Cir. 2003)["Dicta, of course, is not binding on future panels"]. Thus, when this Court says that, "[a]s a general rule, newly constituted panels in a multi-panel circuit are bound by prior panel decisions *closely on point*," (emphasis added), it must be referring to prior *holdings* that are controlling on the issue under consideration in the present case.  As demonstrated above, *Bucci*'s holding is not binding in this case because it is does not address the issue litigated and decided in the district court.

### C. Assuming, Arguendo, That *Bucci* Is A Coterminous Circuit Precedent, Both Exceptions To The Law Of The Case Rule  Make *Carpenter* The Controlling Authority Here.

The law of the circuit is a corollary of the principle of *stare decisis*; it "has soft edges; it is 'neither a straightjacket nor an immutable rule." *United States v. Rodriguez*, 527 F3d 221, 224 (1st

Cir. 2008).

In this spirit, this Court has recognized that the doctrine admits of at least two exceptions. Obviously, the law of the circuit does not apply "when the *holding* of a previous panel is contradicted by controlling authority, subsequently announced(.)" *Id.*, at 225. A related exception applies when a subsequent authority, "although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." In some circumstances, both exceptions may apply; this occurred in *Rodriguez*, supra.

When considering whether one or both of these exceptions militates against applying the law of the circuit rule, this Court does not interpret the intervening Supreme Court ruling narrowly. *United States v. Holloway*, 630 F3d 252, 258 (1st Cir. 2011)["A Supreme Court opinion need not be directly on point to undermine one of our opinions. 'A (Supreme Court) holding . . . can extend through its logic beyond the specific facts of its case'"]. It assesses not just the holding, but the Supreme Court's rationale, its analytical method, and the directional indicators embedded in the

Court's considered commentary on the subject matter of the intervening decision. It examines its own precedent for its compatibility with the new order and discards rulings that cannot be reconciled with the new decision.

For example, in *Carpenter's Local Union No. 26 v. United States Fid. & Guar. Co.*, 215 F3d 136 (1st Cir. 2000),  this Court pointed out that, because the federal system is "not only precedent-based but hierarchical":

> When emergent Supreme Court case law calls into question a prior opinion of another court, that court should pause to consider its likely significance before giving effect to an earlier decision.

*Id.*, at 141. Although *Carpenter's Local* involved an issue of statutory interpretation, a field in which *stare decisis* interests are particularly strong [*Id*.], this Court considered whether its precedent "though not directly overruled or superseded, fairly can be said to have fallen by the wayside." Id., at 142. *Stare decisis*, it said, "leaves room for courts to balance their respect for precedent against insights gleaned from new developments, and to make informed judgments as to whether earlier decisions retain preclusive force." *Id*.

41

Examining rationales of two intervening Supreme Court precedents, this Court noted that neither applied directly to the inquiry involved in *Carpenter's Local*. Both opinions signaled an "analytical shift" in how the statutory problem should be evaluated, although both "stop short of explicitly endorsing a new analytic modality" to the "reference to" inquiry at hand:

> Although the *Travelers* Court had no occasion to link its newly conceived 'objectives' analysis to the 'reference to' inquiry, the two building blocks on which that analysis rests * * * logically undergird both inquiries. [citation ommitted]. We thus proceed to apply the teachings of *Travelers* and *Dillingham* as we understand them.

*Id*., at 143. The Court then analyzed the issue before it using the principles underlying the two intervening Supreme Court precedents and concluded that the new perspective offered by these precedents was more useful analytically than the Circuit precedent: "Believing, as we do, that *Williams* no longer aids us in our consideration of this issue, we abrogate its central holding." *Id*., at 145.

In *Crowe v. Bolduc*, 365 F3d 86 (1st Cir. 2004) this Court followed a similar path when faced with the question of whether a motion to add mandatory prejudgment interest should be brought under Rule 59(e) or 60(a), F.R.Civ.P. Circuit precedent dictated Rule

42

60(a). Three years later, in *Osterneck v. Ernst & Whinney*, 489 U.S. 169 (1989) the Supreme Court held that a motion to add discretionary prejudgment interest must be brought under Rule 59(e); in a footnote the Supreme Court said: "We do not believe the result should be different where prejudgment interest is available as a matter of right."  *Id*., at 176 n. 3.

This Court said: "Following *Osterneck's* lead, we conclude that Rule 59(e) is the proper procedural vehicle for motions seeking to revise a judgment to include an initial award of prejudgment interest (whether mandatory or discretionary)." *Id*., at 92-93. The Court explained:

> To be sure, this footnote is dictum, but it is much more than an offhand comment. We have recognized before, and today reaffirm, that "**carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative**." *United States v. Santana*, 6 F3d 1, 9 (1st Cir. 1993); accord *McCoy v. Massachusetts Inst. of Technology*, 950 F2d 13, 19 (1st Cir. 1991).

*Id*., at 92 [emphasis added]. "To the extent that our earlier decision in *Aubin* is inconsistent with this holding, it is overruled." *Id.*, 93.

A third case in which this Court found circuit precedent not to be binding in the face of intervening Supreme Court decisions is

particularly pertinent to this case.

As noted, in *United States v. Rodriguez*, supra, both exceptions to the law of the circuit rule came into play. At issue was the continuing viability of a 2007 sentencing decision by this Court that prohibited a judge from using the fact that a defendant was not eligible for fast-track leniency as a basis for varying downward from the applicable advisory guidelines range. *United States v. Andujar-Arias*, 507 F3d 734, 739 (1st Cir. 2007). This Court decided that *Andujar-Arias* was no longer viable after the Supreme Court's decisions in *Gall v. United States*, 552 U.S. 38 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007),[18] explaining:

> These decisions . . . shed new light on the scope of a sentencing court's discretion under an advisory guidelines scheme. Collectively, they called into question a number of our earlier decisions by emphasizing the breadth of a district court's discretion to deviate from a defendant's GSR [Guidelines sentencing range] based on the compendium of sentencing factors mentioned in 18 U.S.C. §3553(a). * * * [W]e are now persuaded that the gloss added by the Supreme Court militates in favor of a new approach – an approach that requires, inter alia, abrogating our holding in

---
[18]

*Andujar-Arias* was decided November 19, 2007; *Gall* and *Kimbrough* were decided December 10, 2007; *Rodriguez* was decided June 4, 2008.

*Andujar-Arias*.

*Rodriguez*, 527 F3d at 225.

*Gall* and *Kimbrough* enlarged the discretion of district courts in sentencing, even authorizing sentencing judges to vary from the Guidelines based on policy considerations, including disagreement with the Guidelines. Id., at 227. Although the Guidelines had been declared advisory in *United States v. Booker*, 543 U.S. 220 (2005), various categorical rules and practices from the old regime persisted, particularly in appellate review of lenient sentences. This Court chose to treat *Andujar-Arias* as emblematic of appellate "bright-line" rules of review, *id*., at 226-227, as to which "emergent case law signals that, under an advisory guideline regime, sentencing has become a steadily more open-ended enterprise."[19]

---

[19] Building on the foundation laid in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), *Kimbrough* lends a new flexibility to the scope of the district courts' sentencing authority and, in the bargain, removes a formidable obstacle to the consideration of matters such as fast-track disparity. We refer specifically to the *Kimbrough* Court's enlargement of a sentencing court's capacity to factor into the sentencing calculus its policy disagreements with the guidelines. *Kimbrough*, 128 S.Ct. At 570. This makes plain that a sentencing court can deviate from the guidelines based

*Id*., at 227.

