Nos. 19-1582, 19-1583, 19-1625, 19-1626

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

Nos. 19-1582, 19-1625

UNITED STATES OF AMERICA
Appellant,

v.

NIA MOORE-BUSH, A/K/A NIA DINZEY
Appellee.

_____

Nos. 19-1583, 19-1626

UNITED STATES OF AMERICA
Appellant,

v.

DAPHNE MOORE
Appellee.

_____

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 3:18-30001-WGY
Honorable William G. Young, District Court Judge

_____

# EN BANC BRIEF OF AMICI CURIAE
## REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
## AND EIGHT MEDIA ORGANIZATIONS IN SUPPORT OF APPELLEES

_____

[Caption continued on next page]

Bruce D. Brown
*Counsel of Record for Amici Curiae*
Katie Townsend**
Gabriel Rottman**
Mailyn Fidler**
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
bbrown@rcfp.org
   ** *Of Counsel*

# CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

MPA - The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

PEN American Center, Inc. has no parent or affiliate corporation.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS......................................................... ii

TABLE OF AUTHORITIES.................................................................................. iv

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................1

FED. R. APP. P. 29(A)(4)(E) STATEMENT .........................................................2

INTRODUCTION ...................................................................................................3

ARGUMENT ..........................................................................................................4

    I.   The Fourth Amendment must be rigorously applied when First Amendment rights, including the right to gather the news, are at stake. ...........................4

    II.  Persistent camera surveillance burdens First Amendment interests, including the integrity and confidentiality of the newsgathering process......6

    III. The panel's rule, which would permit the government to monitor the movements of journalists and sources without limit, should be rejected.....10

CONCLUSION ......................................................................................................14

APPENDIX A ........................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Boyd v. United States*, 116 U.S. 616 (1886) ................................................5

*Brower v. County of Inyo*, 489 U.S. 593 (1989) ........................................5

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ......................11, 12, 14

*Commonwealth v. McCarthy*, 142 N.E.3d 1090 (Mass. 2020) ..............14

*Commonwealth v. Mora*, 150 N.E.3d 297 (Mass. 2020) ........................12

*Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765) .........................5

*Heller v. New York*, 413 U.S. 483 (1973) ................................................6

*Katz v. United States*, 389 U.S. 347 (1967) ...........................................11

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 831 F. App'x 662 (4th Cir. 2020), *granting reh'g en banc*, 979 F.3d 219 (4th Cir. 2020)....................13

*Marcus v. Search Warrants*, 367 U.S. 717 (1961) ................................4, 5

*New York v. P.J. Video, Inc.*, 475 U.S. 868 (1986) ..................................6

*Stanford v. Texas*, 379 U.S. 476 (1965) ...........................................3, 4, 5, 14

*United States v. Anderson-Bagshaw*, 509 F. App'x 396 (6th Cir. 2012) ...............12

*United States v. Di Re*, 332 U.S. 581 (1948) ...........................................3

*United States v. Jones*, 565 U.S. 400 (2012) ..........................................12

*United States v. Moore-Bush*, 963 F.3d 29 (1st Cir. 2020) ..............11, 13

*United States v. Ramsey*, 431 U.S. 606 (1977) .........................................6

*Wilkes v. Wood*, 19 How. St. Tr. 1153 (C.P. 1763) .................................5

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) .....................................3

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ...............................4, 5, 6

**Constitutional Provisions**

U.S. Const. amend. IV ................................................................................3

**Other Authorities**

Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post (Nov. 2, 2005), http://wapo.st/Ud8UD ...............................................................................10

Eric Lichtblau, *C.I.A. Had Evidence of Russian Effort to Help Trump Earlier Than Believed*, N.Y. Times (Apr. 6, 2017), https://nyti.ms/2oOwTBz.......................10

*FBI releases files on columnist Jack Anderson*, NBC News (Oct. 11, 2008), https://perma.cc/XD9R-FVM2 ..................................................................................8

*Government Surveillance: U.S. Has Long History of Watching White House Critics and Journalists*, Newsweek (June 23, 1975; republished July 24, 2017), https://perma.cc/B76N-3Z6B ......................................................................................8

James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), http://nyti.ms/neIMIB.....................................................10

Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C ..............................4, 7

Lana Sweeten-Shults, *Anonymous sources vital to journalism*, USA Today (Feb. 27, 2017), https://perma.cc/K385-P7FX ...........................................................11