In addition to liberalizing the discretion of sentencing judges, the Supreme Court revised the way §3353(a)'s catalog of sentencing factors is to be applied, away from treating them as independent considerations and toward treating them as a "tapestry of factors, through which runs the thread of an overarching principle" – the "parsimony principle" that instructs sentencing judges to "impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing." *Id*., at 228. These fundamental changes that *Gall* and *Kimbrough* brought to the approach to be taken in sentencing and appellate review of sentencing are inconsistent with using categorical rules like that in *Andujar-Arias*:

> For these reasons, we conclude that consideration of fast-track disparity is not categorically barred as a sentencing evaluation datum within the overall ambit of 18 U.S.C. §3553(a). To the extent necessary to effectuate this holding, we abrogate our earlier opinion in *Andujar-Arias*.

*Id*., at 229.

---

on general policy considerations.
*Rodriguez*, 527 F3d at 227.

In each of these three cases [and in *Holloway*, 630 F3d at 259-260], this Court found that one or more Supreme Court cases had clearly signaled that its view of the law was shifting in a direction that was incompatible with the rationale of the First Circuit holding being reviewed. In *Carpenter's Local*, this Court perceived that the Supreme Court had "plainly signaled a significant analytic shift" in determining when to apply the ERISA preemption doctrine: it abandoned "strict textualism in favor of a more nuanced approach" that focused on the objectives of the ERISA statute. 215 F3d at 140. This Court applied the Supreme Court's approach, found that it led to a result more aligned with the Supreme Court's new way, and overruled its precedent.

In *Crowe*, this Court followed an explicit Supreme Court directive and overruled its precedent, despite the fact that the directive was stated in dictum. It did so on the principle that "carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative." 365 F3d at 92. And in *Rodriguez*, this Court examined two very fresh intervening Supreme Court decisions

47

and, rather than reading them for the holdings, examined them for the changes in sentencing philosophy, both in terms of devising individualized sentences and in terms of the division of authority between sentencing and reviewing courts. Concluding that its current direction on those points needed realignment, this Court again discarded its passe precedent and struck out in the new direction that the Supreme Court had clearly identified.

Like *Holloway*, Ms. Moore's case belongs with these recalibrating precedents. In *Bucci*, this Court applied the public exposure rationale without considering the individual's interest in the privacy interests that the Supreme Court found significant in *Jones* and controlling in *Carpenter*. Judge Young noted that the *Jones* concurrences "undermine *Bucci's* legal [and] analytic foundations," citing *United States v. Garcia-Gonzalez*, 2015 U.S. Dist. LEXIS 116312, , 2015 WL5145537 (D. Mass. 2015)(Sorokin, J.). He acknowledged that the Supreme Court characterized its *Carpenter* holding as "narrow," and pointed out that his ruling is grounded on the Supreme Court's "necessary reasoning" rather than its holding. G.Add.12. See, *Holloway*, 630 F3d at 258 ["A

48

[Supreme Court] holding . . . can extend through its logic beyond the specific facts of its case"].

The Supreme Court's recognition of an individual's privacy interest in the whole of their physical movements – the patterns of their lives – and in being free from warrantless, targeted and intensive surveillance that collects these intimate details for the foreseeable future to be studied and used as evidence, is binding on this Court.

## III. THE GOOD FAITH EXCEPTION TO THE WARRANT REQUIREMENT DOES NOT EXCUSE THE GOVERNMENT'S FAILURE TO OBTAIN A WARRANT.

The government argues that this Court should reverse the district court's suppression order because it relied in good faith on *Bucci* in utilizing the pole camera without a warrant. GOB 33-35. The government did not assert its claim of good faith in its opposition to Ms. Moore's motion to suppress in the district court, and that court found it thereby waived this claim. G.Add.4-5 & fn. 2. *United States v. Olano*, 507 U.S. 725, 733 (1993)[waived claim cannot be reviewed under Rule 52(b)]; *United States v. Gorsuch*, 404 F3d 543, 547 n. 1 (1st Cir. 2005)[same]. In its motion for

reconsideration the government made a good faith claim but offered no evidence in support of that argument and gave no reason why it had not asserted that claim in its opposition to Ms. Moore's motion to suppress. G.App.145-146. It has not challenged the finding of waiver nor attempted a showing of good cause.

Because the claim is waived, the government cannot obtain any appellate review of it. The government's argument that its motion for reconsideration revived its good faith claim for plain error review lacks merit.

### A. The District Court Finding Of Waiver Is Correct.

### 1. The Government's "Ripeness" Claim Is Waived.

On appeal, the government's only challenge to the waiver finding is its suggestion that its good faith claim may not be ripe until *Bucci* is overruled. GOB, 33-34. This argument was not presented to the district court, and so is waived. *United States v. McNicol*, 829 F3d 77, 83 (1st Cir. 2016) ["This assertion, however, was not made below, and is therefore waived. * * * If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court

cannot be broached for the first time on appeal"]. The good faith claim was "ripe" when the government opposed Ms. Moore's motion to suppress. It asserted a reason why the district court arguably should have denied suppression even if it concluded that the use of the pole camera/data storage unit constituted a search. It is an issue on which the government bore a "heavy burden" of proof. *United States v. Wurie*, 728 F3d 1, 13 (1st Cir. 2013). It is a claim subject to waiver when the government fails to timely present it in the district court. *United States v. Ramirez-Rivera*, 800 F3d 1, 32 (1st Cir. 2015).

The claim was ripe because it was relevant to the issue of suppression and the government had a clear obligation and opportunity to present it in response to Ms. Moore's motion to suppress. See, *Massaro v. United States*, 538 U.S. 500, 504 (2003)["(r)ules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time"].

### *2. No Factual Basis Or Good Cause Is Asserted.*

Good faith reliance requires a factual basis. In *Ramirez-Rivera*, this Court stated:

> Regardless, the good-faith exception would not help the
> government in this case. Lieutenant Flores-Ortiz admitted at
> the evidentiary hearing that the reason the police did not try
> to get a warrant was [that the process would be too much
> trouble and too time-consuming].

800 F3d at 32. At no point has the government made an offer of

proof as to why its investigators did not ask for a warrant, nor has

it argued that, at the time it installed the pole camera, it had

probable cause to justify issuing one. The government here argues

only that "law enforcement *could* reasonably have relied on . . .

*Bucci* in installing and operating the pole camera in this case." GOB,

34 [emphasis added]. It is not a foregone conclusion that the

government *in fact* relied on *Bucci* in this case.