Lindy Royce-Bartlett, *Leak probe has chilled sources, AP exec says*, CNN (June 19, 2013), https://perma.cc/VU8T-6HUP ..............................................................9

*Meeting in Person Most Common Way to Protect Sources*, Pew Research Center (Feb. 4, 2015), https://perma.cc/84RN-FRZ9 .......................................................7

Michael Farrell, *Anonymous Sources*, SPJ Ethics Committee Position Paper, https://perma.cc/5MYN-PXR9 (last visited Feb. 10, 2021)................................11

Scott Shane, David Johnston & James Risen, *Secret U.S. Endorsement of Severe Interrogations,* N.Y. Times (Oct. 4, 2007), http://nyti.ms/1dkyMgF ...................9

Souad Mekhennet & Joby Warrick, *U.S. increasingly sees Iran's hand in the arming of Bahraini militants*, Wash. Post (Apr. 1, 2017), https://perma.cc/ZUA4-8HV7 ...........................................................................10

*With Liberty to Monitor All: How Large-Scale US Surveillance is Harming Journalism, Law, and American Democracy*, Human Rights Watch (July 28, 2014), https://perma.cc/LJ9E88YS ...................................................................7

**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**

Amici curiae are the Reporters Committee for Freedom of the Press (the "Reporters Committee"), and the International Documentary Association, The Media Institute, MPA - The Association of Magazine Media, National Press Photographers Association, PEN America, Radio Television Digital News Association, Society of Environmental Journalists, and the Tully Center for Free Speech (collectively, "amici"). A supplemental statement of identity and interest of amici is attached as Appendix A.

## FED. R. APP. P. 29(A)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION

Persistent and targeted camera surveillance without a warrant threatens First Amendment protections for newsgathering. The panel's conclusion—that such surveillance can never amount to a Fourth Amendment "search"—failed to give First Amendment interests due weight and should be reversed. The Fourth Amendment's history is "a history of conflict between the Crown and the press," *Stanford v. Texas*, 379 U.S. 476, 482 (1965), and the Constitution's guarantee against "unreasonable searches" plays a critical role in protecting the right to gather news, U.S. Const. amend. IV. A "too permeating police surveillance" could reveal sensitive details about journalistic work in progress—the stories pursued, journalistic methods, and especially identities of sources. *United States v. Di Re*, 332 U.S. 581, 595 (1948). Were the government free to monitor journalists without limit, it could strike freely at investigations into government activity by undermining the confidentiality that underpins them. *See Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) ("[J]ournalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant."). But in requiring that searches be carried out only with a warrant supported by probable cause, the Fourth Amendment prohibits intrusion on the newsgathering process absent a sound basis to believe a crime will be uncovered.

The panel's holding provides no such protection. Under its approach, investigators could station a permanent eye with a permanent memory outside any location based on bare curiosity—on the off-chance, say, of catching the next Neil Sheehan visiting the next Daniel Ellsberg's apartment. *See* Janny Scott, *Now It Can Be Told: How Neil Sheehan Got the Pentagon Papers*, N.Y. Times (Jan. 7, 2021), https://perma.cc/NFM7-B76C. That "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression," and it would doubtless chill the reporter-source contacts on which effective journalism—especially investigations into government activity—depends. *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961). This Court should reject that construction of the Fourth Amendment and reaffirm that its requirements apply with "scrupulous exactitude" when First Amendment freedoms are also at stake. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford*, 379 U.S. at 485).

## ARGUMENT

I. **The Fourth Amendment must be rigorously applied when First Amendment rights, including the right to gather the news, are at stake.**

Since the founding, the protections of the First and Fourth Amendments have been closely intertwined. The prohibition against unreasonable searches and seizures has origins in abusive English practices targeting the publishers of dissident publications. *See Stanford*, 379 U.S. at 482. As the Supreme Court has

often observed, two of the landmark cases that informed the Fourth Amendment's adoption—*Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765), and *Wilkes v. Wood*, 19 How. St. Tr. 1153 (C.P. 1763)—were themselves press cases. *See Marcus*, 367 U.S. at 724. In condemning the general warrant as a tool for harassing publishers critical of the Crown, Lord Camden emphasized that a "discretionary power given to [officers] to search wherever their suspicions may chance to fall" is "totally subversive of the liberty of the subject." *Id.* at 728–29 (quoting *Wilkes*, 19 How. St. Tr. at 1167). These cases have been described as "the true and ultimate expression of constitutional law," *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (quoting *Boyd v. United States*, 116 U.S. 616, 626 (1886)), and they stand for the proposition that a regime of suspicionless search power cannot be squared with the guarantee of a free press.