Some law enforcement authorities questioned the warrantless

use of pole cameras after *Jones*. E.g., Farb, Pole Camera

Surveillance Under the Fourth Amendment, North Carolina Criminal

Law, https://nccriminallaw.sog.unc.edu [July 12, 2016][20]; Clark,

---
[20]

"It would not be surprising if in the relatively near future the United
States Supreme Court decides a case on pole camera surveillance,
and there is a reasonable probability that the Court might rule that
extensive video surveillance of a residence requires a search
warrant or its functional equivalent(.) * * * In the meantime, a
cautious officer may wish to seek a court order authorizing the use

Pole Cameras and Surreptitious Surveillance, FBI Law Enforcement Bulletin, 23, 28 (November 2009) ["Currently, there is a divergence in federal case law concerning whether a search warrant is required to conduct pole-camera surveillance in the vicinity of a residence"]. The reason[s] the law enforcement officers did not apply for a warrant involves unresolved questions of fact which the government still has not addressed. Judge Young was fully justified in finding that the government waived its good faith claim. Nothing the government has done since its waiver entitles it to any appellate review of that claim.

A party can obtain relief from waiver in the district court on a showing of "good cause" for the waiver. *United States v. Crooker*, 688 F3d 1, 9-10 (1st Cir. 2012). The government did not attempt to establish "good cause" in its motion for reconsideration [G.App. 145-147] nor in its opening brief. GOB, 33-35.

### B. The Motion For Reconsideration Did Not Obviate Or Cure The Waiver; Plain Error Review Is Not Available.

---

of a pole camera directed at a residence or at least consult with the officer's agency's legal advisor or prosecutor before deciding not to do so."

*1. The Good Faith Argument Was Inadequately Developed.*

The government argues that it is entitled to plain error review in this Court because it asserted its claim in a motion for reconsideration. GOB, 34. But the argument in that motion was fatally flawed: it "contained scant elaboration of the [good faith claim] and offered no analysis of how the . . . law supported such a theory on the facts of this case." G.App. 145-146; *Iverson v. City of Boston*, 452 F3d 94, 104 (1st Cir. 2006); *United States v. Zannino*, 895 F2d 1, 17 (1st cir. 1990)["issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"]. The government did not explain why it did not raise the good faith argument in opposing Ms. Moore's motion to suppress, which clearly challenged the continued vitality of *Bucci*, and it did not attempt to show good cause for not doing so. G.App.145-146.

*2. The Motion For Reconsideration Did Not Revive The Waived Good Faith Claim.*

The government argues that "the consequence of raising an argument for the first time in a motion for reconsideration is plain

54

error review. See *United States v. Tanco-Pizarro*, 892 F3d 472, 479 (1st Cir. 2018)." GOB, 34. The defendant there had failed to make a procedural unreasonableness objection in the district court, which relegated him to plain error review because his failure was treated as a forfeiture. This Court rejected his argument that raising the claim in a motion for reconsideration preserved it for full appellate review. The plain error review was not secured by the motion for reconsideration. *Id*, 478-479 ["The problem for him is that arguments unveiled for the first time in a reconsideration motion are not preserved for appeal"]. A motion for reconsideration cannot be used to enable a party "to undo its own procedural failures(.)" *United States v. Almonte-Reyes, 814 F3d 24, 27 n. 4 (1st Cir. 2016); Iverson v. City of Boston*, 452 F3d 94, 104 (1st Cir. 2006).

This Court reviews the denial of a motion for reconsideration for abuse of discretion. *United States v. Allen*, 573 F3d 42, 53 (1st Cir. 2009). Motions for reconsideration cannot be used as a vehicle for a party to present arguments that could and should have been presented to the court before its original ruling. *Id*. Only a forfeited claim can be reviewed for plain error. *Olano*, supra, at 733.

55

***C. Because Bucci Did Not Hold That The Use Of The Pole Camera In That Case Was Not A Search, The Government Cannot Rely On Bucci To Support A Good Faith Claim That It Was Not A Search.***

The question whether Ms. Moore is entitled to challenge the pole camera use is distinct from whether the government conducted a search with it. *United States v. Boyd*, 138 S.Ct. 1518, 1526 (2018)["Whether a warrant is required is a separate question from . . . whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge"]. In *Bucci*, this Court addressed only the second of these questions. 582 F3d at 116. Accordingly, the government could rely on *Bucci* only for the proposition that Ms. Moore did not have standing to challenge its use of a pole camera to surveil her house. It could not rely on *Bucci* for the distinct proposition that the use of the pole camera was not a search. See, *United States v. Boyd*, 742 Fed. Appx. 587, 588 & n. 1 (3rd Cir. 2018)[on remand from the Supreme Court].[21]

------------------------

[21] "In short, we are persuaded that while the officers could reasonably rely on *Kennedy* to conclude that Byrd did not have Fourth Amendment standing to object to the search, they could not reasonably rely on *Kennedy* to conclude . . . that the search itself

### *D. The District Court's Refusal To Consider A Good Faith Claim Not Asserted Was Not Error.*

Even if this Court conducts a plain error review, the government's argument fails. The error it claims is Judge Young's "declining to find good faith." GOB, 34. This occurred only in his refusing to reconsider his ruling. "If a legal rule was violated during the district court proceedings, and if the [party] did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely [assertion of the claim]." *Olano*, 507 U.S. at 733-734. No such error occurred here. The only reason the government made a "good faith" assertion at any point in the district court is that Judge Young pointed out that the government had waived it by not asserting it.

The good faith exception is a claim in the nature of an affirmative defense [confession and avoidance]. The principle of party presentation instructs federal judges not to assert claims for the government *sua sponte*. In *Greenlaw v. United States*, the Court said:

---

was constitutional." This is not a precedential opinion. *Kennedy* was the equivalent of *Bucci* in *Boyd*.

In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a pro se litigant's rights. See, *Castro v. United States*, 540 U.S. 375, 381-383, 124 S.Ct. 786, 157 L.Ed. 2d 778 (2003).

554 U.S. at 243-244. Regarding omissions of claims by the government in a criminal case, the Court elaborated:

Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us.

*Id*, quoting *United States v. Samuels*, 808 F2d 1298, 1301 (CA8 1987)(R.Arnold, J., concurring in denial of reh'g en banc).

Thus, even if the government had a viable good faith claim, it was not an error for the district court to decline to address it, much less a clear or obvious error. *Greenlaw* required the court to rely on government counsel to decide which claims to present, when and how.

The government has not argued that the district court's finding of waiver is the error it seeks to have reviewed. Waiver of a claim

58

not presented is not per se error. *Rammirez-Rivera, supra*. It violates nobody's rights. *Olano*, 507 U.S. 725, 732-733 (1993).

The government's remaining plain view arguments are not sufficiently developed to warrant appellate review. GOB, 34-35. *United States v. Flete-Garcia*, 925 F3d 17, 38 (1st Cir. 2019). It presented no evidence how or by whom the decision to proceed without a warrant was made, much less that *Bucci* was a consideration. Likewise, it has presented no explanation of why it did not assert its good faith claim in response to the motion to suppress. It does not claim that the judge's finding of waiver was erroneous.

The government's claim of prejudice is cursory; it merely refers to another document that has not been incorporated into its brief. *Zannino*, 895 F3d at 17. It has not offered any account of what impact the suppression order will have on its trial case. The government must show plain error that affects substantial rights before it can invoke this Court's discretion to consider whether a miscarriage of justice would result if its waiver is enforced. The government makes no argument that the fairness, integrity and

public reputation of this proceeding requires review; it merely asserts that plain error review will enhance those qualities in this proceeding. GOB 35; *Zannino,* supra ["a litigant has an obligation 'to spell out its arguments squarely and distinctly(.)'"].