The Supreme Court has, in that vein, emphasized that Fourth Amendment review must be especially rigorous when First Amendment interests hang in the balance. *See Zurcher*, 436 U.S. at 564. In some settings, the Court has concluded that those interests demand a searching application of the Fourth Amendment's usual standards: that "[t]he necessity for a prior judicial determination of probable cause will protect against gross abuses," *New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 (1986) (quoting *Heller v. New York*, 413 U.S. 483, 492–93 (1973)), and

that "the preconditions for a warrant" will deny officers the discretion to "rummage at large" or "deter normal editorial and publication decisions," *Zurcher*, 436 U.S. at 565–66.  On other fact patterns, the Court has suggested that the First Amendment requires more than the Fourth Amendment alone might.  *See, e.g.*, *United States v. Ramsey*, 431 U.S. 606, 623–24 (1977) (reserving the question whether border searches of mail, permissible under the Fourth Amendment, would violate the First Amendment absent a statutory reasonable-suspicion requirement). Uniformly, though, the Court has emphasized that awarding the government a standardless authority to surveil whomever it likes would threaten free expression.

## II. Persistent camera surveillance burdens First Amendment interests, including the integrity and confidentiality of the newsgathering process.

The panel's decision—and the government's position—would allow investigators to use a pole camera to conduct low-cost, warrantless surveillance of any location without limit.  But such persistent, targeted surveillance can reveal a wealth of information about an individual's expressive activities, including a journalist's newsgathering process, chilling important First Amendment rights.

Especially in light of expanding electronic surveillance, meeting in person with sources is a common approach to communicating securely.  *See Meeting in Person Most Common Way to Protect Sources*, Pew Research Center (Feb. 4, 2015), https://perma.cc/84RN-FRZ9 (noting that 59% of reporters surveyed had

met in person to protect a source); *see also* Scott, *supra* (noting that Neil Sheehan frequently visited Daniel Ellsberg's apartment in reporting on the Pentagon Papers). In part because location information can reveal so much, reporters seek to ensure the locations where they meet their sources are private. *See With Liberty to Monitor All: How Large-Scale US Surveillance is Harming Journalism, Law, and American Democracy*, Human Rights Watch (July 28, 2014), https://perma.cc/ LJ9E88YS (noting the precautions that journalists take to conceal their location when meeting in person with sources). They take these steps because exposing source identities can put source jobs or lives at risk; compromise the integrity of the newsgathering process; and, by destroying the trust underpinning the newsgathering process, have a chilling effect.

Knowing that observing who enters, leaves, or is present in a private space at the same time can reveal a journalist's sources, the government has long used location information in attempts to unmask them. *See Government Surveillance: U.S. Has Long History of Watching White House Critics and Journalists*, Newsweek (June 23, 1975; republished July 24, 2017), https://perma.cc/B76N-3Z6B (stating that CIA agents "followed newsmen in 1967, 1971 and 1972 in order to identify their sources"); *FBI releases files on columnist Jack Anderson*, NBC News (Oct. 11, 2008), https://perma.cc/XD9R-FVM2 (explaining that

government documents obtained under the Freedom of Information Act reflected "summaries of [a columnist's] movements while under surveillance, and FBI memos detailing efforts to find his sources"). Those kinds of leak hunts chill reporting. Responding to the Department of Justice subpoenas of Associated Press phone records during a leak investigation, AP President and CEO Gary Pruitt remarked during a speech, "government employees that we once checked in with regularly will no longer speak to us by phone," and "some are reluctant to meet in person." Lindy Royce-Bartlett, *Leak probe has chilled sources, AP exec says*, CNN (June 19, 2013), https://perma.cc/VU8T-6HUP. The government's efforts to expand the scope of location surveillance will only magnify this chilling effect.