## CONCLUSION

The government's pole camera operation constituted a search, conducted without probable cause or a warrant. The law of the circuit does not interpose this Court's ruling in United States v. Bucci as a binding circuit precedent to the contrary. The government has waived any claim that its agents acted in good faith reliance on Bucci in carrying out this warrantless search, and it has not made out a plain error basis for review of that issue. The district court's order should be affirmed.

## REQUEST FOR ORAL ARGUMENT

Appellee Daphne Moore requests that this Court grant her oral argument in her defense of the district court's suppression order. The issues raised are constitutionally important and oral argument will assist the Court in reaching a fully informed and considered judgment.

60

Respectfully submitted,
Appellee Daphne Moore, by
 /s/ John M. Thompson
John M. Thompson
Federal Bar No. 25176
Thompson & Thompson, P.C.
1331 Main Street, Suite 320
Springfield, MA 01103
[413] 739-2100
habeasjohn@ttpclaw.com


/s/ Linda J. Thompson
Linda J. Thompson
Federal Bar No. 5078
1331 Main Street, Suite 320
Springfield, MA 01103
[413] 739-2100
linda@ttpclaw.com


## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limits of F.R.App.P. 32(a)(7)(B) because it contains 12,143 words, excluding the parts of the brief exempted by Rule 32(f). It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(f) because it has been prepared using Verdana proportionally spaced 14 point, in Word Perfect version 9.

/s/ John M. Thompson
John M. Thompson

61

## CERTIFICATE OF SERVICE

    I, John M. Thompson, hereby certify that on October 21, 2019, I electronically served a copy of the foregoing document on the registered participants of the CM/ECF system: Judith Meisner, Esq. and Assistant United States Attorney Randall E. Kromm, Esq.

                            /s/ John M. Thompson
                            John M. Thompson

# ADDENDUM

## CONTENTS

1.  January 29, 2019 Email, AUSA Katharine
Wagner to Attorney Linda Thompson re volume of
pole camera data..................................................  1

2. Defendant Daphne Moore's Renewed Motion
For Evidentiary Hearing On Derivative Evidence
And Suppression Of Evidence Derived From Fruits
Of Pole Camera Surveillance..................................  2

3. Affidavit Of Defendant Daphne Moore In Support
Of Motion For Return Of Seized Property...................  18

4. Chinese Snooping Tech Spreads To Nations
Vulnerable To Abuse, Associated Press, October 16,
2019..................................................................  19

**Linda Thompson**

| | |
|---|---|
| **From:** | Wagner, Katharine (USAMA) <Katharine.Wagner@usdoj.gov> |
| **Sent:** | Tuesday, January 29, 2019 4:06 PM |
| **To:** | Linda Thompson |
| **Subject:** | RE: US v. Daphne Moore |

Hi Linda,

A 4 terabyte hard drive will be sufficient to hold the pole camera data.

Regards,
Kate

**From:** Linda Thompson <Linda@ttpclaw.com>
**Sent:** Tuesday, January 29, 2019 11:42 AM
**To:** Wagner, Katharine (USAMA) <KWagner@usa.doj.gov>; ORegan, Kevin (USAMA) <KORegan@usa.doj.gov>
**Subject:** US v. Daphne Moore

AUSAs Wagner and O'Regan:  What size of hard drive will be necessary to receive discovery of the pole camera data?

Linda J. Thompson
Attorney for Daphne Moore

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 3:18-CR-30001-WGY

UNITED STATES OF AMERICA

v.

DAPHNE MOORE, et als.

DEFENDANT DAPHNE MOORE'S RENEWED MOTION
FOR EVIDENTIARY HEARING ON DERIVATIVE EVIDENCE
AND SUPPRESSION OF EVIDENCE DERIVED FROM
FRUITS OF POLE CAMERA SURVEILLANCE

Defendant Daphne Moore moves the Court for an evidentiary hearing to identify evidence derived from the fruits of the warrantless pole camera surveillance and recording of her home, her activities, her family and her guests from May 17, 2017 through mid-January 2018 at 120 Hadley Street in Springfield.  She further moves for suppression of all evidence as to which the government fails to establish a source wholly independent of the fruits of the pole camera surveillance. As grounds for this motion, Defendant Moore states:

1. By order dated June 3, 2019 the Court ruled that the pole camera recording activity that the government conducted during this period constituted a warrantless search, and ordered that all evidence that directly resulted from

1

this illegality be suppressed. Document 416, pp. 24-25. The Court took no action regarding derivative evidence.

2. Disclosures by the government [since the May 13, 2019 hearing on Moore's motion to suppress] establish that the government not only used pole camera information to further its investigation, it has also used pole camera information for litigation purposes, namely, to prepare key witnesses to testify in trial[1], particularly with regard to Count Three of the superseding indictment [events of November 17, 2017]. For example:

A. In a May 20, 2019 preparation session, one trial witness was shown a photograph that was date stamped 11/17/2019 (sic) and a video clip "from the pole camera footage taken on 11/17/2017" in connection with events that allegedly occurred at Defendant Moore's home [IRS_0000355]; and

B. In a May 29, 2019 preparation session, another trial witness was shown a photograph of Defendant Moore's house as well as "pole camera footage from 11/17/17" from which the witness identified vehicles and individuals in the driveway. IRS_0000362.

Both of these sessions were used to refresh and bolster the cooperating witnesses's memories of the events depicted in the pole camera images.

3. These preparation sessions were conducted after the May 13, 2019 hearing, in which the Court alerted the government to the possibility that it

---

[1]

The papers cited below document that law enforcement witnesses were involved in using pole camera video and stills to prepare the testimony of cooperating witnesses on subjects that both can be expected to testify about.

2

might find the pole camera surveillance conducted in this case to be a search, and specifically inquired of the government about the tainting effect of pole camera evidence on other aspects of the government's case. 5-13-2019Tr:35-36.

4. Defendant Moore has been unable to identify all instances of this kind of taint in the government's evidence

5.   The government's investigation activities were also tainted by information derived from its pole camera surveillance.

A. In her April 23, 2019 Motion to Suppress, Moore asserted that the government's warrantless search produced derivative evidence, and gave some examples. Paragraphs 68 and 209 of the government's November 9, 2017 Title III application reported information obtained from pole camera footage; ATF Agent Bzduch testified in the grand jury about pole camera surveillance fruits, including observations of Ms. Moore and some of her codefendants; and that pole camera footage was used to identify and investigate individuals having no apparent connection to this investigation.   Under a heading "The Pole Camera/Video Surveillance and Its Fruits should be Suppressed," Moore asserted that the pole camera surveillance was used to learn the whereabouts of co-defendants Nia Moore-Bush and Denelson Dinzey at particular times and on particular dates.  See ATF_0000506-507, attached as Exhibit C [use of pole camera to monitor suspect's activities inside vehicle]. Presumably this evidence will be offered as part of the government's conspiracy case. At page 6, Moore asserted that the pole camera fruits were employed in conjunction with the

3

wiretaps, coordinating intercepts with the view of events at 120 Hadley Street.