It is difficult to overstate the value of the reporting that would be lost if journalists could not credibly promise their sources confidentiality. Such confidentiality is a critical component of the reporter-source relationship—a core journalistic practice and a necessary feature of investigative journalism, and that confidentiality is compromised when law enforcement can warrantlessly obtain information about journalists' or sources' whereabouts. Indeed, some of the most important reporting on the functioning of government would not have been possible without confidential sources. The *Washington Post's* reporting on the Watergate scandal was, canonically, based on information from confidential

informant "Deep Throat."   More broadly, news organizations have used

confidential sources to report on harsh interrogation techniques conducted by U.S.

law enforcement, *see, e.g.*, Scott Shane, David Johnston & James Risen, *Secret*

*U.S. Endorsement of Severe Interrogations,* N.Y. Times (Oct. 4, 2007),

http://nyti.ms/1dkyMgF, and the Central Intelligence Agency's secret prisons for

terrorism suspects, *see, e.g.*, Dana Priest, *CIA Holds Terror Suspects in Secret*

*Prisons*, Wash. Post (Nov. 2, 2005), http://wapo.st/Ud8UD.  More recently,

reporters have relied upon confidential sources to report on foreign intelligence

efforts regarding the 2016 presidential election, *see, e.g.*, Eric Lichtblau, *C.I.A.*

*Had Evidence of Russian Effort to Help Trump Earlier Than Believed*, N.Y. Times

(Apr. 6, 2017), https://nyti.ms/2oOwTBz.

As these examples demonstrate, investigative reporting based on

confidential sources is a necessary part of an informed democratic society.

According to the Society of Professional Journalists, although identifying sources

is ideal, "[a]nonymous sources are sometimes the only key to unlocking that big

story, throwing back the curtain on corruption, fulfilling the journalistic missions

of watchdog on the government."  Michael Farrell, *Anonymous Sources*, SPJ

Ethics Committee Position Paper, https://perma.cc/5MYN-PXR9 (last visited Feb.

10, 2021).  Indeed, without confidential sources, journalists "would be relying on

the official side of the story, and the official side of a story isn't always the whole side." Lana Sweeten-Shults, *Anonymous sources vital to journalism*, USA Today (Feb. 27, 2017), https://perma.cc/K385-P7FX.

## III. The panel's rule, which would permit the government to monitor the movements of journalists and sources without limit, should be rejected.

The panel's conclusion—that persistent and targeted camera surveillance can never amount to a Fourth Amendment "search"—failed to give these First Amendment considerations due weight. The panel found that the surveillance at issue exposed no more information than what could be revealed by the kind of "security camera" that *Carpenter v. United States* declined to "call into question." 138 S. Ct. 2206, 2220 (2018). And it suggested, too, that technologies capturing less than the "*whole* of a person's movement[s]" never infringe a reasonable expectation of privacy. *United States v. Moore-Bush*, 963 F.3d 29, 42 (1st Cir. 2020) (emphasis added).

But *Carpenter* supports neither view. As the Court reiterated, "what one seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Carpenter*, 138 S. Ct. at 2217 (quoting *Katz v. United States*, 389 U.S. 347, 351–52 (1967)). As the Massachusetts Supreme Judicial Court wrote in a case about pole cameras, people do not expect that "discrete actions they undertake in unshielded areas around their homes . . . will be observed

and perfectly preserved for the future." *Commonwealth v. Mora*, 150 N.E.3d 297, 306 (Mass. 2020). Similarly, as the Sixth Circuit observed, "few people, it seems, would expect that the government can constantly film their backyard . . . using a secret camera that can pan and zoom and stream a live image to government agents." *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 405 (6th Cir. 2012). The relevant question is not whether some fraction of the information the government captured could have been observed by a passerby, but whether in practice a surveillance technique will give the government the means to expose the "familial, political, professional, religious, and sexual associations" that we expect the Constitution to shield. *Carpenter*, 138 S. Ct. at 2217 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)).

Through that lens, there is a world of difference between the technology at issue in this case and a run-of-the-mill "security camera." *Carpenter*, 138 S. Ct. at 2220. As the panel concurrence observed, *Carpenter* discussed security cameras in connection with "business records" held by third parties—in other words, the Court was presumably imagining a subpoena for, say, footage captured by a camera outside a recently robbed bank. *Moore-Bush*, 963 F.3d at 51 (Barron, J., concurring). To be sure, a reporter might happen to meet a source at a park bench near a bank with such a camera installed; the camera might happen to be pointed in

the direction of the meeting; law enforcement might happen to discover that the reporter frequents that location; and the footage might happen to be preserved long enough for law enforcement to retrieve it and uncover the source's identity. But that chain of hypotheticals makes it difficult for the government to leverage conventional security cameras to target anyone in particular for surveillance—especially sustained surveillance[1]—which attenuates any chilling effect from run-of-the mill private security cameras.