B. Defendant Moore asserted that the pole camera images "must be suppressed, along with all evidence derived directly or indirectly therefrom." Motion, 7, 12-13. She requested a hearing at which the government would be required to demonstrate that the fruits of this warrantless search were admissible. Id., 12-13.

C. The government did not challenge any of these assertions in its opposition. Document 367. It conceded that the November 9, 2017 affidavit in support of the Application for Authorization to Intercept Wire and Electronic Communications "discusses the installation of the pole camera and the results obtained at that time (Defendants Exhibit A2("Ex.A2")."

6. The Court conducted a non-evidentiary hearing on Defendant Moore's motion to suppress on May 13, 2019. Derivative evidence was discussed only with the government, and fleetingly. The Court asked government counsel what impact an order allowing the motion would have on the government's case, and specifically, whether the wiretap warrants depend on it.  5-13-19Tr:35-36. Defendant Moore was not addressed regarding this issue. Id.

7. In circumstances where a prior illegality has been established, "the burden of showing admissibility rests, of course, on the prosecution." *Brown v. Illinois*, 422 U.S. 590, 604 (1975). Here, the government is the party with superior knowledge of the source of its evidence, of the uses it has made of the pole camera footage and images, and the time line on which that evidence was developed. The extent to which evidence identified as possibly tainted by fruits

4

Add. 5

of the pole camera surveillance was derived with the aid of those illegal pole camera videos and still photos must be determined by means of an evidentiary hearing. In *United States v. Flores*, 888 F3d 537 1st Cir. 2018) the district court held an evidentiary hearing and made its findings regarding the "independent source" doctrine based in part on assessments of the credibility of witnesses.[2] Id., at 547-548; *United States v. Dessesaure*, (1st Cir. 2005).

8.   The impact and influence of the fruits of the pole camera search are not easily identified in the other evidence presently known to Defendant Moore. In her motion, Moore pointed to specific indications that the pole camera fruits had been used to develop other evidence. See ¶5A, supra. Express references to pole camera-generated information are found in the November 9, 2017 wiretap affidavit [Exhibit A2 in support of the motion to suppress]: [a] ¶10 identifies it generally as one of the sources; and [b] ¶¶68, 99,135,146,147,209,210,216,313,316 and 317 assert facts that appear to be derived, directly or indirectly, from the pole camera images.

9. On January 12, 2018 SA Howe and SA Person offered Ms. Moore transportation from the Hampden Superior Court to her home, a distance of some 5 miles. 1-12-2018Tr:32. They surreptitiously recorded their interrogation of Defendant Moore in the course of that 40 minute trip.   Questions and statements by the agents disclose that much of that interrogation was informed

---

[2]

The government has not asserted an independent source claim, but the Court "previewed" that issue in footnote 9 of its June 3, 2019 order. Document 422.

5

and guided by pole camera information. See Chart A, attached.

10.  In grand jury testimony, Special Agent Bzduch described the pole camera set-up to the jury and testified that he had used it to both view Ms. Moore's premises "in real time" and to review stored information to provide him a historical perspective and refresh his memory. GJ0000639-640. He and Special Agent Howe both used pole camera information to prepare for their grand jury testimonies.

11. The government has not disclosed what searches of the pole camera memory cache have been conducted, how frequently, by whom, or for what purposes.

12. The pole camera was used extensively for investigative purposes. A sample of the admitted or apparent use of the pole camera in connection with other investigative methods between November 13, 2017 and December 1, 2017 is attached as Chart B.

13. There is no reason to assume that the type of use of the pole camera video footage and stills for trial preparation was not also used similarly for investigative purposes, to prompt or assist witnesses – some of whom are acknowledged to have been addicts or heavy narcotics users during the period in which the events they supposedly witnessed or participated in occurred – in reconstructing events about which they are expected to testify.

14. The foregoing presentation establishes that there is a substantial basis for believing that the fruits of the pole camera surveillance that this Court has found to have constituted a warrantless search pervade the government's

6

case beyond the images produced by that activity, and that suppression of those direct fruits of that unconstitutional activity will not adequately protect Ms. Moore's Fourth Amendment and First Amendment rights, nor serve as an effective deterrent.

15. For this reason, it is imperative that the Court conduct a "taint" hearing before trial, at which the government is required to demonstrate that the evidence it intends to offer is not a fruit of the poisonous tree. *Alderman v. United States*, 394 U.S. 165, 180-185 (1969); see *United States v. Underwood*, 880 F2d 612, 616 (1st Cir. 1989)[In Fifth Amendment context, "This burden of proof . . . is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony"].

Wherefore, Defendant Daphne Moore requests that the Court convene an evidentiary hearing before trial at which the government will bear the burden of establishing that the evidence it intends to offer at trial has a legitimate source independent of the information developed through its pole camera surveillance. Defendant Moore further requests that, as to all evidence for which the government fails to establish a source wholly independent of the pole camera surveillance fruits, the Court issue an order of suppression for trial.

7

Respectfully submitted,
Daphne Moore, Defendant, by

/s/ Linda J. Thompson
Linda J. Thompson, Esq.
BBO# 496840
THOMPSON & THOMPSON, P.C.
1331 Main Street, Suite 320
Springfield, MA 01103

[413] 739-2100
linda@ttpclaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document will be served on counsel of record for each represented party in this action through PACER's electronic filing and service system, this 6th day of June, 2019.

/s/ Linda J. Thompson
Linda J. Thompson

8

## EXHIBIT A. Sample Table Of Pole Camera Tainted Investigation Activities November and December 2017

| Report ID # | Date | Report Author and Activity Summary |
|---|---|---|
| ATF0000715-716 | 11-28-2017 | C. Bzduch. Pole camera observation leads to RMV check |
| ATF0000732-733 | 12-1-2017 | C. Bzduch. Items taken from trash D. Moore seen on pole camera putting at curb |
| ATF0000670 670-674 | 11-15-2017 | A.DiPaol. Surveillance involving pole camera leads to observation of narcotics transaction and RMV check |
| ATF00652-657 | 11-15-2017 | J.Forte. Surveillance related traffic stop of D. Dinzey. |
| ATF0000686-687 | 11-24-2017 | B.Person. Surveillance aided by pole camera observations, coordinated with information obtained via wiretap |
| ATF0000688-705 | 11-24-2017 | C.Bzduch. Surveillance aided by pole camera observations, coordinated with information obtained via wiretap, leading to CT, VT and MA RMV inquiries and arrest of Gallas on I-91 |
| ATF0000620 | 11-13-2017 | J.Forte. Surveillance of 120 Hadley Street linking vehicle movement to 892 Main Street |
| ATF0000639-644 | 11-17-2017 | A.Venteluolo. Surveillance of multiple locations in Springfield aided by pole camera surveillance identifying and following individuals and vehicles. RMV inquiry. |

9

## EXHIBIT B.  Chart Of Pole Camera-Influenced Interrogation Of Defendant Moore

| Page | Speaker | Pole Camera-Influenced Questioning |
|------|---------|-----------------------------------|
| 4 | Person | "Cause we've, we've sat back and observe this for months going…" |
| 7 | Person | "So I got to ask, what happened to that black Audi?" [CHUCKLES] |
| 8 | Person | "All right. 'Cause over the last few weeks we've noticed they've been driving rental cars in your name." |
|   | Person | "He was driving that thing with Vermont tags and Springfield just kept pulling him over."[3] |
| 9 | Person | "All right. So that Vermont Audi could be up north, with Dinzey or somewhere up there with this . . . 'cause they had people just coming over to the house. (sic)" |
| 10 | Moore<br>Person<br>Moore<br>Person<br>Moore<br>Person<br>Moore<br>Person<br><br>Moore | "My house?<br>Your house.<br>Ugh!<br>Have you seen any of these Vermont guys?<br>No!<br>I mean, yeah. I can show you that later.<br>Okay.<br>We can sit down at your Mom's if you don't mind. I got photos of them. It's uh . . .<br>Wow! Wow! Oh my God! My house." |

---

[3] In rows 3, 4 and 5 the transcriber appears to have confused the speaker, misnaming Moore as the speaker in rows 3 and 5 and Person as the speaker in row 4 rather than vice versa.