This case, though, deals with the government's deliberate installation of a camera to capture movements of a specific individual. In that scenario, as long as the government chooses its camera placement with precision, access to even "a small slice" of an individual's movements, *Moore-Bush*, 963 F.3d at 42, may provide law enforcement with the kind of "intimate window into a person's life" for which *Carpenter* requires a warrant, 138 S. Ct. at 2217. Whether a camera so intrudes in any particular case will depend, intuitively, on where it points and what it can capture. As the Massachusetts Supreme Judicial Court observed in a related

---

[1] The result might be different if the government were able to access a network of stationary cameras sufficiently comprehensive to paint a detailed picture of an individual's movements over time and across a broad geographic area. *Cf. Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 831 F. App'x 662 (4th Cir. 2020), *granting reh'g en banc*, 979 F.3d 219 (4th Cir. 2020) (granting rehearing of the panel's conclusion that persistent aerial surveillance over Baltimore was not a Fourth Amendment "search").

context, cameras positioned "near constitutionally sensitive locations—the home, a place of worship, etc.—reveal more of an individual's life and associations than does [a camera] trained on an interstate highway." *Commonwealth v. McCarthy*, 142 N.E.3d 1090, 1104 (Mass. 2020). This Court need not resolve every such hypothetical to conclude that the panel's bright-line rule, which would treat a camera trained on a newspaper's office no differently than a traffic camera at a busy intersection, does not square with one's reasonable expectation of privacy.[2]

For all reasons discussed above, the threat to First Amendment freedoms posed by that approach is severe. Such a framework gives law enforcement far too much discretion to place under a magnifying glass anyone it might perceive as a threat—to keep inquisitive reporters and suspected sources on a short leash. The press could not, under such scrutiny, provide the vigorous check on government

---

[2]     Amici emphasize, too, that rejecting the panel opinion's proffered, bright-line rule—that persistent, long-term, and targeted surveillance by the government can *never* present a Fourth Amendment search—would have no bearing, in the context of the privacy torts, on the crucial First Amendment protections long established in the law for newsgathering in the public interest. "[T]he Fourth Amendment imposes higher standards on the government than those on private, civil litigants," *In re Facebook, Inc., Internet Tracking Litigation*, 956 F.3d 589, 604 n.7 (9th Cir. 2020), in part "[b]ecause of the special considerations involved in defining the private citizen's protection against intrusion by the government" and in part because the government—unlike a journalist—has no First Amendment information-gathering rights of its own to weigh in the balance, *Sanders v. Am. Broadcasting Companies*, 978 P.2d 67, 74 n.3 (Cal. 1999).

that the Constitution recognizes and protects. This Court should make clear that a Fourth Amendment warrant, and nothing less, is necessary to protect the press's interests in the context of persistent, targeted surveillance. "No less a standard could be faithful to First Amendment freedoms." *Stanford*, 379 U.S. at 485.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to affirm the decision of the district court.

Dated:       February 11, 2021       Respectfully submitted,

Bruce D. Brown
*Counsel of Record for Amici Curiae*
Katie Townsend**
Gabriel Rottman**
Mailyn Fidler**
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
bbrown@rcfp.org
  *** Of Counsel*

# APPENDIX A

## Supplemental statement of identity of amici curiae

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of journalists and news organizations.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture. Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

MPA – The Association of Magazine Media, ("MPA") is the industry association for magazine media publishers. The MPA, established in 1919, represents the interests of close to 100 magazine media companies with more than 500 individual magazine brands. MPA's membership creates professionally researched and edited content across all print and digital media on topics that include news, culture, sports, lifestyle and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

PEN American Center ("PEN America") is a non-profit association of writers that includes novelists, journalists, editors, poets, essayists, playwrights,

publishers, translators, agents, and other professionals. PEN America stands at the intersection of literature and human rights to protect open expression in the United States and worldwide. We champion the freedom to write, recognizing the power of the word to transform the world. Our mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible, working to ensure that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to make it possible for everyone to access the views, ideas, and literatures of others. PEN America has approximately 7,500 members and is affiliated with PEN International, the global writers™ organization with over 100 Centers in Europe, Asia, Africa, Australia, and the Americas.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Society of Environmental Journalists is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

The Tully Center for Free Speech began in Fall, 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limit because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 2,600 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman in size 14 font.

Dated:      February 11, 2021          /s/__Bruce Brown_____
                                        Bruce D. Brown
                                        *Counsel of Record for Amici Curiae*