10

Add. 11

| 13 | Person | "Oh yeah. There's an Audi in the garage. I didn't look at it yet. Somebody called and said, 'Is this the Audi?' I'm like, 'No. It's a black one.' What you said it's white? There's a different Audi in the garage. |
| | Moore | There's no – behind the gate you mean? |
| | Person | Yeah, I'm sorry. Behind the gate. Yeah. |
| | Moore | [U/I] Ohm. There's no Audi in my garage. |
| | Person | Whose, whose is that? |
| | Moore | In my garage. That car belongs to . . . I thought that Nelson was driving that car at one point. |
| | Person | It does, its not reg. I haven't seen it, so...." |
| 14 | Moore | "It's probably – yes. |
| | Person | It's probably not registered and I don't even know if it drives. |
| | Moore | Because I, yeah. Because I saw it, ohm – this car needs to move because I'm having my basement redone. |
| | | * * * |
| | Person | And he was driving that white Audi this summer. |
| | Moore | He was right? Okay. |
| | Person | You know where that one is? |
| | Moore | I don't know, listen." |
| 17 | Person | "Agent DiPaolo did not answer so hopefully they started the search ... but I'd like to sit with your moms, you mom, . . . at your mom's. Good English here and ohm, just go over some of these people that may have been at the house when you were there." |
| 18 | Person | "Because she was driving the last rental in your name, so was Dinzey." |
| 20 | Person | "They had rental cars all summer." |
| 23 | Person | "Inside a house I think she thought and he thought they had protection." |

11

| 27 | Person | "These drug users, drug dealers would show up to the house . . ." |
|    | Moore | Uh-huh. |
|    | Person | When your car is there and they're here for an hour or two. |
|    | Moore | But see, my car is here but I'm not here. |
|    | Person | That's why, that's part of the reason I was asking you. Are you using it all the time? And then they go, they transport drugs and go back to the house and then . . . money comes in the accounts." |
| 30 | Howe | "So this is the car?" |
| 31 | Person | "Oh...yes. |
|    | Moore | Oh, so I got rid of it. |
|    | Person | All right. |
|    | Moore | That's interesting. |
|    | Person | That's not the white Audi we've been watching. |
|    | Moore | That's not? |
|    | Person | No. |
|    | Moore | No, I thought. |
|    | Person | That's a different white Audi. The other white Audi is in Connecticut right now. |
|    | Moore | What the hell? |
|    | Person | She blew the engine |
|    | Moore | A white Audi? |
|    | Person | He was driving a white Audi all summer that she blew the engine on and you don't recall any of the blown engine issues? |
|    | Moore | I don't interact with them on a daily basis like that. |
|    | Person | All right. |
|    | Moore | I know when there's a car, they had a car in, ohm. . . being repaired but I don't know about the white Audi. |
|    | Person | [Sighs] Alright |

12

| 32 | Person | I believe you. [Laughs] I believe you. There's just, there's been a lot of working a lot of moving parts in this for the last year. All centered around  – this house and then that nail salon."<br>* * * |
| | Person | The nail salon is a hang out.<br>* * * |
| | Person | We've done a lot of surveillance on that place in the last few months. |
| 33 | Person | And identified a lot of people coming in and out of there and a lot of the same people come, came to this house. |
| | Moore | Same people. Came to my house? |
| | Person | Yeah [Pause] |

13

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: Nia MOORE-BUSH et al (OCDETF - Operation 91 Northbound) | Investigation Number: 762045-17-0019 | Report Number: 38 |
|---|---|---|

### SUMMARY OF EVENT:

**SURVEILLANCE:** On June 27, 2017, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agents Meehan, Person, Ventetuolo, McKee, and Bzduch conducted surveillance in the area of 120 Hadley Street in Springfield, MA.

### NARRATIVE:

1. On June 27, 2017, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Brian Meehan, SA Brian Person, SA Anthony Ventetuolo, SA John McKee, and SA Chris Bzduch conducted surveillance in the area of 120 Hadley Street in Springfield, Massachusetts.

2. Surveillance was initiated at approximately 19:38 hours on the above stated date. The following observations were made during the course of surveillance:

   - At approximately 19:38 hours, a black Chevrolet Tahoe bearing Connecticut registration AJ27691 (black Tahoe) was observed in the driveway of 120 Hadley Street in Springfield, Massachusetts. Nia MOORE-BUSH and Dinelson DINZEY were by the vehicle.
   - At approximately 20:02 hours, MOORE-BUSH drove the black Tahoe to McDonald's restaurant located at 1402 Allen Street in Springfield, Massachusetts. MOORE-BUSH exited the vehicle with a purse in hand and entered McDonald's restaurant.
   - At approximately 20:23 hours, MOORE-BUSH exited McDonald's restaurant and entered the black Tahoe. MOORE-BUSH pulled out of the McDonald's restaurant parking lot and turned on to Allen Street.
   - At approximately 20:36 hours, MOORE-BUSH parked the black Tahoe in the driveway of 120 Hadley Street in Springfield, Massachusetts. DINZEY walked up to the window of the black Tahoe. Another black female, who appeared to be Daphne MOORE, walked towards the black Tahoe with two children.
   - At approximately 20:42 hours, a dark colored Honda CRV bearing Massachusetts registration 5JZT50 (CRV) pulled away from 120 Hadley Street in Springfield, Massachusetts. It appeared that Daphne MOORE was driving the CRV. The CRV drove to TD Bank located at 465 North Main Street in East Longmeadow, Massachusetts (corner of Harkness Avenue and Main Street). The female driving the vehicle (appeared to be Daphne MOORE) was observed using the drive-thru ATM.

| Prepared by: Christopher M. Bzduch | Title: Special Agent, Springfield Field Office | Signature: | Date: 07/05/17 |
|---|---|---|---|
| Authorized by: West H. Jackson Jr. | Title: Resident Agent in Charge, Springfield Field Office | Signature: | Date: 7/10/17 |
| Second level reviewer (optional): Mickey D. Leadingham | Title: Special Agent in Charge, Boston Field Division | Signature: | Date: 7/10/17 |

ATF EF 3120.2 (10-2004)
For Official Use Only

EXHIBIT C

ATF_0000506

Add. 15

- At approximately 20:47 hours, the black Tahoe pulled out of the driveway of 120 Hadley Street in Springfield, Massachusetts. There were multiple occupants in the vehicle. It appeared that there were children in the back seat of the black Tahoe.
- At approximately 20:55 hours, the black Tahoe parked on the North side of the street near the intersection of Wilbraham Road and Colonial Avenue in Springfield, Massachusetts.
- At approximately 21:02 hours, a female approached the black Tahoe.
- At approximately 21:05 hours, children were observed in the back seat of the black Tahoe.
- At approximately 21:09 hours, the black Tahoe pulled away from the intersection of Wilbraham Road and Colonial Avenue. DINZEY appeared to be driving the black Tahoe.
- At approximately 21:16 hours, the black Tahoe pulled in to the driveway of 120 Hadley Street in Springfield, Massachusetts. The CRV and a black Audi bearing Vermont registration 52486 were parked in the driveway.
- At approximately 21:50 hours, DINZEY walked up to the black Tahoe and entered the vehicle. DINZEY was observed, via pole camera footage, using an electronic device with a screen lit up. The device was consistent with the size of a tablet. DINZEY was also observed, via pole camera footage, to be smoking inside the vehicle.
- At approximately 22:16 hours, the black Tahoe, with DINZEY driving, pulled out of the driveway of 120 Hadley Street in Springfield, Massachusetts. The black Tahoe stopped at a gas station on Allen Street in Springfield, Massachusetts. DINZEY exited the black Tahoe and began to pump gas. DINZEY entered the vehicle and pulled the black Tahoe out of the parking lot of the gas station. DINZEY began driving at a high rate of speed upon exiting the parking lot. The black Tahoe drove out of sight of surveillance units. Surveillance units attempted to locate the black Tahoe but were unable to locate the vehicle.
- At approximately 00:30 hours on June 28, 2017, surveillance was terminated.

3. On a previous date, SA Bzduch received information from Enterprise Rent-A-Car (Enterprise), a subsidiary company of EAN Holdings LLC, that MOORE-BUSH had rented the black Tahoe from their company on or about June 26, 2017. According to information received from Enterprise, MOORE-BUSH rented the vehicle through July 10, 2017.


Attachments:

- Information on Connecticut Registration AJ27691 (2 Pages)
- Information on Massachusetts Registration 5JZT50 (1 Page)
- Information on Vermont Registration 52486 (1 Page)
- Notes (2 Pages)

ATF EF 3120.2 (10-2004)
For Official Use Only

ATF_0000507

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,  )      Crim. No. 18-30001-MGM
                            )
        vs.                 )
                            )
DAPHNE MOORE, Defendant.    )
                            )

## AFFIDAVIT OF DEFENDANT DAPHNE MOORE
## IN SUPPORT OF MOTION FOR RETURN OF SEIZED PROPERTY

I, DAPHNE MOORE, being aware of the penalties for perjury, state on my oath that:

1. I am the same person who is named as the defendant in the above captioned matter;

2. At the time of my arrest on December 21, 2018, I was employed as an Assistant Clerk of the Hampden County Superior Court, serving in the courtroom, a position I have held for 18 years. I was placed on administrative leave at the time of my arrest;

3. My first contact with this case was on January 12, 2018, when my home was searched pursuant to a search warrant. Personal documents belonging to me were seized, including my passport, my tax returns and settlement papers related to a car accident in which I was injured. It took my attorney, Linda J. Thompson, many months to get the government to return these papers. An agent contacted me on my cell phone during the search and

1

EXHIBIT  B

I used my cell in the presence of agents but my cell phone was not seized;

4. I hold an AB in History from Mount Holyoke College (1986); an MS in Human Services Administration from Springfield College (1990); and a Juris Doctorate from Western New England University School of Law (1994);

5. Following graduation from law school, I clerked in the Massachusetts Appeals Court for Justice Frederick L. Brown (1994-1995). I also clerked for Judge Michael A. Ponsor at the Federal District Court in Springfield (1995-1997). I worked in private practice in Connecticut (9/1997-5/1999) and was employed as a trial attorney for the Committee for Public Counsel Services in Hampden County (8/1999-12/2000) before accepting my current position as an assistant clerk (01/02/01);

6. I taught at Springfield College for more than 25 years, both undergraduate and graduate courses, the following areas: Criminal Law; Constitutional Interpretation; Police in Modern Society; Race and Gender; Race, Religion and Culture; Women and Crime; Ethics and Law; research and writing - a 16 month course resulting in a master's thesis; Advocacy and Policy Analysis - the Legal Aspects of Human Services;

7. I am the mother of Nia Moore-Bush, a defendant in this case, who was arrested in January of 2018, along with her husband, Dinelson Dinzey, who is also a co-defendant;

8. I am the legal guardian for Daymien Moore and Noslen Dinzey, my

2

grandchildren, who have each lived with me since their birth. I take them to visit their mother who has been held at the Women's Jail in Chicopee, MA since her arrest;

9. On December 21, 2018, I was arrested at my home, 120 Hadley St., Springfield, MA. A man approached my car as I pulled into the driveway, announced himself as an ATF agent and told me that he had a warrant for my arrest. He told me: "You can call Linda and let her know."

10. I do not carry generally carry my cell phone on my person for health reasons. My cell phone was in my purse which was in the car. I got my phone out of my purse and got out of the car as directed. I called my attorney, Linda J. Thompson; the ATF agent also spoke with her on my cell phone and gave her a phone number for contacting AUSA Wagner;

11. There were a minimum of four (4) law enforcement officers present at the time of my arrest; none of them were women. One of the agents told me that I should leave my valuables at home. I put my pocketbook and jewelry in the house. After using my cell phone to make arrangements for my grandchildren and to arrange transportation for myself, I asked if could put my cell phone back inside the house. An ATF agent said: "No, I'll give your phone to Linda." ;

12. From my home, I was taken to the Springfield Police Department on Pearl Street in Springfield. There I was frisked, fingerprinted, and

3

photographed. I was directed to power off my cell phone and put it on the counter, which I did. I was directed to give up the elastic tie that I was wearing on my wrist, which I also did. I was then driven to Worcester in an ATF SUV;

13.  At the Worcester Federal District Court I was strip searched, fingerprinted, photographed and directed to swab the interior of my cheek for DNA, which I did. I signed a document certifying that no property was taken from me by the marshals. A law enforcement agent told me that my phone would be given to Linda in the courtroom. I was shackled during the time I waited in the lock-up, including during the time I was conferring with Attorney Linda Thompson and Attorney John Thompson;

14. It was late in the afternoon, after 3:00 pm, when I was finally taken into the courtroom and arraigned. The prosecutor did not move for my detention. My attorney spoke to the Magistrate about the return of my cell phone. She then spoke to AUSA Wagner about returning my phone and I heard that it was being held as evidence;

15. I left the courtroom in shackles which were finally removed when I was back at the Marshal's lock-up. As I was leaving the courthouse in Worcester, an ATF agent returned my elastic hair tie and asked me to sign a receipt for it;

16. The cell phone that was seized from my possession was an Apple Iphone 8 Plus that I acquired at the Sprint Store, Eastfield Mall, Springfield on

4

Add. 20

January 25, 2018.   I used this phone to carry out my clerk duties, communicating with both judges and attorneys regarding court business. I also used my phone to communicate with my attorney throughout the time leading up to my arrest and on the day of my arrest.  This phone is my principal communication tool and is essential to my everyday personal and professional life.

Signed under the pains and penalties for perjury this 8th day of January, 2019.

Daphne Moore

5

Add. 21

TECH

# Chinese snooping tech spreads to nations vulnerable to abuse

By Associated Press                                                                      October 16, 2019 | 3:14pm



High-tech video cameras hang from an office building in downtown Belgrade, Serbia.
AP

BELGRADE, Serbia — When hundreds of video cameras with the power to identify and track individuals started appearing in the streets of Belgrade as part of a major surveillance project, some protesters began having second thoughts about joining anti-government demonstrations in the Serbian capital.

Local authorities assert the system, created by Chinese telecommunications company Huawei, helps reduce crime in the city of 2 million. Critics contend it erodes personal freedoms, makes political opponents vulnerable to retribution and even exposes the country's citizens to snooping by the Chinese government.

The cameras, equipped with facial recognition technology, are being rolled out across hundreds of cities around the world, particularly in poorer countries with weak track records on human rights where Beijing has increased its influence through big business deals. With the United States claiming that Chinese state authorities can get backdoor access to Huawei data, the aggressive rollout is raising concerns about the privacy of millions of people in countries with little power to stand up to China.

Add. 22

"The system can be used to trail political opponents, monitor regime critics at any moment, which is completely against the law," said Serbia's former commissioner for personal data protection, Rodoljub Sabic.



A young Serbian rights group activist has her face painted to confuse the Huawei surveillance video cameras with face-recognition software installed in Belgrade, Serbia.
AP

Groups opposed to Serbian President Aleksandar Vucic say police are leaking video of protests to pro-government media, which publish the images, along with the identities of participants. Vucic himself has boasted the police have the capability to count "each head" at anti-government gatherings. During a recent rally, protesters climbed up a pole and covered a camera lens with duct tape scrawled with the word "censored."

Serbian police deny any such abuse of the Huawei system, which will eventually encompass 1,000 cameras in 800 locations throughout Belgrade. Huawei said in a statement that it "complies with all applicable laws and regulations" in Serbia and anywhere else it does business.



AD                                                                                              SKIP AD >

While facial recognition technology is being adopted in many countries, spurring debate over the balance between privacy and safety, the Huawei system has gained extra attention due to accusations that Chinese laws requiring companies to assist in national intelligence work give authorities access to its data.

As a result, some countries are reconsidering using Huawei technology, particularly the superfast 5G networks that are being rolled out later this year.

Still, Huawei, which denies accusations of any Chinese government control, has had no trouble finding customers eager to install its so-called Safe Cities technology, particularly among countries that China has brought closer into its diplomatic and economic orbit.

Besides Serbia, that list includes Turkey, Russia, Ukraine, Azerbaijan, Angola, Laos, Kazakhstan, Kenya and Uganda, as well as a few liberal democracies like Germany, France and Italy. The system is used in some 230 cities, exposing tens of millions of people to its screening.

In a promotional brochure, Huawei says its video surveillance technology can scan over long distances to detect "abnormal behavior" such as loitering, track the movement of cars and people, calculate crowd size and send alerts to a command center if it detects something suspicious. Local authorities can then act upon the information they receive.

In one case advertised on its website, the company says a suspect in a hit-and-run accident in Belgrade was later discovered in China with the help of face recognition data shared by the Serbian police with their Chinese counterparts.

In view of the cybersecurity accusations leveled by the US and international rights groups against Huawei, the relationship between China and countries that use the company's technology is coming under renewed scrutiny.

China's influence in Serbia, a European Union candidate that Beijing views as a gateway to the continent, has significantly expanded in recent years through Beijing's global Belt and Road investment programs. The populist Serbian regime has been keen to develop closer ties and the country's fragile democracy allows China's economic interests to grow relatively unchecked, without raising too many questions about human rights, environmental standards or transparency.



A high-tech video camera on a pillar in Belgrade, Serbia.
AP

China's state investment bank has granted billions of dollars in easy-term loans to build coal-powered plants, roads, railroads and bridges. Chinese police officers even help patrol the streets of Belgrade, a security presence officially billed as assisting the growing number of Chinese tourists who visit the city.

It's a similar story in Uganda, where China has invested heavily in infrastructure like highways and a hydropower dam on the Nile.

When longtime President Yoweri Museveni launched a $126-million project to install Huawei facial recognition systems a year ago, he said the cameras were "eyes, ears and a nose" to fight rampant street crime in the sprawling capital, Kampala. Opposition activists say the real goal is to deter street protesters against an increasingly unpopular government.

"The cameras are politically motivated," said Joel Ssenyonyi, a spokesman for the musician and activist known as Bobi Wine who has emerged as a powerful challenger to Museveni. "They are not doing this for security. The focus for them is hunting down political opponents."

In neighboring Kenya, the government has also renewed its focus on public safety after a spate of extremist attacks. It has been pushing to register people digitally, including by recording DNA, iris and facial data. To do so, it turned to China, which helped finance the installation of surveillance cameras in Kenya as far back as 2012.



Cameras hang from a pole in Belgrade, Serbia.

Add. 24

Cameras hang from a pole in Belgrade, Serbia.
AP

The Kenyan government wants to pool into one database all the information from public and private CCTV cameras, including those with facial recognition technology, a move that activists warn would vastly expand its surveillance powers in a country that does not have comprehensive data protection laws.

A growing number of countries are following China's lead in deploying artificial intelligence to track citizens, according to the Carnegie Endowment for International Peace. The group says at least 75 countries are actively using AI tools such as facial recognition for surveillance — and Huawei has sold its systems in 50 of those countries, giving it a far wider reach than competitors such as Japan-based NEC and US-based IBM.

"It's very unclear what safeguards are being put in place," said Steven Feldstein, a Carnegie Endowment fellow who authored a report on the issue. "Where are images being stored? How long are they being stored for? What kind of accountability procedures will there be? What type of operations will be linked to these surveillance cameras?"

Huawei said in an emailed statement that it "complies with all applicable laws and regulations in our countries of business. This is the most fundamental principle of our business operations. We are dedicated to bringing people better connectivity, eliminating digital gaps and promoting the sustainable development of our societies and economies."

In Belgrade's bustling downtown Republic Square, high-tech video cameras are pointed in all directions from an office building as pedestrians hurry about their everyday business.

With public authorities disclosing little about how the cameras work, a rights group has set up a tent to ask pedestrians whether they know they are being watched.

"We don't want to be in some kind of Big Brother society," said rights activist Ivana Markulic. "We are asking: Where are the cameras, where are they hidden, how much did we pay for them and what's going to happen with information collected after this surveillance?"

FILED UNDER   **CHINA**, **CIVIL RIGHTS**, **CYBERSECURITY**, **CYBERSPYING**, **HUAWEI**, **HUMAN RIGHTS**, **PROTESTS**, **SERBIA**, **SURVEILLANCE**, **TECHNOLOGY**

Recommended by